UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                            :

**SEAN M. GERLICH**
**Rue de Theux 91**
**B-1050 Brussels**
**Belgium,**
                                                            :

**CHRISTOPHER D. COLEMAN**
**1482 Greenmount Avenue**
**Pittsburgh, Pennsylvania  15216,**
                                                            :

**JAMES K. GOOCH**
**179 Vaughan Street**
**Portland, Maine  04101,**
                                                            :

**BENJAMIN M. MEIER**
**100 Haven Avenue**
**Apt. #30C**
**New York, N.Y.  10032,**
                                                            :

**JAMES N. SAUL**
**2422 Commonwealth Avenue**
**Madison, Wisconsin  53711,**
                                                            :

**JENNIFER A. ZAJAC**
**3416 Cowley Way**
**Suite #3**
**San Diego, California  92117,**
                                                            :

                         **Plaintiffs,**            Civil Action No. 08-1134 (JDB)
              **v.**
                                                            :

**UNITED STATES DEPARTMENT**
   **OF JUSTICE,**
_____:

_____ :

**MONICA M. GOODLING**
**c/o John M. Dowd, Esq.**
**Akin, Gump, Strauss, Hauer & Feld**
**1333 New Hampshire Ave., N.W.**
**Washington, D.C.  20036-1564,**

                                          :

**MIICHAEL J. ELSTON**
**McGuire Woods**
**1050 Connecticut Ave., N.W., Suite 1200**
**Washington, D.C.  20036-5317,**

                                          :

**ESTHER S. McDONALD**
**Seyfarth Shaw**
**815 Connecticut Ave., N.W., Suite 500**
**Washington, D.C.  20006-4004,**

                                          :

**ALBERTO R. GONZALES**
**c/o Kathryn Haun**
**Office of the Attorney General**
**RFK Main Justice Building, Rm. 5112**
**United States Department of Justice**
**950 Pennsylvania Ave., N.W.**
**Washington, D.C.  20530,**

                                          :

                      **Defendants.**

_____: :

## AMENDED COMPLAINT

1.  This is a class action for damages, declaratory relief, and injunctive relief

in redress of harms caused by defendants' admitted wrongful conduct, of which

plaintiffs and all those similarly situated are aggrieved.

2.  This Court has jurisdiction over this action pursuant to subsections (g)(1)(C) and (g)(1)(D) of the Privacy Act of 1974, 5 U.S.C. § 552a; the First and Fifth Amendments to the Constitution (in conjunction with the jurisdictional authority recognized for *Bivens* lawsuits); 28 U.S.C. §1331; the Civil Service Reform Act, 5 U.S.C. §§ 2301-02 (in conjunction with the Declaratory Judgment Act, 28 U.S.C. § 2201); the All Writs Act, 28 U.S.C. § 1651(a); the Federal Records Act, 5 U.S.C. §§ 3301, et seq.; and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.   With respect to plaintiffs' Privacy Act claims, most particularly those of plaintiffs Gooch, Meier, and Zajac, plaintiffs lacked information material to those claims prior to defendant Department of Justice's information disclosures of June 24, 2008, the true nature and content of which were materially and willfully concealed and misrepresented by certain of defendant Department of Justice's employees prior to that time.

## Parties

3.  Plaintiff Sean M. Gerlich, a citizen of the United States, is an attorney who graduated from a top-tier law school with strong credentials yet like many others similarly situated was rejected and not hired by defendant United States Department of Justice as part of its Honors Program for graduating law students during the Fall of 2006.

4.  Plaintiff Christopher D. Coleman, a citizen of the United States, is an attorney who graduated from a top-tier law school with strong credentials yet like many others similarly situated was rejected and not hired by defendant United States Department of Justice as part of its Summer Law Intern Program for law students during the Fall of 2006.

5.  Plaintiff James K. Gooch, a citizen of the United States, is an inactive attorney who graduated from a top-tier law school with strong credentials yet like many others similarly situated was rejected and not hired by defendant United States Department of Justice as part of its Honors Program for graduating law students (or, as in his case, recently graduated law students holding a federal judicial clerkship) during the Fall of 2002.

6.  Plaintiff Benjamin M. Meier, a citizen of the United States, is an attorney who graduated from a top-tier law school with strong credentials yet like many others similarly situated was rejected and not hired by defendant United States Department of Justice as part of its Honors Program for graduating law students (or, as in his case, recently graduated law students holding a federal judicial clerkship) during the Fall of 2002.

7.  Plaintiff James N. Saul, a citizen of the United States, is an attorney who graduated from a well-respected law school with strong credentials yet like many

4

others similarly situated was rejected and not hired by defendant United States Department of Justice as part of its Honors Program for graduating law students during the Fall of 2006.

8.   Plaintiff Jennifer A. Zajac, a citizen of the United States, is an attorney who graduated from a top-tier law school with strong credentials yet like many others similarly situated was rejected and not hired by defendant United States Department of Justice as part of its Honors Program for graduating law students during the Fall of 2002.

9.   Defendant United States Department of Justice is an agency of the Federal Government of the United States and, as such, owes fundamental duties of fairness, evenhandedness, constitutional fealty, and proper compliance with legal requirements to all members of the public about whom it makes, inter alia, administrative determinations such as those involved in its Honors Program and Summer Law Intern Program.  Acting through its employees in 2006, primarily Chief of Staff to the Deputy Attorney General Michael J. Elston, Counsel to the Associate Attorney General Esther S. McDonald, and (in a different way and to a lesser extent) Office of Attorney Recruitment and Management Director Louis DeFalaise, under the putative supervision of Deputy Attorney General Paul J. McNulty, Acting Associate Attorney General William W. Mercer, and Principal

Deputy Associate Attorney General Gregory G. Katsas, under the oversight and influence of Department of Justice White House Liaison Monica M. Goodling, and in turn under the authoritative direction, supervision, and oversight of Attorney General Alberto R. Gonzales, and in 2002 largely through others, defendant Department of Justice on behalf of the United States breached its legal duties to plaintiffs, and to many others who were similarly situated, in its Honors Program and Summer Law Intern Program decisionmaking during both the years 2002 and 2006.

10.  Defendant Monica M. Goodling, sued in her individual capacity, was defendant Department of Justice's White House Liaison, in the Office of the Attorney General, during 2006.  As such, and insofar as she was influenced, authorized, and permitted by Attorney General Gonzales to so behave, she both influenced and exerted authority over, inter alia, the actions of the Department's Honors Program/Summer Law Intern Program "screening committee" during that year.  On information and belief, and based also on statements of public record, she in turn was continuously influenced also by as-yet-unnamed persons in the White House Office of Political Affairs.

11.  Defendant Michael J. Elston, sued in his individual capacity, was Chief of Staff to the Deputy Attorney General in the Office of the Deputy Attorney

General, as well as "chairman" of the Department's Honors Program/Summer Law
Intern Program "screening committee" during 2006.

12.  Defendant Esther S. McDonald, sued in her individual capacity, was
Counsel to the Associate Attorney General in the Office of the Associate Attorney
General, as well as a primary member of the Department's Honors
Program/Summer Law Intern Program "screening committee" during 2006.

13.  Defendant Alberto R. Gonzales, sued in his individual capacity, was the
Attorney General, the head of the United States Department of Justice, the head of
the Office of the Attorney General, and as such the official responsible for the
actions of defendant Goodling and in turn those of the Department's Honors
Program/Summer Law Intern Program "screening committee" during 2006.
Simply put, defendant Goodling, for many serious intents and purposes, not
excluding individual liability as well as institutional accountability, acted as his
alter ego.  *Cf., e.g.*, 5 U.S.C. § 2302(c) (embodying principle, in personnel-
management context, of actors such as Gonzales and Goodling being "similarly
responsible" for their actions).  He, above all other individual defendants to this
civil action, who conspired together with him to necessarily achieve an
unprecedented deprivation of constitutional rights for purely political gain, is the
individual most responsible and accountable for the resultant harms and

7

consequent damages suffered by plaintiffs and all those who were similarly

situated in 2006 (and, on information and belief, to a distinctly less direct but as-

yet-unknown degree in 2002).

**Facts as to Plaintiff Gerlich**

14.  On September 5, 2006, as a third-year law student and in advance of the

program deadline, plaintiff Gerlich applied for selection as part of defendant

Department of Justice's Honors Program, along with many others similarly

situated.  His goal was to continue his career of federal service, and to commence

his legal career as an attorney, by working as an attorney for defendant Department

of Justice.  Based upon his academic credentials and other qualifications, as well as

his understanding of what ought to have been the strict fairness, evenhandedness,

and fundamental lawfulness of defendant Department of Justice's decisionmaking

process for such career attorney positions, he had every basis for expecting that he

would be able to do so.

15.  As part of his overall qualifications, plaintiff Gerlich's Honors Program

application included the fact that he already had worked for defendant Department

of Justice in a legal capacity -- i.e., that he had served in the Department of Justice

as a law clerk during the preceding summer, working in large measure directly for

the head of one of the Department's forty components, someone who, to both

plaintiff Gerlich and to others, spoke very highly of plaintiff Gerlich's work and his candidacy for an attorney position upon graduation through the Department's Honors Program.  On information and belief, this Department of Justice official, a presidential appointee, did indeed provide strong statements in support of plaintiff Gerlich's Honors Program application, but as with many others, plaintiff Gerlich's liberal affiliation(s) became a wholly unlawful but insuperable barrier to his application's success.

16.  On October 31, 2006, plaintiff Gerlich received notification from defendant Department of Justice that his Honors Program application had been accepted as timely and in good order but that his application was denied, without so much as an interview.  No particular reason was given, which in context left the distinct impression that standards other than those ordinarily applied in the Honors Program had been applied in plaintiff Gerlich's case, as well as in those of others.

17.  Plaintiff Gerlich was grossly disappointed by this action, inasmuch as to him and to those around him it was greatly at variance with what was reasonably anticipated.  It adversely affected his search for post-graduation employment as a new attorney at the outset of his legal career, causing both out-of-pocket job-search (and other related) expenses and losses of valuable time that he otherwise would not have incurred, and it further caused shock, anger, humiliation, mental distress,

emotional upset, loss of reputation and professional standing, loss of confidence in his government, disruption of planning and other inconvenience, and similar personal harm in multiple respects. As a consequence, as he ended his third and final year of law school he approached graduation without an attorney position, and he ultimately moved to Belgium, where he now resides.

18. Further, defendants' actions, as described below and evidenced in Defendants' Report of June 24, 2008 (explicated below), had the adverse effect of depriving plaintiff Gerlich and those similarly situated of a fair opportunity to obtain the professional benefit of defendant Department of Justice's Honors Program employment, and thereby of the considerable value (including economic value) that such employment holds for new law school graduates -- both immediately and residually throughout the continued course of their legal careers. *See, e.g.*, Report I at 34 (reporting the commonly held judgment that it is "a big deal to get in[to the Justice Department] through the Honors Program"). In other words, such an adverse effect remains ongoing, for both those treated unfairly and unlawfully by defendant Department of Justice in its Honors Program decisionmaking and those treated unfairly and unlawfully by defendant Department of Justice in its Summer Law Intern Program decisionmaking as well.

**Facts as to Plaintiff Coleman**

19.  On August 1, 2006, plaintiff Coleman, as a second-year law student and on the first day of the program's application period, applied for selection as part of defendants' Summer Law Intern Program, along with many others similarly situated.  His career goal was to continue his public service career and to obtain future employment as an intern and then attorney for the Department of Justice. Based upon his academic credentials and other qualifications, as well as his understanding of what ought to have been the strict fairness, evenhandedness, and fundamental lawfulness of defendant Department of Justice's decisionmaking process for the Summer Law Intern Program, he had every basis for expecting that he would be able to do so.

20.  As part of his overall qualifications, plaintiff Coleman's Summer Law Intern Program application included the fact that he was an Operation Iraqi Freedom veteran and eligible for a veteran's preference.  His application included reference to other public service work and his academic achievements, but as with many others, plaintiff Coleman's liberal affiliation(s) became a wholly unlawful but insuperable barrier to his application's success.

21.  On August 1, 2006, plaintiff Coleman received notification by e-mail from defendant Department of Justice that his Summer Law Intern Program

application had been accepted as timely and that it would notify applicants by mid-October of their status.  However, plaintiff Coleman received no follow up e-mail or any other communication whatsoever from defendant Department of Justice, which in context left the distinct impression that standards other than those ordinarily applied in the Summer Law Intern Program had been applied in plaintiff Coleman's case, as well as in those of others.

22.  Plaintiff Coleman was grossly disappointed by this effective rejection action, inasmuch as to him and to those around him it was greatly at variance with what was reasonably anticipated.  It adversely affected his search for both pre-graduation and post-graduation employment as a law student and then a new attorney at the outset of his legal career, causing both out-of-pocket job search (and other related) expenses and losses of valuable time that he otherwise would not have incurred, and it further caused shock, anger, humiliation, mental distress, emotional upset, loss of reputation and professional standing, loss of confidence in his government, disruption of planning and other inconvenience, and similar personal harm in multiple respects.  As a consequence, upon completion of his law school studies and after spending the summer months of 2007 in a position other than that of intern at the Department of Justice, plaintiff Coleman approached graduation without an attorney position, and he ultimately obtained an attorney

position in the U.S. Army Judge Advocate General's Corps.

23.  Further, defendants' actions, as described below and evidenced in Defendants' Report of June 24, 2008 (explicated below), had the adverse effect of depriving plaintiff Coleman and those similarly situated of a fair opportunity to obtain the professional benefit of defendant Department of Justice's Summer Law Intern Program employment and thereby of the considerable value (including economic value) that such employment holds for new law school graduates -- both immediately and residually throughout the continued course of their legal careers. In other words, such an adverse effect remains ongoing, for both those treated unfairly and unlawfully by defendant Department of Justice in its Summer Law Intern Program decisionmaking and those treated unfairly and unlawfully by defendant Department of Justice in its Honors Program decisionmaking as well.

### Facts as to Plaintiff Gooch

24.  On or about September 1, 2002, as a recent law school graduate, a current judicial law clerk, and also a post-graduate participant in defendants' Summer Law Intern Program during the summer of 2002, plaintiff Gooch applied for selection as part of defendants' Honors Program, along with others similarly situated.  His goal was to commence a career of federal service, and to begin his post-clerkship legal career as an attorney in 2003, by working as an attorney for the

Department of Justice.  Based upon his academic credentials and other

qualifications, as well as his understanding of what ought to have been the strict

fairness, evenhandedness, and fundamental lawfulness of defendant Department of

Justice's decisionmaking process for such career attorney positions, he had every

basis for expecting that he would be able to do so.

25.  As part of his overall qualifications, plaintiff Gooch's Honors Program

application included the fact that he already had worked for defendant Department

of Justice in a legal capacity -- i.e., that he had served in the Department of Justice

as a law clerk during the preceding summer as a Summer Law Intern Program

participant, working in the Environmental Defense Section ("EDS") of the

Environment and Natural Resources Division ("ENRD").  On information and

belief, both plaintiff Gooch's supervising attorneys and EDS's Section Chief spoke

very highly to both plaintiff Gooch and to others within the Department of plaintiff

Gooch's work and his candidacy for an attorney position through the Department's

Honors Program, and these favorable comments were repeated on behalf of his

application by the Principal Deputy Assistant Attorney General of ENRD to some

Department personnel involved in Honors Program selections, but as with many

others, plaintiff Gooch's liberal affiliation(s) became a wholly unlawful but

insuperable barrier to his application's success.

26.  During approximately the first week of November 2002, plaintiff Gooch received notification from defendant Department of Justice that his Honors Program application had been accepted as timely and in good order but that his application was denied, without so much as an interview.  No particular reason was given, which in context left the distinct impression that standards other than those ordinarily applied in the Honors Program had been applied in plaintiff Gooch's case, as well as in those of others.

27.  Plaintiff Gooch was grossly disappointed by this action, inasmuch as to him and to those around him it was greatly at variance with what was reasonably anticipated.  It adversely affected his search for post-graduation employment as a new attorney at the outset of his legal career, causing both out-of-pocket job-search (and other related) expenses and losses of valuable time that he otherwise would not have incurred, and it further caused shock, anger, humiliation, mental distress, emotional upset, loss of reputation and professional standing, continuing loss of confidence in his government, disruption of planning and other inconvenience, and similar personal harm in multiple respects.

28.  Further, defendant Department of Justice's actions, as described below and evidenced in Defendants' Report of June 24, 2008 (explicated below), had the adverse effect of depriving plaintiff Gooch and those similarly situated of a fair

opportunity to obtain the professional benefit of defendant Department of Justice's
Honors Program employment and thereby of the considerable value (including
economic value) that such employment holds for new law school graduates -- both
immediately and residually throughout the continued course of their legal careers.
*See, e.g.*, Report I at 34 (reporting the commonly held judgment that it is "a big
deal to get in[to the Justice Department] through the Honors Program").  In other
words, such an adverse effect remains ongoing, for both those treated unfairly and
unlawfully by defendant Department of Justice in its Honors Program
decisionmaking and those treated unfairly and unlawfully by defendant
Department of Justice in its Summer Law Intern Program decisionmaking as well.

### Facts as to Plaintiff Meier

29.  On or about September 1, 2002, as a second-year federal judicial clerk,
plaintiff Meier applied in advance for selection as part of defendant Department of
Justice's Honors Program, along with many others similarly situated.  His goal was
to continue his career of federal service, to further his legal training under the
Nation's premier attorneys, and to commence his career as a practicing attorney
with the Department of Justice.  Having been accepted into the Honors Program as
a third-year law student two years earlier, plaintiff Meier initially had declined this
offer in November 2000, advising defendant Department of Justice that he was

pursuing a judicial clerkship in the Northern District of Ohio and intended to reapply to the Honors Program near the completion of this clerkship. Based upon his academic credentials, other qualifications and experience, and an oral understanding from Department of Justice employees -- as well as his understanding of what ought to have been the strict fairness, evenhandedness, and fundamental lawfulness of defendant Department of Justice's decisionmaking process for such career attorney positions -- he had every basis for expecting that he would be able to do so.

30. As part of his overall qualifications, plaintiff Meier's 2002 Honors Program application included the fact that he already had worked for defendant Department of Justice in a legal capacity -- i.e., that he had served in the Department of Justice in its Summer Law Intern Program with the Office of Policy Development in the Summer of 2000. In addition, the application noted that plaintiff Meier had held leadership positions in Cornell Law School organizations and the *Cornell International Law Journal*, worked for several Cornell Law School professors, and excelled in domestic and international moot court competitions. Since his initial acceptance to the Honors Program as a third-year law student in November 2000, plaintiff Meier had graduated with honors from that law school, authored articles on human rights and public interest law, received awards for his

17

achievements in civil and human rights, been admitted to the New York State Bar,

and begun a competitive federal judicial clerkship.  However, as with many others,

plaintiff Meier's liberal affiliation(s) became a wholly unlawful but insuperable

barrier to the success of his application in 2002.

31.  On or about November 15, 2002, plaintiff Meier received notification

from defendant Department of Justice that his Honors Program application had

been accepted as timely and in good order but that his application was denied

without plaintiff Meiers even being asked to come in for an interview.  No

particular reason was given for the denial of even an interview, which, in the

context of his many previous interviews with and offers from the Department of

Justice, left the distinct impression that standards other than those ordinarily

applied in the Honors Program had been applied in plaintiff Meier's case, as well

as in those of others.

32.  Plaintiff Meier was grossly disappointed by this action, as it was greatly

at variance with what was reasonably anticipated.  This denial adversely affected

his search for public service employment at the outset of his legal career, causing

professional uncertainty, out-of-pocket career-reformulation expenses, and loss of

time and effort.  Having invested in his legal education in the pursuit of a position

serving justice and country, this denial further caused sadness and regret, loss of

reputation and professional standing, loss of confidence in the fairness of government and the course of justice, and disruption of professional planning and legal aspirations. He ended his federal judicial clerkship thwarted in his passion for public service and frustrated by defendant Department of Justice's lack of impartiality. As a consequence of these harms, he left the practice of law to pursue further education at Columbia University, where he is now completing his doctoral dissertation.

33. Further, defendant Department of Justice's actions, as described below and evidenced in Defendants' Report of June 24, 2008 (explicated below), had the adverse effect of depriving plaintiff Meier and those similarly situated of a fair opportunity to obtain the professional benefit of defendant Department of Justice's Honors Program employment and thereby of considerable value (including, without limitation, educational and economic value) that such employment holds for new law school graduates -- both immediately and residually throughout the continued course of their legal careers. *See, e.g.*, Report I at 34 (reporting the commonly held judgment that it is "a big deal to get in[to the Justice Department] through the Honors Program"). In other words, such an adverse effect remains ongoing, for both those treated unfairly and unlawfully by defendant Department of Justice in its Honors Program decisionmaking and those treated unfairly and

unlawfully by defendant Department of Justice in its Summer Law Intern Program

decisionmaking as well.

### Facts as to Plaintiff Saul

34.  On or about September 1, 2006, as a third-year law student and in

advance of the program deadline, plaintiff Saul applied for selection as part of

defendants' Honors Program, along with many others similarly situated.  His goal

was to commence his legal career as an attorney for the Environment and Natural

Resources Division within the Department of Justice.  Based upon his academic

credentials and other qualifications, as well as his understanding of what ought to

have been the strict fairness, evenhandedness, and fundamental lawfulness of

defendant Department of Justice's decisionmaking process for such career attorney

positions, he had every basis for expecting that he would be able to do so.

35.  As part of his overall qualifications, plaintiff Saul's Honors Program

application stated, inter alia, that he stood in the top 10% of his class at Lewis &

Clark Law School, identified by *U.S. News & World Report* eight times since 1997

as the best law school in the United States for the study of environmental law; that

he served as Articles Editor for the journal *Environmental Law*, the Nation's oldest

legal journal focused on environmental and natural resources law; that he had

participated in, and had been named as Best Oral Advocate at, the 2006 National

Animal Advocacy Moot Court Competition at Harvard Law School; that he had

been selected as the recipient of the Steven Manas Memorial Scholarship, given by

the environmental and natural resources faculty of Lewis & Clark Law School to a

student or students who demonstrate exceptional leadership and commitment to

environmental protection; and that he was at the time of application enrolled in an

Environmental Prosecution Clinical Internship, hosted by the U.S. Attorney's

Office in Portland, Oregon, as well as Lewis & Clark Law School's renowned

environmental clinic, the Pacific Environmental Advocacy Center.  However, as

with many others, plaintiff Saul's liberal affiliation(s) became a wholly unlawful

but insuperable barrier to his application's success.

     36.  On or about November 15, 2006, plaintiff Saul received notification

from defendant Department of Justice that his Honors Program application had

been accepted as timely and in good order but that he had not been offered even an

interview with defendant Department of Justice's Environment and Natural

Resources Division.  No particular reason was given as to why he was not offered

an interview with the Environment and Natural Resources Division, even though

that Division was a participating component in the 2006 Honors Program hiring

process and (as it was widely known at the time) it was expected to hire

approximately twenty new attorneys through the Honors Program that year.  His

rejection in context left the distinct impression that standards other than those ordinarily applied in the Honors Program had been applied in plaintiff Saul's case, as well as in those of others.

37.  Plaintiff Saul was grossly disappointed by this action, inasmuch as to him and to those around him it was greatly at variance with what was reasonably anticipated.  It adversely affected his search for post-graduation employment as a new attorney at the outset of his legal career, causing both the expenditure of out-of-pocket employment-related expenses and losses of valuable time that he otherwise would not have incurred, and it further caused shock, anger, humiliation, mental distress, emotional upset, loss of reputation and professional standing, loss of confidence in his government, disruption of planning and other inconvenience, and similar personal harm in multiple respects.

38.  Not until April 2007, near the conclusion of his third and final year of law school, was plaintiff Saul offered an attorney position.  Plaintiff Saul now resides in Madison, Wisconsin, where he is employed by Midwest Environmental Advocates, Inc., a non-profit environmental law center in a position that pays him a salary considerably less than the starting salary paid to new Honors Program attorneys in the Department of Justice and that affords him considerably less professional and personal value in terms of reputation, experience, and

opportunities for career advancement than would an Honors Program attorney

position with defendant Department of Justice's Environment and Natural

Resources Division.

39.   Further, defendant Department of Justice's actions, as described below

and evidenced in Defendants' Report of June 24, 2008 (explicated below), had the

adverse effect of depriving plaintiff Saul and those similarly situated of a fair

opportunity to obtain the professional benefit of defendant Department of Justice's

Honors Program employment and thereby of the considerable value (including

economic value) that such employment holds for new law school graduates -- both

immediately and residually throughout the continued course of their legal careers.

*See, e.g.*, Report I at 34 (reporting the commonly held judgment that it is "a big

deal to get in[to the Justice Department] through the Honors Program").  In other

words, such an adverse effect remains ongoing, for both those treated unfairly and

unlawfully by defendant Department of Justice in its Honors Program

decisionmaking and those treated unfairly and unlawfully by defendant

Department of Justice in its Summer Law Intern Program decisionmaking as well.

**Facts as to Plaintiff Zajac**

40.   Prior to September 15, 2002, and in advance of the program deadline,

plaintiff Zajac, as a third-year law student, applied for selection as part of

defendants' Honors Program, specifically with the Department's Environment and Natural Resources Division. Her goal was to begin a career of federal service working in the environmental law arena, and to commence her legal career as an attorney, by working as an attorney for the Department of Justice. Based upon her academic credentials and other qualifications, as well as her understanding of what ought to have been the strict fairness, evenhandedness, and fundamental lawfulness of defendant Department of Justice's decisionmaking process for such career attorney positions, she had every basis for expecting that she would be able to do so.

41. As part of her overall qualifications, plaintiff Zajac's Honors Program application included, inter alia, the fact that she was a graduate of Cornell University's College of Agriculture and Life Science, with a bachelor of science in natural resources; that she was in the top third of her class at Tulane Law School; that she was eligible for a certificate in environmental law from her law school (a top-five environmental law school); that she was a senior editor of the *Tulane Environmental Law Journal*; that she had participated as a brief writer and oralist at the Pace National Environmental Moot Court Competition (the premier moot court competition for environmental law); that she was a member of the Tulane Moot Court Board; that she was then currently working as an extern for a federal

24

judge (a position that she had competed with other students to obtain); that she had

worked for internationally known environmental law professor Oliver Houck as a

research assistant; and that she had worked as a law clerk for the U.S. Department

of the Navy Judge Advocate General's Corps in its Appellate Defense Division (a

paid summer internship) during the summer between her first and second year of

law school.

42.  Plaintiff Zajac's application also included strong letters of

recommendation from a former U.S. Attorney (then the head of Tulane Law

School's environmental law program) and from a U.S. Navy JAG.  However, as

with many others, plaintiff Zajac's liberal affiliation(s) became a wholly unlawful

but insuperable barrier to her application's success.

43.  Prior to November 30, 2002, plaintiff Zajac received notification from

defendant Department of Justice that her Honors Program application had been

accepted as timely and in good order but that her application was denied, without

so much as an interview.  No particular reason was given, which in context left the

distinct impression that standards other than those ordinarily applied in the Honors

Program had been applied in plaintiff Zajac's case, as well as in those of others.

This impression was bolstered by the fact that plaintiff Zajac had received an

interview for the Department of the Interior's Honors Program (which is a much

smaller program).

44. Plaintiff Zajac was grossly disappointed by this action, inasmuch as to her and to those around her it was greatly at variance with what was reasonably anticipated.  It adversely affected her search for post-graduation employment as a new attorney at the outset of her legal career, causing both out-of-pocket job-search (and other related) expenses and losses of valuable time that she otherwise would not have incurred, and it further caused shock, anger, mental distress, emotional upset, loss of reputation and professional standing, loss of confidence in his government, disruption of planning and other inconvenience, and similar personal harm in multiple respects.  As a consequence, as she ended her third and final year of law school, plaintiff Zajac approached graduation without an attorney position, and she ultimately moved back to her home state of California, where she resided for several months before obtaining a temporary attorney position in Washington, D.C.

45. Further, defendant Department of Justice's actions, as described below and evidenced in Defendants' Report of June 24, 2008 (explicated below), had the adverse effect of depriving plaintiff Zajac and those similarly situated of a fair opportunity to obtain the professional benefit of defendant Department of Justice's Honors Program employment and thereby of the considerable value (including

economic value) that such employment holds for new law school graduates -- both immediately and residually throughout the continued course of their legal careers. *See, e.g.*, Report I at 34 (reporting the commonly held judgment that it is "a big deal to get in[to the Justice Department] through the Honors Program"). In other words, such an adverse effect remains ongoing, for both those treated unfairly and unlawfully by defendant Department of Justice in its Honors Program decisionmaking and those treated unfairly and unlawfully by defendant Department of Justice in its Summer Law Intern Program decisionmaking as well.

### Facts Generically Common to All Plaintiffs and Putative Class Members

46. On June 24, 2008, defendant Department of Justice, through its Office of the Inspector General ("OIG") and Office of Professional Responsibility ("OPR"), issued a report that directly related to the above-described circumstances, entitled, "An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program" ("Defendants' First Report" or "Report I").

47. This Report revealed that, as had been suspected based upon the 2007 congressional testimony of defendant Goodling, defendant Department of Justice's Honors Program and Summer Law Intern Program appeared, in the words of a principal malefactor in the process, defendant Elston, to "have been 'Monica-

ized.'"  Report I at 84.

48.  In fact, defendant Department of Justice's Inspector General

("defendants' IG") and Counsel for Professional Responsibility jointly found that a

total of 170 Honors Program applicants and 189 Summer Law Intern Program

applicants in 2006 had their applications rejected amidst a blatantly politicized

process of agency decisionmaking for those programs.  *See* Report I at 38, 40, 50,

53.  For 2002, based upon statistical evidence carefully compiled, the numbers

documented were 287 and 185, respectively.  *See id.* at 18, 20.  Putting aside any

possibility of multiplicity in any of these reported numbers (i.e., following the

approach of defendant Department of Justice itself), this amounts to a total of 831

such individuals.

49.  Worse yet, through their work preparing this Report, defendant

Department of Justice's investigators found that the 2006 hiring process's other

principal actor, defendant McDonald, engaged in the prohibited practice of

conducting Internet searches for information of a "political" or "ideological"

nature to use against the granting of applications, *see, e.g.*, Report I at 41, 71-72,

73; *see also id.* at 77 (reporting "confirm[ation] that she conducted searches on

many of the candidates' names"), and that she actually had gone so far as to create,

maintain, and disseminate "printout" records of such Internet searches for

"attach[ment] to the candidate's application," *id.* at 82.

50.  They also found evidence that neither defendant McDonald nor even defendant Elston, by his own admission, nor any actual or putative supervisory official involved, had either received or given adequate instruction or training on the proprieties of their enterprise, including instruction that would have made immediately apparent to all involved their breach of Honors Program and Summer Law Intern Program applicants' Privacy Act rights, *see* Report I at 76, 80-81, 93, and that even defendant Elston, as the more senior of the two, did not act on his mere recognition that their actions had the "appearance" of being "problematic," because he just "'didn't have time' to address the issue," *id.* at 83.

51.  Indeed, Defendants' First Report evidences the fact that none of defendant Department of Justice's officials identified above recognized that the prohibitions of the Privacy Act applied to the activities involved.  Remarkably, this Report not only documents that fact, it itself reveals that even the very OIG/OPR investigators involved in its preparation – as well as defendant Department of Justice's own Inspector General and Counsel for Professional Responsibility, as its signatories – likewise have been unaware of the Privacy Act's applicability to their investigation's subject matter, else that certainly would have been addressed as an additional point of misconduct in this Report (and, commensurately, as a subject of

29

remedial recommendation), rather than have this Report on its face authoritatively imply otherwise.  *See* Report I, passim; *see also id.* at 52-53 (matter-of-factly reporting good-faith, but nonetheless negligent, *remedial* making of unconsented "Internet searches" by Civil Division that, in fact, *themselves also* constituted Privacy Act subsection (e)(7) violations); *id.* at 49 (documenting such unawareness by Tax Division); *id.* at 51-52 (same as to Antitrust Division); *cf. id.* at 85 n.54 (revealing fact that OIG/OPR itself conducted such "an Internet search," but one not violative of Privacy Act subsection (e)(7) inasmuch as it doubtless was "pertinent to and within the scope of an authorized law enforcement activity").

52.  All this was so despite the fact that it is defendant Department of Justice that regularly prosecutes individuals for violating the Privacy Act's prohibitions that are criminally sanctionable under Privacy Act subsection (i).

53.  Likewise, this Report also evidences the fact that none of the relevant officials identified above recognized that the records-maintenance and records-disposition proscriptions and requirements of the Federal Records Act applied to the activities involved – most particularly including the conduct of defendant Elston, both personally as well as by and through his unnamed "staff assistant." Report I at 68-69.  Again, this Report not only documents this fact, it itself reveals that even the OIG/OPR investigators involved in its preparation – as well as

defendant Department of Justice's own Inspector General and Counsel for

Professional Responsibility, as its signatories – likewise have been unaware of the

Federal Records Act's particular applicability to their investigation's subject

matter, else that presumably would have been addressed as an additional point of

misconduct (and, accordingly, remedial recommendation) in this Report, lest this

Report on its face authoritatively imply otherwise.  *See also id.* at 68 (stressing

"the limited documentary evidence that exists" on even recent such matters, and

the "lack of a written record," thus reporting the basis for Federal Records Act

violations even apart from the blithely reported record destruction); *id.* at 69

(tellingly focusing on two, but only two, extant "e-mail chains" as a limited basis

for its conclusions, without addressing whether such investigative limitations even

could have existed absent Federal Records Act noncompliance); *id.* at 98

(reflecting the fact that OIG/OPR investigators found no Fall 2002 records extant

in Summer 2007, less than five years later, despite the Federal Records Act's

requirements, thus meaning that the extent to which unlawful Internet searching

occurred in 2002 is as yet unknown); *cf. id.* at 41 n.29 ("However, because we

were unable to reconstruct what information McDonald obtained from the Internet,

our analysis of candidates' affiliations is based upon the information in their

applications.").

54.  This above-described pattern of unawareness, most especially as to the applicable prohibitions of the Privacy Act (which as noted above is partly a criminal statute), is further evidenced by the testimony of defendant Department of Justice's Inspector General on this subject matter, inter alia, before the Senate Judiciary Committee on July 30, 2008, in which he emphasized in general that "laws . . . need to be adhered to, they need to be understood" but did not recognize the applicability of these laws in particular.  Testimony of Department of Justice Inspector General Glenn A. Fine Before Senate Judiciary Committee, dated July 30, 2008.  Defendants' IG did officially recognize before that committee, to his credit, that defendant Department of Justice's actions as documented in Defendants' First Report and Defendants' Second Report (as explicated below) violated "the Constitution" among other laws, and that they did so in a manner that certainly is "very troubling, very damaging," causing "damage to the Department of Justice that we'll [only] hopefully get over."  *Id.*

55.  On information and belief, and as a matter of such public record, defendant Department of Justice has to date not made any remedial effort to supplement Defendants' First Report (or for that matter any formal effort to supplement it in any way) so that it could serve as a necessary caution to both current and future Justice Department officials, as well as other federal agency

employees, regarding either the Privacy Act deficiencies or the Federal Records

Act deficiencies that are factually documented, but not legally recognized, within

it.

56. In fact, the major remedial effort made by defendant Department of

Justice regarding the unlawfulness of its two hiring programs generally, among

efforts which incidentally were found inadequate by defendants' IG in other more

general respects, stands as perhaps the most extreme example possible of

defendant Department of Justice's continued Privacy Act-related deficiencies. As

Defendants' First Report documents, a "reform" was instituted by OARM in the

form of a "standards guidance" memorandum issued by OARM on April 26, 2007.

Report I at 67. Yet as defendant Department of Justice's own critical assessment

of this attempted remedial step reported, this newly issued "standards guidance"

instructed defendant Department of Justice's components to be sure to:

> . . . exercise "due caution" [in Honors Program and Summer
> Law Intern Program decisionmaking] when considering web-
> posted information [in order] to ensure correct identification
> and attribution.

Report I at 68.

57. In other words, this purportedly "remedial" guidance not only failed to

instruct the Justice Department's components to not engage in conduct that is in

fact violative of Privacy Act subsection (e)(7) to begin with, it actually *premised* (albeit surely unwittingly) that components would continue that very violative course of conduct (i.e., Internet searches for First Amendment-laden background information on career applicants) that had been pioneered by defendants Goodling and McDonald -- and it then proceeded as if those components therefore need be concerned only with the potential unfairness of holding such (improperly obtained) information against a career applicant in the absence of "correct identification." Report I at 68; *accord id.* at 82 (documenting without appreciation defendant Elston's flawed current view that the "accuracy" of such Internet-derived, First Amendment-laden information is what he wrongfully failed to "consider" previously).

58.  In this respect, as with all others involving the Privacy Act's prohibitions involved here, as well as those involving the Federal Records Act, Defendants' First Report, and its immediate aftermath, together reveal defendant Department of Justice's utterly unredeemable obliviousness to its legal obligations, and its remarkably recidivistic failures to meet them, in the first place. *See also id.* at 100-01.

59.  Accordingly, there is every basis for great and immediate concern that defendant Department of Justice's future compliance with these two statutes, and

its rectification of the above-described deficiencies, will as things now stand not be addressed and properly ensured as an ordinarily expected outgrowth of the OIG/OPR investigations and reports that factually identified them. *See also* Report I at 101-02 (making such concerns even more acute by using almost without exception mere hortatory phraseology toward defendant Department of Justice – "we believe," "should be," "we recommend" – thus exposing key fact that OIG/OPR remedial recommendations actually are aspirational, not mandatory, in character -- even if "accepted" -- and therefore that they might or might not actually be implemented in absence of judicial review and enforcement); *cf.* Report II at 139 (pointing to "more effective[]" results obtained "as a result of . . . civil litigation" filed against the Justice Department where "political considerations" had been used in selections for certain career positions); Testimony of Department of Justice Inspector General Glenn A. Fine Before Senate Judiciary Committee, dated July 30, 2008 (similarly suggesting that possible remedial "criminalization" by Congress of such "blatant politicization" conduct, in order to achieve some "accountability," could be flawed by "unintended consequences").

60.  The great importance of definitely undertaking and succeeding with such remedial efforts generally, though, was quite pointedly advocated by defendants' IG at this recent Senate Judiciary Committee hearing, during which he

emphasized on behalf of defendant Department of Justice that, as best as he can do

so, he will "monitor" its future remedial actions as to those deficiencies that were

recognized in his reports to date, and that "it does require vigilance" in order to

"ensure" no "recurrence."  Testimony of Department of Justice Inspector General

Glenn A. Fine Before Senate Judiciary Committee, dated July 30, 2008; *see also*

Prepared Written Testimony of Department of Justice Inspector General Glenn A.

Fine Before Senate Judiciary Committee, dated July 30, 2008, at 9 (emphasizing

importance of "vigilance by current and future Department leaders," but suggesting

that such purely internal attention only "can *help* prevent a recurrence of the . . .

violations . . . that are described in our reports") (emphasis supplied); Report II at

140 (same); Letter to Attorney General Michael B. Mukasey From Senate

Judiciary Committee Members Re: "Illegal, Politicized Hiring Practices," dated

Aug. 1, 2008 (emphasizing prospect of "continuing consequences" to guard

against).

     61.  On information and belief, this latter point emphasized by defendants'

IG was born of the fact, inter alia, that the unlawful conduct of the Honors Program

and Summer Law Intern Program in the year 2002 *did indeed recur*, in a manner

found to be no less wrongful and damaging, if not even shockingly more so, in the

year 2006.  *See, e.g.*, Report I at 98.

62.  Nor did defendant Department of Justice upon creation of its Privacy and Civil Liberties Office within its Office of the Deputy Attorney General in March 2006 (which immediately assumed Departmentwide Privacy Act responsibility from defendant Department of Justice's Office of Information and Privacy), or thereafter, take any step through that new office, or the political appointee heading it, to ensure defendant Elston's awareness of the Privacy Act's requirements and prohibitions, most specifically including those relevant here to activities undertaken in the Fall of 2006.  The same is so as to defendants Goodling and McDonald.  It is as yet unknown whether this is so as to defendant Gonzales.

63.  On this latter point in particular, it is most significant that defendants' IG, at the Senate Judiciary Committee hearing described above, listed a series of remedial steps that defendant Department of Justice either had taken as of that date or had firmly committed to take, but that as to the particular subject of the remedial training of defendant Department of Justice's employees, even as to the more general legal obligations that were successfully recognized in his reports, he stated only that its current leadership officials "are *considering* training."  Testimony of Department of Justice Inspector General Glenn A. Fine Before Senate Judiciary Committee, dated July 30, 2008 (emphasis supplied); *see also* Testimony of Attorney General Michael B. Mukasey Before Senate Judiciary Committee, dated

July 9, 2008 (evincing distinctly limited appreciation of remedial concerns)
(colloquy with Sen. Russell D. Feingold).

64.  This is no less the case with respect to the matter of accountability for
the constitutional torts committed in concert by the individual defendants to this
civil action.  *See id.* ("I think that, um, to the extent there is to be accountability,
that was covered in the OIG report.  People who were, uh, deficient, uh . . . came in
for criticism.") (statement by Attorney General Mukasey to Sen. Feingold); *see
also id.* ("It's very important that we be prepared to look backward, to clean up.
. . . I detect a very pronounced reluctance to look backward into the problems of
the Department of Justice.") (statements of Sen. Sheldon Whitehouse); *id.*
(statement of Sen. Joseph R. Biden, Jr.) (same, generally); *cf.* Statement of Sen.
Patrick Leahy, Chairman, Senate Judiciary Committee, July 30, 2008
(characterizing Attorney General Mukasey's remedial attitude at the Senate
Judiciary Committee's July 9 hearing as one limited to focusing on "just a few bad
apples" rather than on "a more serious, *systemic* problem") (emphasis supplied).

65.  Defendants' First Report was "accept[ed]" by Attorney General Michael
B. Mukasey upon its issuance; it has not been controverted.  *See* Statement of
Attorney General Michael B. Mukasey dated June 24, 2008.  Based upon it, it is
now clear and firmly evidenced that hundreds of applicants to defendant

Department of Justice's Honors Program in 2002 and 2006, like plaintiffs, and likewise to its Summer Law Intern Program in those years, were the subjects of flagrantly unfair, improper, unlawful, and constitutionally violative treatment in the handling of their applications, to their distinct detriments, both immediate and continuing.

66.  Further, while defendant Department of Justice has made and perhaps continues to make, in the words of Attorney General Mukasey, "institutional changes" aimed at correcting its past wrongful actions in this regard, *see* Statement of Attorney General Michael B. Mukasey dated June 24, 2008, there is no evidence that it has taken sufficient (or to date even any) corrective steps as to its legal obligations under either the Privacy Act or the Federal Records Act in such matters.  *See* Report I, passim; Testimony of Department of Justice Inspector General Glenn A. Fine Before Senate Judiciary Committee, dated July 30, 2008 (evincing appreciation of no such corrective steps); Testimony of Attorney General Michael B. Mukasey Before Senate Judiciary Committee, dated July 9, 2008 (same).  Defendants' First Report and subsequent events establish both the need for such corrective steps to have been taken as well as clear evidence, by defendant Department of Justice's own hand, that in fact they have not adequately been taken to date, more than a year after defendant Department of Justice commenced, in

stutter steps, its remedial focus on the situation.

67. This likewise appears to be the case with respect to the remedial

recommendations made in Defendants' Second Report (as explicated below).

Immediately after the July 30 Senate Judiciary Committee hearing, Attorney

General Mukasey, on behalf of defendant Department of Justice, issued his first

fulsome public statement on the subject matter of these two reports. Most

significantly, Attorney General Mukasey said:

> It is neither permissible nor acceptable to consider *political*
> affiliations in the hiring of career Department employees. I
> have acted, and will continue to act, to ensure that *these words*
> are translated into reality so that what is described in the recent
> OIG/OPR reports does not recur.

Statement of Attorney General Michael B. Mukasey dated July 30, 2008 (emphasis

supplied); Statement of Attorney General Michael B. Mukasey dated July 28, 2008

(using phrase "political considerations" in reference to Report's findings, but

"political affiliations" in reference to his remedial intent, and then referencing only

latter formulation through phrase "my words"); *see also* Testimony of Attorney

General Michael B. Mukasey Before Senate Judiciary Committee, dated July 9,

2008. By contrast, just hours earlier, defendants' IG had testified to the Senate

Judiciary Committee that he believed defendant Department of Justice ought to

remedy what he found, lest it recur, by ensuring that henceforth career hiring

decisions are not based on "political *or ideological*" affiliations. Testimony of Department of Justice Inspector General Glenn A. Fine Before Senate Judiciary Committee, dated July 30, 2008. In other words, there was a distinct, and distinctly significant, substantive difference between the two forms of statement, one that itself speaks volumes as to the adequacy of any non-*Bivens* remedy in this matter.

68. Indeed, that very substantive point was painstakingly made in Defendants' First Report, as it goes to the heart of the misconduct found and the remedial steps that therefore are required in order to rectify it. *See* Report I at 6-8 (analyzing point carefully and comprehensively); *see also, e.g.*, *id.* at 32 (using full, proper phrase "political or ideological"); *id.* at 92 (same); *id.* at 99 (same); *cf. id.* at 7 n.8 (reporting results of enlistment of Office of Legal Counsel for presumably neutral opinion on question); *accord* Report II at 12-15.

69. Thus, as to OIG/OPR recommendations in this subject area generally, defendant Department of Justice has demonstrated its persistent refusal or inability to implement such recommendations with necessary care and precision even where they *are* made. *See also, e.g.*, Defendants' Opposition to Plaintiff's Motion for a "Preliminary Scheduling Order," Civil Action No. 08-1134 (D.D.C.), filed on July 11, 2008, at 1, 2 (repeatedly using incomplete phrase "political affiliation"); *id.* at 3

(employing even less precise phrase "for political reasons"); *cf. id.* at 4

("Defendant takes very seriously the findings made in the OIG/OPR Report,

. . . ."). And with the passage of time it intransigently continues to do so. *See, e.g.*,

Prepared Remarks of Attorney General Michael B. Mukasey Before the American

Bar Association, dated Aug. 12, 2008 (freely proclaiming, inter alia, that only

"political affiliations" were involved).

70.  In summary conclusion, Defendants' First Report found that defendant

Department of Justice's actions in both of these hiring programs, through these

improperly trained (or untrained) and tragically undersupervised high-level

employees during 2006, "violated federal law" (including the Constitution) in

multiple respects.  Report I at 96, 99; *see also id.* at 98.

71.  Generally speaking, such findings and conclusions also were made in

Defendants' First Report as to both the Honors Program and the Summer Law

Intern Program for the year 2002. *See* Report I at 32, 33-34; *see also id.* at 98.  As

to that earlier year, and as to both programs, this Report specifically found that

defendant Department of Justice had succeeded in achieving "a pattern of

deselecting candidates based on political or ideological affiliations." *Id.* at 32.

These results would not have been possible without sustained efforts to achieve

them, even within an economic environment that may have been more constrained

than in previous or subsequent years.  *See id.* at 17.

72.  These sustained efforts did not begin in the Fall of 2002; rather, they began at the beginning of that calendar year, when an exploitive organizational change was conceived to facilitate them.  On information and belief, several officials in the Office of the Attorney General and in the Office of the Deputy Attorney General (and tellingly without the knowledge of the then-Associate Attorney General) conspired and began acting in concert early in 2002 to lay the groundwork for unlawful hiring practices being used in the Honors Program and in the Summer Law Intern Program; they did so by removing the longtime director of OARM from that position and replacing her with someone who to this day remains the director of OARM.  That first longtime director of OARM, a career Senior Executive Service official, was abruptly reassigned to the newly vacant (i.e., upon the scheduled retirement of its incumbent) position of director of the Office of Dispute Resolution ("ODR") within the Office of the Associate Attorney General, so that the now-current OARM director, a former United States Attorney under Presidents Reagan and Bush for more than a decade, would as of mid-2002 be the official directly overseeing the Honors Program and the Summer Law Intern Program.

73.  On information and belief, this highly unusual and quite unprecedented

reassignment was undertaken so abruptly that the person who had been slated to

fill that newly vacant position as director of ODR (i.e., the then-deputy director of

that office, who was to succeed the ODR director upon that official's retirement in

March 2002) was informed of this sudden development only through an odd

telephone call, received by him from a coordinating official in the Office of the

Deputy Attorney General (i.e., not from the Associate Attorney General, as would

be expected, or someone acting on his behalf), which made that coordinated

development all the more suspiciously shocking.  No official explanation of this

was ever made on behalf of defendant Department of Justice's leadership offices.

74.  On information and belief (and with the benefit of hindsight in light of

subsequent events), the true explanation for the above-described developments is

that several as-yet-unknown and/or unnamed persons in defendant Department of

Justice's leadership offices during 2002 (specifically including an Associate

Deputy Attorney General and, on information and belief, also individuals within or

acting on behalf of the White House Office of Political Affairs and the Office of

the White House Counsel – of which defendant Gonzales was the head -- but not

including anyone then in the Office of the Associate Attorney General) acted in

concert to conceive, implement, and/or as best as possible "cover up" or "smooth

over" this two-part reassignment for the purpose of facilitating a long-term plan

(which became successful both in 2002 and then again in 2006) to "politicize" the Honors Program and the Summer Law Intern Program in a manner and to a degree that simply would not have been possible had that longtime career director of OARM not been reassigned.

75.  Most significantly, these extraordinary (indeed, unprecedented) and perniciously calculated efforts in 2002 became an integral part of the subsequent wrongful acts by the individual defendants to this civil action in that the latter would not have been possible without the former.  In other words, the conspiracy to deprive "ideologically undesirable" program applicants of their constitutional rights (i.e., as necessarily part and parcel of the new use of unlawful hiring criteria in order to relatively favor "ideologically desirable" applicants, as is explicated below) actually began in 2002 and (even with the substitution of individual participants over time, save for defendant Gonzales) reached full fruition in 2006. *See, e.g.*, Defendants' First Report at 98-99; *see also* Testimony of Monica M. Goodling Before House Judiciary Committee, dated May 23, 2007 (confessing to results of her highly successful exercise of "initiative" as new Department of Justice White House Liaison during 2006).  On information and belief, nothing as pernicious and numerically pervasive in such a context as this has ever before occurred at the United States Department of Justice.

76.  What's more, and quite significant for purposes of this civil action, Defendants' First Report also made clear that defendant Department of Justice's employees already have engaged in the destruction of much of the record evidence (in many instances, the "best evidence") of this misconduct.  *See* Report I at 68-69; *see also id*. at 41 n.29.  This factual finding, consistent with its casual treatment in Defendants' First Report, was not at all addressed by defendants' IG at the July 30, 2008 Senate Judiciary Committee hearing.

77.  Thus, while the record is not yet entirely clear as to exactly what defendant Department of Justice has in fact done regarding its relevant continuing records-maintenance and records-disposition responsibilities under the Privacy Act and the Federal Records Act, respectively, it is entirely clear that more does need to be done and that, very much to the point, defendant Department of Justice has demonstrated a recent history of not taking such measures fully and properly, in this specific regard, on its own.

78.  This overall course of unlawful conduct by defendant Department of Justice, and the individual defendants to this civil action, is further amplified and made clear through a second such report issued by defendant Department of Justice, entitled, "An Investigation of Allegations of Politicized Hiring By Monica Goodling and the Other Staff of the Office of the Attorney General" (June 28,

2008) ("Defendants' Second Report" or "Report II").  The subject matter of this
second OIG/OPR report was the closely related matter of "politicized hiring" in
other career employee categories, including those of immigration judges, Board of
Immigration Appeals members, and Assistant United States Attorneys in one role
or another.  *See* Report II at 2.

79.  This second related OIG/OPR investigation focused on the actions of
the individual defendants to this civil action (except for defendant McDonald), and
in so doing it revealed additional details about their improper activities.  It found,
for example, that defendant Goodling had authorized "extensive" Internet
"research" on career candidates in these categories that was "designed to obtain
their political and ideological affiliations," Report II at 20 -- just as was the case
with defendant McDonald as to Honors Program and Summer Law Intern Program
applicants -- and that, most significantly, "Goodling conducted much of her
Internet screening research herself," *id.* at 21.  *See id.* at 59 (reporting defendant
Elston's own awareness that, in the case of at least one career candidate, "Goodling
was taking a long time to conduct Internet research on him because his last name
was common"); *see also id.* at 103 (reporting further details of such Internet
screening activities); *id.* at 121 (making clear that "documents . . . were obtained"
through such Internet searches).

80.  These investigators further found that Goodling personally tailored, and even advocated the use by others of, certain Internet "search strings" for such purposes.  Report II at 21.  On information and belief, defendant Goodling's involvement in the similarly extensive "Internet research" activities (and wrongful record creation) conducted primarily by defendant McDonald for Honors Program/Summer Law Intern Program decisionmaking included such assistance to McDonald; due to the wrongful record destruction that was undertaken by or for defendant Elston, as described above, the full extent of this is not yet fully known. *See also* Testimony of Monica M. Goodling Before House Judiciary Committee, dated May 23, 2007 (admitting that she was proficient at "opposition research":  "I did research people that we were considering for hiring, yes. . . . You wanted to know if there's something negative about someone before you hired them to work at the department.").

81.  This second investigation also found that defendant Goodling had a certain way of characterizing her "success" in filling career positions through such unlawful means:  The Justice Department "can hire one more good American." Report II at 31.  Based upon such astonishingly dark and damning evidence, OIG/OPR readily concluded that defendant Goodling had committed acute misconduct in this hiring realm as well.  *See, e.g.*, *id.* at 35, 45.

48

82.  The facts established through this second investigation revealed an even clearer picture of what the investigators reported had been called, by political and career officials alike, a new-found "Monica problem."  Report II at 43.  The OIG/OPR investigators found that, in what on information and belief almost certainly is an unprecedented situation, even Justice Department officials at levels as high as that of the Deputy Attorney General himself were intimidated and/or overridden by the exercise of the extreme authority granted to defendant Goodling by defendant Gonzales, to the point at which the problem of "Goodling's opposition" on such matters was time and again taken to be an enormous, near-insuperable barrier.  *Id.* at 52; *see, e.g.*, *id.* at 136; *see also id.* at 17 n.28 (emphasizing strength of Goodling's delegated "authority").

83.  This second OIG/OPR report also documents an even further, formal delegation of authority by defendant Gonzales to defendant Goodling.  *See* Report II at 61 n.43 (describing formal regulatory step that successfully had effect of shifting certain personnel authority from Deputy Attorney General McNulty to defendant Goodling).  While this Report dutifully also reports the fact that defendant Gonzales disclaimed knowledge of many of defendant Goodling's activities -- *see id.* at 22 n.19 (reporting Gonzales's posture as follows:  "was not aware," "was not aware," "was not even aware") – it at the same time takes pains

to include the counterpoised factual point that "the Office of the Attorney General is a relatively small office . . . ."). *Id*. at 10; *see also id*. at 37 n.28 (discrediting, as contrary to actual facts, suggestion that Goodling did not technically have "authority" from Gonzales for what she did).

84. Thus, the OIG/OPR report of this second, closely related investigation not only shows more acutely the unlawful actions of defendant Goodling, it sheds more harsh inculpatory light on the gross irresponsibility in such matters (to the point of acute, concerted unlawfulness) on the part of defendant Gonzales as well. *See also, e.g.*, *id*. at 47 (reflecting fact that Goodling in her congressional testimony, on subject of detailees, admitted "that senior Department managers were aware that she was using politics to screen career candidates").

85. This Report, too, was accepted by Attorney General Mukasey upon its issuance, albeit this time only implicitly; it, too, has not been controverted. *See* Statement of Attorney General Michael B. Mukasey dated July 28, 2008.

86. Thus, these two reports together stand as effective indictments of the conduct of all defendants to this civil action, as well as official guideposts to any additional evidence that may be required for its full adjudication.

## Count One: Violations of Privacy Act Subsection (e)(7)

87. Plaintiffs hereby re-allege and incorporate all allegations in all above

paragraphs.

88.  Subsection (e)(7) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.

89.  Defendant Department of Justice maintained records about plaintiffs in connection with its determination of the results of their Honors Program and Summer Law Intern Program applications, records which were part of a system of records within the meaning of the Privacy Act.

90.  According to Defendants' First Report, such records included "printouts of [Internet] search results" that were created by defendant McDonald -- who "conducted Internet searches on the candidates using Google and MySpace" and "searched for organizations to which candidates belonged" -- as well as her written "comments on the applications throughout the process concerning the liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73, 92-96.  Such records were maintained also by defendant Elston.  *See id.* at 79-83, 92-96.  It is as yet unknown whether such records were maintained also by defendant Goodling.  There is no particular reason to believe that such records

were directly and personally maintained by defendant Gonzales.

91.  Plaintiffs and those similarly situated were not required to mention any of their such memberships or affiliations in their applications.  Such activities constitute the exercise of rights guaranteed by the First Amendment, including the freedoms of speech, political/ideological expression, and association, within the meaning of Privacy Act subsection (e)(7).

92.  In handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion, defendant Department of Justice violated their rights under Privacy Act subsection (e)(7) by creating and maintaining records reflective of the exercise of their First Amendment rights without express legal authorization or lawful justification, thereby affecting them adversely, and it did so with intentional or willful conduct, including conduct constituting more than gross negligence.

93.  Indeed, as is documented in Defendants' First Report, defendant Department of Justice through its employees has shown no appreciable understanding of, or regard for, the legal requirements and prohibitions that are imposed upon it by Privacy Act subsection (e)(7), despite the fact that at previous times it actually provided extensive authoritative guidance to other federal

departments and agencies on that very subject.

94.  Moreover, as is consistently evidenced in defendants' own reports, as well as in subsequent public statements as described above, even its Office of the Inspector General and also its Office of Professional Responsibility evidently possesses insufficient awareness of the Privacy Act's requirements and prohibitions to apply them as standards of conduct to matters such as the instant ones that fall within their individual or joint purviews.

95.  Defendant Department of Justice's flagrant, persistent, and unremitting violations of this particular statutory provision, above all others, and their broad implications in full context, warrant use of the full measure of the Court's compensatory, equitable, and remedial authority, including through properly measured exercise of the Court's *Bivens* authority as addressed below.  *Accord* Report I at 101 ("As we found in this investigation, membership in organizations that are perceived as liberal or conservative *can easily be used as a screening device* to discriminate on the basis of political [or ideological] affiliation.") (emphasis supplied); *compare* Testimony of Attorney General Michael B. Mukasey Before Senate Judiciary Committee, dated July 9, 2008 (pointedly and tellingly responding to senator's remedial pressure ("Well, I want a review – ") by saying:  "Um, if you can point to any *criminal* laws that were violated, obviously

those – ”) (emphasis evidently in original); Prepared Remarks of Attorney General Michael B. Mukasey Before the American Bar Association, dated Aug. 12, 2008 (same).

**Count Two:  Violations of Privacy Act Subsection (e)(5)**

96.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

97.  Subsection (e)(5) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.

98.  Defendant Department of Justice maintained records about plaintiffs in connection with its determination of the results of their Honors Program and Summer Law Intern Program applications, records which were part of a system of records within the meaning of the Privacy Act.

99.  According to Defendants’ First Report, such records included “printouts of [Internet] search results” that were created by defendant McDonald -- who “conducted Internet searches on the candidates using Google and MySpace” and “searched for organizations to which candidates belonged” -- as well as her written “comments on the applications throughout the process concerning the liberal

affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73, 92-96.  Such records were maintained also by defendant Elston.  *See id.* at 79-83, 92-96.  It is as yet unknown whether such records were maintained also by defendant Goodling.  There is no particular reason to believe that such records were directly and personally maintained by defendant Gonzales.

100.  Records maintained by defendant Department of Justice as part of plaintiffs' Honors Program/Summer Law Intern Program applications were required by law to not unnecessarily include (i.e., beyond that which was submitted by the applicant himself or herself) records reflecting an individual's political or ideological affiliations.

101.  In handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion, defendant Department of Justice through its employees failed to maintain their records "with such accuracy, relevance, timeliness, and completeness as [was] reasonably necessary to assure fairness to [them] in [defendant's] determination[s]."

102.  In short, but as is described in great detail above, there was absolutely nothing "fair" to plaintiffs or to those similarly situated in how they were treated in

defendants' Honors Program/Summer Law Intern Program decisionmaking.

103.  Thus, in handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion (records which neither were lawfully relevant nor assured fairness), defendant Department of Justice through its employees violated their rights under Privacy Act subsection (e)(5), affecting them adversely, and it did so with intentional or willful conduct, including conduct constituting more than gross negligence.

### Count Three:  Violations of Privacy Act Subsection (e)(10)

104.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

105.  Subsection (e)(10) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (10) establish appropriate administrative, technical and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained.

106.  Defendant Department of Justice maintained records about plaintiffs in connection with its determination of the results of their Honors Program and Summer Law Intern Program applications, records which were part of a system of

records within the meaning of the Privacy Act.

107. According to Defendants' First Report, such records included "printouts of [Internet] search results" that were created by defendant McDonald -- who "conducted Internet searches on the candidates using Google and MySpace" and "searched for organizations to which candidates belonged" -- as well as her written "comments on the applications throughout the process concerning the liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention." Report I at 76-83; *see also id.* at 72-73, 92-96. Such records were maintained also by defendant Elston. *See id.* at 79-83, 92-96. It is as yet unknown whether such records were maintained also by defendant Goodling. There is no particular reason to believe that such records were directly and personally maintained by defendant Gonzales.

108. Records maintained by defendant Department of Justice as part of plaintiffs' Honors Program/Summer Law Intern Program applications were required by law to not unnecessarily include (i.e., beyond that which was submitted by the applicant himself or herself) records reflecting an individual's political or ideological affiliations.

109. In handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in

the above-described fashion, defendant Department of Justice through its

employees failed to meet its obligations to maintain such records with sufficient

safeguards to protect their integrity and avoid substantial harm, embarrassment,

inconvenience, and unfairness to plaintiffs in its determinations and

decisionmaking.

110.  As well, the manner in which defendant Elston maintained such

records, and engaged in lax supervision over both them and the employees who

had access to them, including his "staff assistant," was itself improper and, from a

proper legal standpoint, was grossly and irresponsibly unsuccessful.  *See* Report at

68-69, 79-91, 94-96.

111.  On information and belief, and as is evidenced in Defendants' First

Report, defendant Department of Justice took no meaningful action to comply with

its subsection (e)(10) obligations for its instant records-maintenance and

decisionmaking processes.

112.  In handling the Honors Program/Summer Law Intern Program

applications and related records regarding plaintiffs and others similarly situated in

the above-described fashion, defendant Department of Justice through its

employees violated their rights under Privacy Act subsection (e)(10), affecting

them adversely, and it did so with intentional or willful conduct, including conduct

constituting more than gross negligence.

### Count Four:  Violations of Privacy Act Subsection (e)(1)

113.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

114.  Subsection (e)(1) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by Executive order of the President.

115.  Defendant Department of Justice maintained records about plaintiffs in connection with its determination of the results of their Honors Program and Summer Law Intern Program applications, records which were part of a system of records within the meaning of the Privacy Act.

116.  According to Defendants' First Report, such records included "printouts of [Internet] search results" that were created by defendant McDonald -- who "conducted Internet searches on the candidates using Google and MySpace" and "searched for organizations to which candidates belonged" -- as well as her written "comments on the applications throughout the process concerning the liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73,

92-96.  Such records were maintained also by defendant Elston.  *See id.* at 79-83,

92-96.  It is as yet unknown whether such records were maintained also by

defendant Goodling.  There is no particular reason to believe that such records

were directly and personally maintained by defendant Gonzales.

117.  Records maintained by defendant Department of Justice as part of

plaintiffs' Honors Program/Summer Law Intern Program applications were

required by law to not unnecessarily include (i.e., beyond that which was submitted

by the applicant himself or herself) records reflecting an individual's political or

ideological affiliations.

118.  In handling the Honors Program/Summer Law Intern Program

applications and related records regarding plaintiffs and others similarly situated in

the above-described fashion, defendant Department of Justice through its

employees created and maintained records that were both irrelevant and

unnecessary (i.e., unlawful to be considered) and thereby failed to maintain in its

records "only such information about [them] as [was] relevant and necessary to

accomplish a [lawful] purpose of the agency."

119.  Thus, in handling the Honors Program/Summer Law Intern Program

applications and related records regarding plaintiffs and others similarly situated in

the above-described fashion, defendant Department of Justice through its

employees violated their rights under Privacy Act subsection (e)(1), affecting them

adversely, and it did so with intentional or willful conduct, including conduct

constituting more than gross negligence.

### Count Five:  Violations of Privacy Act Subsection (e)(2)

120.  Plaintiffs hereby re-allege and incorporate all allegations in all above

paragraphs.

121.  Subsection (e)(2) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (2) collect
> information to the greatest extent practicable directly from the subject
> individual when the information may result in adverse determinations
> about an individual's rights, benefits, and privileges under Federal
> programs.

122.  Defendant Department of Justice maintained records about plaintiffs in

connection with its determination of the results of their Honors Program and

Summer Law Intern Program applications, records which were part of a system of

records within the meaning of the Privacy Act.

123.  According to Defendants' First Report, such records included

"printouts of [Internet] search results" that were created by defendant McDonald --

who "conducted Internet searches on the candidates using Google and MySpace"

and "searched for organizations to which candidates belonged" -- as well as her

written "comments on the applications throughout the process concerning the

liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73 92-96.  Such records were maintained also by defendant Elston.  *See id.* at 79-83, 92-96.  It is as yet unknown whether such records were maintained also by defendant Goodling.  There is no particular reason to believe that such records were directly and personally maintained by defendant Gonzales.

124.  Records maintained by defendant Department of Justice as part of plaintiffs' Honors Program/Summer Law Intern Program applications were required by law to not unnecessarily include (i.e., beyond that which was submitted by the applicant himself or herself) records reflecting an individual's political or ideological affiliations.

125.  In handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion, defendant Department of Justice through its employees failed to collect information directly from them -- i.e., to go no further than collecting information from them, as opposed to through improper Internet search means, given that such improperly collected Internet information was in fact collected for the express purpose of triggering adverse administrative determinations and decisions about plaintiffs' rights, privileges, or benefits under a

federal program, with their consequent adverse effects.

126.  Thus, in handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion, defendant Department of Justice through its employees violated their rights under Privacy Act subsection (e)(2), affecting them adversely, and it did so with intentional or willful conduct, including conduct constituting more than gross negligence.

### Count Six:  Violations of Privacy Act Subsection (e)(6)

127.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

128.  Subsection (e)(6) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes.

129.  Defendant Department of Justice maintained records about plaintiffs in connection with its determination of the results of their Honors Program and Summer Law Intern Program applications, records which were part of a system of records within the meaning of the Privacy Act.

130. According to Defendants' First Report, such records included "printouts of [Internet] search results" that were created by defendant McDonald -- who "conducted Internet searches on the candidates using Google and MySpace" and "searched for organizations to which candidates belonged" -- as well as her written "comments on the applications throughout the process concerning the liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73, 92-96.  Such records were maintained also by defendant Elston.  *See id.* at 79-83, 92-96.  It is as yet unknown whether such records were maintained also by defendant Goodling.  There is no particular reason to believe that such records were directly and personally maintained by defendant Gonzales.

131. Records maintained by defendant Department of Justice as part of plaintiffs' Honors Program/Summer Law Intern Program applications were required by law to not unnecessarily include (i.e., beyond that which was submitted by the applicant himself or herself) records reflecting an individual's political or ideological affiliations.

132. In handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion, including through their dissemination as evidenced in

Defendants' First Report, *see, e.g.*, Report I at 72, defendant Department of Justice through its employees failed to meet its obligations to maintain its records with sufficient propriety, care, and safeguards to ensure that they were properly relevant for all reasonably foreseeable and lawful agency purposes.

133.  As well, the manner in which defendant Elston maintained such records, and engaged in lax supervision over both them and the employees who had access to them, was itself improper and, from a proper legal standpoint, was grossly and irresponsibly unsuccessful.  *See* Report I at 68-69, 79-91, 94-96.

134.  In handling the Honors Program/Summer Law Intern Program applications and related records regarding plaintiffs and others similarly situated in the above-described fashion, including through their dissemination as evidenced in Defendants' First Report, *see, e.g.*, Report I at 72, defendant Department of Justice through its employees violated plaintiffs' rights under Privacy Act subsection (e)(6), affecting them adversely, and it did so with intentional or willful conduct, including conduct constituting more than gross negligence.

### Count Seven:  Violations of Privacy Act Subsection (e)(9)

135.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

136.  Subsection (e)(9) of the Privacy Act provides that:

> Each agency that maintains a system of records shall . . . (9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance.

137.  Defendant Department of Justice maintained records about plaintiffs in connection with its determination of the results of their Honors Program and Summer Law Intern Program applications, records which were part of a system of records within the meaning of the Privacy Act.

138.  According to Defendants' First Report, such records included "printouts of [Internet] search results" that were created by defendant McDonald -- who "conducted Internet searches on the candidates using Google and MySpace" and "searched for organizations to which candidates belonged" -- as well as her written "comments on the applications throughout the process concerning the liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73, 92-96.  Such records were maintained also by defendant Elston.  *See id.* at 79-83, 92-96.  It is as yet unknown whether such records were maintained also by defendant Goodling.  There is no particular reason to believe that such records were directly and personally maintained by defendant Gonzales.

66

139.  Records maintained by defendant Department of Justice as part of plaintiffs' Honors Program/Summer Law Intern Program applications were required by law to not unnecessarily include (i.e., beyond that which was submitted by the applicant himself or herself) records reflecting an individual's political or ideological affiliations.

140.  The actions of defendants Elston and McDonald (and of their putative supervisors as well), as described above, manifestly were undertaken in personally irresponsible ignorance of and/or in total disregard for their specific Privacy Act-related legal obligations and responsibilities for such a personnel process, inter alia, high-level or otherwise, as is reflected in the findings and conclusions of defendant Department of Justice's own Report.

141.  As well, the manner in which defendant Elston maintained such records, and engaged in lax supervision over both them and the employees who had access to them, was itself improper and, from a proper legal standpoint, was grossly and irresponsibly unsuccessful.  *See* Report I at 68-69, 79-91, 94-96.

142.  On information and belief, and as is evidenced in Defendants' First Report, defendant Department of Justice took no meaningful action to comply with its Privacy Act subsection (e)(9) obligations for its instant records-maintenance and decisionmaking processes.  By all accounts, it simply ignored the fact that the

67

Privacy Act is "an 'omnibus code of fair information practices,'" *Freedom of Information Act Guide & Privacy Act Overview* (May 2004), at 889, one that, as addressed in an overarching way through subsection (e)(9), explicitly requires relevant "instruct[ion]" to employees such as defendants Elston and McDonald under circumstances such as those involved here. *See, e.g.*, Report I at 76. Evidently, any such instruction received by them was effectively negligible. And there is, as yet, no reason to believe that this was any less so in the case of those who worked in the Office of the Attorney General during 2006, such as defendants Goodling and Gonzales.

143. On information and belief, and as is evidenced in Defendants' First Report and also in Defendants' Second Report, such deficiencies continue to date within this subject-matter area as to a range of defendant Department of Justice's records.

144. In fact, as is described in detail above, even in the wake of the issuance of Defendants' First Report, defendant Department of Justice has consistently and unwaveringly overlooked its Privacy Act violations in this regard, not to mention the focused remedial measures that are necessary to ensure that they do not recur. *Accord* Report I at 102 (identifying proper goal as "ensur[ing] that [such] serious problems . . . do not recur in the future"). This, despite the ostensible firmness of

68

Attorney General Mukasey on the subject, albeit at the hortatory level: "It is

crucial that the American people have confidence in the propriety of what we do

and how we do it." Statement of Attorney General Michael B. Mukasey dated July

30, 2008.

145.  In handling its Honors Program/Summer Law Intern Program

applications and related records regarding plaintiffs and others similarly situated,

and permitting employees who were not properly instructed on their legal

obligations just to proceed to undertake such responsibilities and actions without

adequate training, instruction, and/or guidance, defendant Department of Justice

made possible -- and evidently in context even made inevitable -- the working

environment in which such a wide range of Privacy Act rights of plaintiffs and

others similarly situated were so grossly and repeatedly violated.

146.  Thus, in handling plaintiffs' Honors Program/Summer Law Intern

Program applications and related records regarding plaintiffs and others similarly

situated in the above-described fashion, defendant Department of Justice through

its employees violated their rights under Privacy Act subsection (e)(9), affecting

them adversely, and it did so with intentional or willful conduct, including conduct

constituting more than gross negligence.

147.  Consequently, in sum, due to the range and multiplicity of the Privacy

Act violations that are documented in Defendants' First Report and are described

in the paragraphs above, defendants have committed, against plaintiffs and those

similarly situated, an untold and as-yet-uncountable number of actionable

"failures" (i.e., separate and distinct failures to comply with a Privacy Act

requirement) within the meanings of Privacy Act subsections (g)(1)(C) and

(g)(1)(D), as well as Privacy Act subsection (g)(4)(A).

148.  Moreover, as is now plainly evidenced through defendant Department

of Justice's current conduct as detailed above, such widespread Privacy Act

deficiencies continue to exist as to records of defendant Department of Justice's

Honors Program and Summer Law Intern Program activities, both past and present

(not to mention as to other activities and records), and are unremittingly

continuing, which warrants judicial review under the Administrative Procedure

Act, a declaratory judgment, and appropriate injunctive relief, lest in the absence of

adequate remedial action they recur.

**Count Eight:  Violations of First and Fifth Amendments to the Constitution**

149.  Plaintiffs hereby re-allege and incorporate all allegations in all above

paragraphs and, as to *Bivens* claims, they likewise incorporate all such allegations

in the paragraphs below.

150.  Defendant Department of Justice wrongfully created and maintained

records regarding the exercise of plaintiffs' rights under the First Amendment (and those of others similarly situated), including the freedoms of speech, political/ideological expression, and association, as is described in Defendants' First Report and Defendants' Second Report, which together likewise document that defendant Department of Justice directly violated plaintiffs' First Amendment rights through its unlawful First Amendment-based hiring practices, and in so doing it wrongfully abridged, and effectively penalized plaintiffs for the free exercise of, such rights. *See also* Report I at 7 n.8 (emphasizing violation of rights under First Amendment in particular); *see, e.g.*, *id.* at 59 (". . . the Screening Committee had found an article on the Internet in which the candidate was quoted as expressing . . ."). On information and belief, and as is evidenced by matters of public record, the four individual defendants to this civil action conspired to do so and, working effectively in concert, did in fact do so.

151. Defendant Department of Justice unlawfully made determinations and decisions regarding plaintiffs and others similarly situated in a manner that admittedly not only were in contravention of merit-based principles but also were impermissibly based on criteria/classification of political and ideological affiliation the use of which impinged upon their constitutionally protected interests in, inter alia, following a chosen career path free from unreasonable (let alone grossly

unlawful) governmental interference, thus depriving them of both liberty and property interests and their rights to due process and equal protection of the laws. On information and belief, and as is evidenced by matters of public record, the four individual defendants to this civil action conspired to do so and, working effectively in concert, did in fact do so.

152.  Moreover, defendants' successful impingement upon plaintiffs' constitutional interests and rights to due process and equal protection of the laws in plaintiffs' dealings with defendants on such matters as described above, while pervasively systematic in nature, was undertaken individually on a case-by-case basis and uniquely in complete and utter secrecy.  Indeed, plaintiffs are aware of only one instance among the several hundred such ones involved here in which the rejected applicant actually learned the true manner and nature of his or her rejection -- and that is one in which defendants' veil of secrecy was pierced only because the applicant was working as an intern for the component involved, and through that exceptional circumstance that information was made known to him as an expiation of the deep regret felt by a component official (even as a noncareer employee) over that applicant's pernicious treatment at the hands of defendants through their unlawful scheme.  By contrast, in the case of an applicant such as plaintiff Saul, for example, he did not learn even that he had been rejected (let

alone the unlawful basis for it) until he recognized himself as constituting a case chosen by OIG/OPR for interrogating defendant Elston, successfully, upon plaintiff Saul's reading of Defendants' First Report.  *See* Report I at 86.

153.  Such secrecy, which was both an integral characteristic of defendants' joint scheme and essential to its shocking success, was greatly enhanced by the improper "burn bag" destruction of the very federal records that memorialized (and in certain respects embodied) defendants' violative conduct.  *See* Report I at 68-69 (matter-of-factly describing this distinctive element of this unprecedented constitutional violation of plaintiffs' rights and interests in this particular case).

154.  Indeed, once these records were destroyed within the Office of the Deputy Attorney General, defendant Elston, acting covertly but, in retrospect, manifestly on behalf of all other individual defendants to this civil action, evidently lied about their concerted actions and actually refused "to confirm or deny" the validity of allegations about the actions of himself and those other individual defendants *even when pressed to do so by his immediate superior, the Deputy Attorney General, see id.* at 66 – thus committing conspiratorial "cover-up" misconduct that, on information and belief, has not occurred within the leadership offices of the Department of Justice in slightly more than thirty-five years. *Compare* Statement of Sen. Patrick Leahy, Chairman, Senate Judiciary Committee,

dated July 30, 2008 (". . . and the widespread, illegal hiring practices within the Justice Department that have been revealed, represent the most serious threat to the effectiveness, professionalism, and independence of the Department since Watergate.").

155.  Thus, the constitutionally violative actions of which plaintiffs are aggrieved, undertaken in concert by the individual defendants to this civil action, including the Attorney General of the United States and those acting under his direct authorization, were unlawful actions undertaken for an unlawful, nongovernmental purpose -- and they thus constituted a distinct species of constitutional violation in multiple respects, one so extremely corrupt and brazenly executed that heretofore it would not reasonably have been even conceived of as within the category of necessarily actionable impingements of constitutional interests and deprivations of Fifth Amendment due process and equal protection of the laws.

156.  Such flagrantly unlawful conduct by defendant Department of Justice, and by the individual defendants to this civil action, warrants specific and commensurate redress, as an indispensable remedy, and in a form achieving deterrence as well as accountability, lest it recur.  *Accord* Report I at 102 (conceding correctness, critical importance, and viability of "nonrecurrence" goal,

while at same time demonstrating defendant Department of Justice's current

inability to "ensure" that on its own); *see also* Testimony of Department of Justice

Inspector General Glenn A. Fine Before Senate Judiciary Committee, dated July

30, 2008  (speaking of "*systemic*, important issue that needs to be addressed")

(emphasis supplied) .

157.  As a matter of fact, in addition to all of the above-described evidence

that defendant Department of Justice is unwilling and/or unable to take a properly

remedial approach to this matter thus far, the blatantly aggressive actions of

Attorney General Mukasey on August 12, 2008 made that extremely, and

extremely pointedly, clear.  In a speech chosen to be given to the attorney

membership of the American Bar Association, at its annual convention in New

York City, Attorney General Mukasey went out of his way to address this subject,

under the remarkable subject heading of:  "[P]rofessionalism at the United States

Department of Justice."  Prepared Remarks of Attorney General Michael B.

Mukasey Before American Bar Association, dated Aug. 12, 2008.  Flatly

disagreeing with his own Inspector General, Attorney General Mukasey asserted

that the misconduct involved in this case "was *not systemic* in that only a few

people were directly implicated in it," people who "deviated from [a] strict

standard," and who committed "only violations of the civil service laws."  *Id.*

(emphasis supplied).

158.  Indeed, stressing that this position is taken by defendant Department of

Justice "because the wrongdoing violated federal civil service law, but not criminal

law," Attorney General Mukasey then went so far in these remarks as to offer the

following explanation of why defendant Department of Justice will not take any

"more drastic steps":

> That does not mean, as some people have suggested, that those
> officials who were found by the joint reports to have committed
> misconduct have suffered no consequences.  Far from it. The
> officials most directly implicated in the misconduct left the
> Department to the accompaniment of substantial negative publicity.
> Their misconduct has now been laid bare by the Justice Department
> for all to see.  As a general matter in such cases, where disciplinary
> referrals are appropriate, they are made.  To put it in concrete terms,
> *I doubt that anyone in this room would want to trade places with any
> of those people.*

*Id.* (emphasis supplied).

159.  Thus, on the matter of both accountability for past constitutional

violations and, most critically, deterrence of future ones, defendant Department of

Justice now has established a firm and resolute "wouldn't want to trade places with

'em" standard.  *See also id.* (asserting in like fashion that "the institutional

problems identified in the reports have been remedied"); Statement of Sen. Patrick

Leahy, Chairman, Senate Judiciary Committee, dated Aug. 12, 2008 (observing in

response that defendant Department of Justice "seems intent on insulating this administration from accountability"); Statement of Rep. John Conyers, Chairman, House Judiciary Committee, dated Aug. 13, 2008 (observing in response: "The Department of Justice cannot reestablish its credibility so long as it persists in a strategy designed to avoid revealing all the facts that have so compromised the integrity of the Department of Justice and to prevent real accountability for misconduct by former DOJ officials.").

### Count Nine: *Bivens* Claims Against Defendant Goodling

160.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs and, as to *Bivens* claims, they likewise incorporate all such allegations in the paragraphs below.

161.  Defendant Goodling, in her capacity as Department of Justice White House Liaison during 2006, was in regular communication with, and was influenced by, various unknown and/or unnamed persons within the White House Office of Political Affairs who, as a matter course, in turn consulted with senior White House official Karl C. Rove (and perhaps others) before communicating with her as the Department of Justice White House Liaison on matters of sensitivity.  *See, e.g.*, Report II at 86.

162.  On information and belief, and as can be documented, defendant

Goodling was well acquainted with defendant McDonald before defendant

McDonald joined the Department of Justice – or was interviewed by defendant

Goodling for her position as Counsel to the Associate Attorney General, *see* Report

I at 76 – despite all appearances or suggestions to the contrary.

163.  As is accurately documented in Defendants' First Report, *see* Report I

at 79, defendant Goodling also was well acquainted with defendant Elston prior to

his selection for participation in the Department's Honors Program/Summer Law

Intern Program "screening committee," and as "chairman" of that committee, for

2006.  In fact, she is the Department official who arranged for, and oversaw, his

participation.  *See id.* at 79-80.

164.  Defendant Goodling conspired and coordinated directly with

defendants Elston and McDonald, and also with defendant Gonzales, to deprive

plaintiffs and those similarly situated of their Fifth Amendment rights to due

process and equal protection of the laws in such a manner, and on such a basis, as

to necessarily abridge their First Amendment freedoms of speech,

political/ideological expression, and association, as well as their rights to due

process and equal protection of the laws as described above.  As is documented in

defendants' reports, such violations constituted abridgments of plaintiffs'

constitutional interests extending into their personal lives by, inter alia, inhibiting

the free exercise of their First Amendment rights with regard to future activity in

relation to possible future employment with defendant Department of Justice or

any other federal agency.

165.  Moreover, as Defendants' First Report makes entirely (even if

surprisingly) clear, defendant Goodling actually was the principal wielder of

authority among the three subcabinet-level individual defendants to this civil

action (i.e., other than defendant Gonzales).  *See, e.g.*, Report I at 65 ("Elston said

it was clear to him from Goodling's comments that eliminating Department-level

review was not an option.").  Indeed, on information and belief, and also based

specifically on the documented concern of defendant Elston that "Goodling may

have told McDonald to do what she was doing," Report I at 83, defendant

Goodling built upon her pre-existing relationship with defendant McDonald to

position the latter specifically as a viable instrument of Internet searching as well

as more generally a reliable participant in their scheme overall.

166.  As is documented also in Defendants' Second Report, defendant

Goodling also personally tailored, and even advocated the use by others of, certain

Internet "search strings" for such purposes.  *See* Report II at 21.  On information

and belief, Goodling's involvement in the similarly extensive "Internet research"

activities (and wrongful record creation) conducted primarily by defendant

McDonald for Honors Program/Summer Law Intern Program decisionmaking
included such assistance to McDonald, though due to the wrongful record
destruction that was undertaken for defendant Elston, as described above, the
extent of this is not yet fully known.

167.  Thus, the very similar Internet search and oversight activities of
defendant Goodling regarding other hiring programs, as documented in
Defendants' Second Report, are manifestly of a piece with those involved here.
*See, e.g.*, Report II at 20-22.  So, too, is the blatantly unlawful, self-indicting
attitude on defendant Goodling's part that likewise was found.  *See id.* at 31
(discovering and documenting Goodling's hiring motto:  "[We now] can hire one
more good American.").  It is not as yet known whether defendant Gonzales
acquiesced to or less passively endorsed that expression.

168.  On information and belief, the above-described conduct was in no
small part what defendant Goodling was referring to during her May 2007
appearance before the House Judiciary Committee when she spoke of having
"crossed the line" in her dealings with members of the public who applied for
career Justice Department positions, either directly or indirectly.  Testimony of
Monica M. Goodling Before House Judiciary Committee, dated May 23, 2007; *see
also id.* ("I don't believe I intended to commit a crime . . . [but] . . . I believe I

crossed the lines").

169.  However, unlike as with defendants Elston and McDonald, as is described both above and below, there is as yet no reason to believe that the continuation of the actions of defendant Goodling, and thereby their continued effectiveness in defendants' unlawful scheme, was in any way facilitated by dishonesty or dissembling on her part in the face of any questioning by her superiors in the Office of the Attorney General.  In other words, while defendant Elston's conduct was questioned (unsuccessfully) by Deputy Attorney General McNulty, and defendant McDonald likewise endeavored to shield the true nature of her work from Acting Associate Attorney General Mercer, defendant Goodling evidently (and for reasons not yet fully known) was spared such scrutiny by defendant Gonzales, amounting to a lesser degree of culpability on the part of the former (but necessarily a far greater degree of it on the part of the latter).

170.  Even given the high degree of effectiveness with which defendant Goodling together with the other individual defendants to this civil action proceeded in their unlawful enterprise – for an unlawful, nongovernmental purpose -- that enterprise could not have been successful without the foundation of organizational change made by (and the secrecy ensured thereby) defendant Department of Justice in the year 2002 as described above.

### Count Ten: *Bivens* Claims Against Defendant Elston

171.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs and, as to *Bivens* claims, they likewise incorporate all such allegations in the paragraphs below.

172.  Defendant Elston was both a principal actor and a day-to-day driving force in the concerted actions (including their secrecy and "cover-up") of the individual defendants to this civil action as they successfully proceeded with their corruption of Honors Program and Summer Law Intern Program decisionmaking through the necessarily pervasive commission of constitutional torts.

173.  Defendant Elston conspired and coordinated directly with defendants Goodling and McDonald (and less directly with defendant Gonzales) to deprive plaintiffs and those similarly situated of their Fifth Amendment rights to due process and equal protection of the laws in such a manner, and on such a basis, as to necessarily abridge their First Amendment freedoms of speech, political/ideological expression, and association, as well as their rights to due process and equal protection of the laws as described above.  As is documented in defendants' reports, such violations constituted abridgments of plaintiffs' constitutional interests extending into their personal lives by, inter alia, inhibiting the free exercise of their First Amendment rights with regard to future activity in

relation to possible future employment with defendant Department of Justice or
any other federal agency.

174.  As Chief of Staff to the Deputy Attorney General and the Goodling-
chosen chairman of the Honors Program/Summer Law Intern Program "screening
committee," defendant Elston time and time again acted in gross violation of
plaintiffs' constitutional rights, with the resultant commission of constitutional
torts that, on information and belief, may well be likewise unprecedented, in whole
or in part, in and of themselves.  This was an extraordinary and uniquely successful
conspiracy for the purpose of achieving unlawful, nongovernmental, entirely
political results that required the gross deprivation of hundreds of individual
constitutional rights, including the constitutionally protected liberty and property
interests in due process and equal protection of the laws, not to mention defendant
Elston's breach of his institutional responsibility to the many Justice Department
components that were involved.

175.  Remarkably, defendant Elston actually spoke of "giv[ing the
components] some ideas on how to screen the candidates (checking the web, etc.),"
and he even went so far as to do so both repeatedly and with an argumentative
thrust to the effect that any component's refraining from doing so constituted,
within the realm of his misguided assertions, its "failure to adequately screen

candidates." Report I at 6. In other words, not content to violate the Privacy Act rights of plaintiffs and all those similarly situated through the work of himself and defendant McDonald in their own partial ignorance, he sought authoritatively to have this achieved at a more threshold administrative level (i.e., with less work for himself) by unwitting groups of other Department of Justice employees. This itself constituted Privacy Act-based misconduct (not to mention institutional corruption) of breathtaking scope and dimension.

176. Defendant Elston's most extreme actions even included, as subsequently was documented in Defendants' First Report based upon his own later truthful admissions, his making inaccurate statements, or in some instances evidently even the statement of outright falsehoods, when he was questioned contemporaneously about such actions by his superiors. *See, e.g.*, Report I at 48-49 (Elston conversation with Assistant Attorney General Peter D. Keisler); *id.* at 66-67 (Elston conversation with Deputy Attorney General Paul J. McNulty); *id.* at 96 (same); *see also id.* at 60 (Elston conversation with OARM director DeFalaise). Thus, as was expressed even more pointedly above with respect to Deputy Attorney General McNulty, the magnitude and acuteness of the constitutional violations committed by him were made possible by, and were repeatedly undergirded by, garden-variety dishonesty. *See also* Report I at 93-96 & n.60

(determining that OIG/OPR could not "credit" many statements by Elston to, inter alia, its investigators).  Yet the constitutional torts committed were not garden-variety at all.

177.  On information and belief, and as is documented in Defendants' First Report, the above-described conduct (including conduct additionally described below) is what defendant Elston was referring to (and/or actually was deflecting from) in the conversation documented in Defendants' First Report that included his glib statement of ostensible belated concern that the 2006 Honors Program and Summer Law Intern Program had been "Monica-ized."  Report I at 84.

178.  Indeed, defendant Elston effectively confessed to his culpability in this "huge problem for the Department," on multiple levels, suggesting that as he became "really tired of these things," specifically including component appeals to him of "screening committee" rejections, he sometimes "didn't spend a lot of time thinking about them."  Report I at 82, 84, 88, 90, 94-95; *see also, e.g.*, *id.* at 96 (". . . Elston stated that the candidates were deselected on the basis of . . . inappropriate information on the Internet."); *id.* at 84 (documenting comparable such "conce[ssion]").

179.  Even given the uncharacteristically high degree of effectiveness with which defendant Elston together with the other individual defendants to this civil

action proceeded in their unlawful enterprise – for an unlawful, nongovernmental

purpose -- that enterprise could not have been successful without the foundation of

organizational change made by (and the secrecy ensured thereby) defendant

Department of Justice in the year 2002 as described above.

**Count Eleven:  *Bivens* Claims Against Defendant McDonald**

180.  Plaintiffs hereby re-allege and incorporate all allegations in all above

paragraphs and, as to *Bivens* claims, they likewise incorporate all such allegations

in the paragraph immediately below.

181.  On information and belief, and as can be documented, defendant

McDonald was well acquainted with defendant Goodling before defendant

McDonald joined the Department of Justice – or was interviewed by defendant

Goodling for her position as Counsel to the Associate Attorney General, *see* Report

I at 76 – despite all suggestions or appearances to the contrary.

182.  Defendant McDonald conspired and coordinated directly with

defendants Goodling and Elston (and less directly with defendant Gonzales) to

deprive plaintiffs and those similarly situated of their Fifth Amendment rights to

due process and equal protection of the laws in such a manner, and on such a basis,

as to necessarily abridge their First Amendment freedoms of speech,

political/ideological expression, and association, as well as their Fifth Amendment

rights to due process and equal protection of the laws as described above.  As documented in defendants' reports, such violations constituted abridgments of plaintiffs' constitutional interests extending into their personal lives by, inter alia, inhibiting the free exercise of their First Amendment rights with regard to future activity in relation to possible future employment with defendant Department of Justice or any other federal agency.

183.  Defendant McDonald's principal role in this coordinated unlawful effort was to apply, and to aid others in applying, improper standards in Honors Program and Summer Law Intern Program decisionmaking through, inter alia, the use of  "printouts of [Internet] search results" that were created by her as she "conducted Internet searches on the candidates using Google and MySpace" and "searched for organizations to which candidates belonged," as well as through her written "comments on the applications throughout the process concerning the liberal affiliations of candidates she rejected," including "memberships" that a "candidate's application did not mention."  Report I at 76-83; *see also id.* at 72-73, 92-96; Report II at 20-22.

184.  Her actions in furtherance of this conspiratorial enterprise even included, as subsequently was found and documented in Defendants' First Report, her dissembling and being less than completely truthful when she was questioned

about her actions by the Associate Attorney General.  *See* Report I at 78-79.  *But see also id.* at 63-64 (reporting the mere "on the lookout . . . going forward" approach, rather than a more responsibly active one, indulged in by then-Principal Deputy Associate Attorney General Katsas, defendant McDonald's direct supervisor).

185.  On information and belief, the above-described conduct is what defendant McDonald was referring to in the conversation documented in Defendants' First Report recounting her stated belief "that she was the one the OIG was going to be concerned about."  Report I at 79.  In so stating, in tandem with her resultant abrupt resignation from the Justice Department on the eve of her rescheduled OIG/OPR interview (and, of course, her subsequent refusal to help shed further light on these matters through an OIG/OPR interview as a former employee), defendant McDonald exhibited both a callous disregard for the constitutional rights of all involved and, for present purposes, the attitude of someone chosen by others to achieve a desired unlawful result by evading detection and then seemingly (i.e., thus far) avoiding accountability.

186.  Even given the high degree of effectiveness with which defendant McDonald together with the other individual defendants to this civil action proceeded in their unlawful enterprise – for an unlawful, nongovernmental purpose

-- that enterprise could not have been successful without the foundation of organizational change made by (and the secrecy ensured thereby) defendant Department of Justice in the year 2002 as described above.

### Count Twelve:  *Bivens* Claims Against Defendant Gonzales

187.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

188.  Defendant Gonzales was head of the Office of the Attorney General during 2006 and as such was himself responsible for both general and specific grants of authority to, and the actions of, defendant Goodling.  In fact, defendant Gonzales effectively acknowledged and evidenced gross failures on his part in this regard, inter alia, during his testimony before the Senate Judiciary Committee twice in 2007.

189.  Acting in a manner wholly unprecedented for an Attorney General, defendant Gonzales effectively conspired with defendants Elston and McDonald, including by and through defendant Goodling, to deprive plaintiffs and those similarly situated of their Fifth Amendment rights to due process and equal protection of the laws in abridgment of, inter alia, their rights to follow a chosen profession free from such high-level government interference (as described above), in such a manner, and on such a basis, as to necessarily abridge their First

Amendment freedoms of speech, political/ideological expression, and association, as well as their rights to due process and equal protection of the laws, as is described above. As is documented in defendants' reports, such violations constituted abridgments of plaintiffs' constitutional interests extending into their personal lives by, inter alia, inhibiting the free exercise of their First Amendment rights with regard to future activity in relation to possible future employment with defendant Department of Justice or any other federal agency.

190. The very fact that defendant Gonzales, as Attorney General of the United States and the Nation's chief law enforcement officer, was responsible through the conduct of the Office of the Attorney General for such effective denials of due process in the admittedly unlawful use of First Amendment-based standards -- in such a shockingly systematic and successful way -- necessarily impinged on plaintiffs' constitutionally protected liberty and property interests in due process and equal protection of the laws as described above. Plaintiffs have constitutionally protected interests in receiving better (i.e., lawful) treatment by the Attorney General of the United States in their dealings with their Federal Government on matters of equal protection (including protection from the making of impermissible, ideological determinations and decisions about them), due process (both substantive and procedural), economic value, and, in effect, the

fundamental constitutional right to petition one's government free of unlawful government action.

191.  Through his unprecedented, irresponsible abnegation of responsibility as head of the Office of the Attorney General, defendant Gonzales effectively authorized defendant Goodling to apply (and/or to cause to be applied) unlawful standards to the members of the public who made application for Honors Program or Summer Law Intern Program employment with defendant Department of Justice in 2006, overtly acting in gross violation of their constitutional rights, with the resultant commission of constitutional torts that, on information and belief, may well be likewise unprecedented, wholly or partly, in and of themselves.  This was an extraordinary, and uniquely successful, conspiracy to achieve political results that required the gross deprivation of hundreds of individuals' constitutional rights, including the constitutionally protected liberty and property interests in due process and equal protection of the laws, for which defendant Gonzales was legally most responsible.  *See, e.g.*, Report I at 65 (reflecting fact that continuation of "screening committee" actions under defendant Gonzales "was important [for] the Attorney General [to] have input into his Honors Program").

192.  Notwithstanding that he has disclaimed, inter alia, knowledge, cognition, realization, awareness, understanding, appreciation, focus, sustained

retention, basic recall, and/or overall recollection of such particular matters, *see,
e.g.*, Report II at 22 n.19, defendant Gonzales, as both Attorney General and head

of the Office of the Attorney General, knew or should have known in sufficient

detail about the conduct, actions, institutional activities, related interpersonal

dealings, degree of familiarity with basic principles and standards, overall

background of training and orientation, and risk of unprofessional mindset of

defendant Goodling in relation to the Attorney General's Honors Program and

Summer Law Intern Program, inter alia, so as to ensure that they would not operate

during 2006, either directly or indirectly, in a manner that so grossly trampled

constitutional interests and deprived plaintiffs and hundreds of other like

individuals of their constitutional rights as described above. *Cf.* Report I at 67 n.46

(notably making clear that, as to this OIG/OPR investigation, investigators asked

defendant Gonzales only whether and when he was "aware of complaints" about

Honors Program/Summer Law Intern Program matters, not about his involvement

in and/or responsibility for any or all underlying constitutionally violative

conduct); *see also* Testimony of Inspector General Glenn A. Fine Before Senate

Judiciary Committee, dated July 30, 2008 (characterizing with precision OIG/OPR

question to defendant Gonzales as only whether he was "aware of problems or

complaints" about programs).

193.  In this particular regard, even apart from all others, defendant Gonzales mishandled his official responsibilities in a manner so flagrantly irresponsible as to constitute more than gross negligence and reckless disregard for the proper avoidance of constitutional violations by and through his employees.  Among all cabinet officers, he as Attorney General was best positioned to do otherwise; his breaches of responsibility, and his constitutionally violative acts of commission and/or omission, were commensurately and singularly wrongful – which is not to assert, for present purposes, the absence of other contexts in which his misconduct was comparable or perhaps worse.

194.  Even given the exceptionally high degree of effectiveness with which defendant Gonzales together with the other individual defendants to this civil action proceeded in their unlawful enterprise – for an unlawful, nongovernmental purpose -- that enterprise could not have been successful without the foundation of organizational change made by (and the secrecy ensured thereby) defendant Department of Justice in the year 2002 as described above.

### Count Thirteen:  Violations of the Civil Service Reform Act

195.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

196.  Plaintiffs are not federal employees strictly limited as such in their

ability to seek redress for defendant Department of Justice's gross violations of the

fairness principles and requirements contained in the Civil Service Reform Act

("CSRA") in their cases (including in those of others similarly situated). In fact,

the actions of defendant Department of Justice complained of above actually

resulted in that circumstance.

197. By creating and maintaining records about plaintiffs as is described

above and evidenced in Defendants' First Report, defendant Department of Justice

wrongfully injected politics, political affiliation, and ideological affiliation into its

Honors Program and Summer Law Intern Program decisionmaking as to plaintiffs

and as to those similarly situated, consciously and callously harming them in

specific violation of the CSRA standards and requirements set forth at 5 U.S.C. §§

2301(b), 2301(b)(1)(E), 2301(b)(2), and 2302(b)(12); at 42 C.F.R. § 1(a); and in

defendant Department of Justice's own statements of policy regarding such career

employee hiring actions. *See* Report I at 6-8; *see also, e.g.*, *id.* at 93-94 & n.59.

198. The fact that defendants Goodling and Elston failed to have proper

awareness of which categories of Department of Justice employees consist of

career employees, as opposed to those that do not, *see, e.g.*, Report II at 121-22, is

further illustrative of defendant Department of Justice's gross overall failures in

this regard through a pervasive scheme that warrants commensurate declaratory

judgment relief.

## Count Fourteen:  Violations of the Federal Records Act

199.  Plaintiffs hereby re-allege and incorporate all allegations in all above paragraphs.

200.  The Federal Records Act regulates not only records maintenance, which is at the heart of this civil action, but also the processes of records disposition as well.

201.  As is glaringly evidenced in Defendants' First Report, and is described above, defendant Department of Justice has failed to meet both its records-maintenance responsibilities and its records-disposition responsibilities and to most if not all, of the records pertaining to its administrative decisionmaking regarding plaintiffs and others similarly situated.  *See, e.g.*, Report I at 68-69.

202.  This is evidenced in Defendants' Second Report as well.  *See* Report II at 21 (reporting Federal Records Act-related statement by defendant Goodling as follows:  "Normally, if I found [through 'Internet screening research'] something that was negative about someone, we didn't hire them, and I wouldn't have necessarily retained it.").

203.  And as is now plainly evidenced through defendant Department of Justice's current conduct as described above, such records-maintenance as records-

disposition vulnerabilities continue to exist as to records of defendant Department

of Justice's Honors Program and Summer Law Intern Program, both past and

present, as well as other programs throughout the Department of Justice, and

presumptively are continuing in the absence of adequate remedial training -- which

warrants judicial review under the Administrative Procedure Act, a declaratory

judgment, and appropriate injunctive relief, lest in the absence of adequate

remedial action it recur.

### Class Action Allegations

204.  In accordance with Rule 23.1(a) of the Local Rules of this Court,

plaintiffs hereby indentify the following portions of Rule 23 of the Federal Rules

of Civil Procedure as those under which this civil action is claimed to be properly

maintainable as a class action:  Rules 23(b)(1) and 23(b)(3).

205.  As to the allegations appropriate to the claim that this civil action is

properly maintainable as a class action, plaintiffs specifically re-allege and

incorporate all of the allegations of all of the above paragraphs as uniformly

constituting such.

206.  As to the approximate size and definition of the alleged class

(including subclasses), plaintiffs hereby identify them as consisting of the numbers

and types of persons who have been referenced by defendant Department of Justice

(i.e., as known to defendant Department of Justice in the first instance rather than known to plaintiffs) in the descriptions that are contained in Defendants' First Report for the years 2002 and 2006. For purposes of establishing numerosity, it may be noted that Defendants' First Report establishes a number that exceeds 800. *See* Defendants' First Report at 18, 20, 40, 53; *see also id.* at 38.

207. As to the basis upon which plaintiffs claim to be adequate representatives of the class (including subclasses), plaintiffs aver that as is demonstrated in paragraphs 3-8 and 14-44, above, they are by their own circumstances situated similarly to the putative class members and are by virtue of their very close familiarity with the law and facts applicable to their claims and the common claims of putative class members uniquely qualified to proceed as their representatives in the vindication of their rights and the pursuit of appropriate redress for defendant Department of Justice's and the individual defendants' violations of same.

208. As to the alleged questions of law and fact claimed to be common to the class, plaintiffs aver that they are as stated in the allegations and claims of legal violations specifically made above, including but not limited to the proper administrative compliance with the multiple identified requirements of the Privacy Act of 1974 and the Federal Records Act, and claims arising under the Constitution

of the United States as made against defendants Goodling, Elston, McDonald, and Gonzales individually.

209.  As to the allegations supporting the findings required by Rule 23(b)(3) of the Federal Rules of Civil Procedure, plaintiffs specifically re-allege and incorporate all of the allegations of all of the above paragraphs as uniformly constituting such, and they further specifically aver the facts of those allegations as both individually and as a whole supporting findings in this case that common questions of law and fact predominate and that the maintenance of this civil action as a class action is superior to any other available method of fairly and efficiently adjudicating the matters that have been placed in controversy by the findings and conclusions set out in Defendants' First Report and Defendants' Second Report.

### Prayer for Relief

WHEREFORE, plaintiffs pray for relief as follows:

210.  Plaintiffs each seek damages in the amount of one-hundred thousand dollars ($100,000) against defendant United States Department of Justice (for Privacy Act purposes in the stead of the United States), as well as for each member of the class (or applicable subclass) as established and certified in this action.

211.  Plaintiffs Gerlich, Coleman, and Saul each seek damages in the amount of fifty thousand dollars ($50,000) against defendant Goodling, damages in the

amount of fifty thousand dollars ($50,000) against defendant Elston, damages in the amount of twenty-five thousand dollars ($25,000) against defendant McDonald, and damages in the amount of one hundred twenty-five thousand dollars ($125,000) against defendant Gonzales, as well as damages in those respective amounts as against those respective defendants for each member of the class (or applicable subclass) as established and certified in this action.

212.  Plaintiffs Gerlich, Coleman, and Saul each seek punitive damages against defendant Goodling, against defendant Elston, and against defendant McDonald, separately, and punitive damages against defendant Gonzales, in amounts that are twice and three times the total amounts awarded as against each individual defendant in those two defendant groups, respectively, as well as punitive damages in those respective amounts as against those respective defendants for each member of the class (or applicable subclass) as established and certified in this action.

213.  Plaintiffs Gooch, Meier, and Zajac each seek, separately for themselves and for each member of the class (or applicable subclass), damages and punitive damages against defendant Gonzales in amounts to be specified in a further amendment of this Amended Complaint in the event that it is determined, either at trial or beforehand, that defendant Gonzales's involvement in matters

occurring during the year 2002, including but not limited to the replacement of

defendant Department of Justice's OARM director earlier that year, was as

suspected causally connected to the unlawful administration of the Honors

Program/Summer Law Intern Program in 2002 (not to mention 2006).

214.  Plaintiffs seek a declaratory judgment that defendant Department of

Justice, defendant Goodling, defendant Elston, defendant McDonald, and

defendant Gonzales, both individually and acting in concert, violated plaintiffs'

constitutional rights – specifically, their First Amendment freedoms of speech,

political/ideological expression, and association, and their Fifth Amendment rights

to due process and equal protection of the laws – as well as such rights of those

similarly situated in the class (or applicable subclass) as established and certified in

this action.

215.  Plaintiffs seek a declaratory judgment that defendant Department of

Justice has violated the standards, requirements, and most fundamental legal

principles embodied in the CSRA, through an unprecedented scheme spanning the

years 2002-2006 that was so uniquely and pervasively successful that

extraordinary remedial measures are warranted lest it yet again recur.

216.  Plaintiffs seek a declaratory judgment that defendant Department of

Justice has violated, and in the absence of adequate remedial action evidently

continues to violate, requirements of the Federal Records Act and the Privacy Act of 1974, specifically including a declaration that defendant Department of Justice's mishandling of its Privacy Act responsibilities constitutes more than gross negligence and amounts to an overall institutional violation of, inter alia, Privacy Act subsection (e)(9), particularly given the levels of agency officials involved.

217.  Plaintiffs seek injunctive relief, on behalf of past, present, and future aggrieved persons, in the form of orders enjoining defendant Department of Justice from continuing to violate its legal obligations under the Constitution, the Civil Service Reform Act, the Federal Records Act, and the Privacy Act of 1974. As to the latter in particular, plaintiffs seek an injunction designed to ensure that any relevant remedial measures recently taken by defendant Department of Justice, or identified with particularity but yet to be taken, become institutionalized throughout the Department, specifically including within the realm of high-level appointees, as a necessary and appropriate safeguard against any future recurrence. In the event that no such step has yet been taken in a particular respect by the time of the issuance of the Court's judgment in this civil action, plaintiffs seek an injunction ordering the immediate institution of such measures.

218.  Plaintiffs seek an order awarding them and their fellow class members the costs and reasonable attorney fees involved in bringing this action.

219.  Plaintiffs seek, on their own behalves as well as on behalf of all other class members, such other relief that the Court may deem just and proper.

220.  Plaintiffs demand a trial by jury on all applicable claims.

By Plaintiffs' Attorney:

_____

Dated:  August 15, 2008                DANIEL J. METCALFE
D.C. Bar # 244293
4801 Massachusetts Ave., N.W.
Washington, D.C.  20016
(202) 274-4134