## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SEAN M. GERLICH, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.  08-1134 (JDB)** |
| **UNITED STATES DEPARTMENT OF JUSTICE, et al.,** | |
| **Defendants.** | |

### MEMORANDUM OPINION

Plaintiffs are eight unsuccessful applicants for employment with the United States Department of Justice ("DOJ") who assert claims arising from the well-publicized misconduct of senior DOJ officials who allegedly discriminated against certain applicants based upon their political affiliations.  Plaintiffs assert claims against defendant DOJ for monetary and equitable relief under the Privacy Act, the Civil Service Reform Act ("CSRA"), the Federal Records Act ("FRA") and the United States Constitution.  Plaintiffs have also sued former DOJ officials Alberto Gonzales, Monica Goodling, Michael Elston, and Esther McDonald, and current DOJ official Louis DeFalaise (collectively, the "individual defendants"), personally for money damages based on claims brought directly under the First and Fifth Amendments to the Constitution.  Now pending before the Court are motions to dismiss filed by DOJ and each of the individual defendants pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

From the inception of this case, plaintiffs have emphasized, repeatedly, the extraordinary

---

[1] All defendants have moved to dismiss pursuant to Rule 12(b)(6) and DOJ, Gonzales and Elston have moved to dismiss pursuant to Rule 12(b)(1).  Defendant Gonzales also has moved to dismiss pursuant to Rule 12(b)(5) for insufficient service of process.

circumstances that underlie it. To be certain, the Court agrees that misconduct by senior government officials -- especially when it implicates the First Amendment -- is gravely serious and must not be condoned. But defendants have raised several threshold issues that potentially prevent this Court from considering the merits of plaintiffs' case. Indeed, for the reasons explained below, the Court will not reach the merits of plaintiffs' constitutional claims against the individual defendants because it concludes that, under controlling Supreme Court and D.C. Circuit precedent, the CSRA is a comprehensive, remedial statutory scheme that precludes the recognition of an implied damages remedy against the individual defendants. The Court also concludes that plaintiffs' claims for equitable relief suffer from fatal pleading deficiencies. Likewise, most of plaintiffs' Privacy Act claims are insufficiently pled and must be dismissed. Plaintiffs James Saul, Matthew Faiella and Daniel Herber have, however, satisfied their pleading burden with respect to DOJ's alleged maintenance of First Amendment-related records (Count I) and irrelevant records (Count II) in violation of the Privacy Act, and those plaintiffs will be allowed to proceed with those claims. However, the other plaintiffs lack standing to pursue those claims and they will be dismissed from the case.

## BACKGROUND[2]

I.     **Allegations of Misconduct in the Honors Program and Summer Law Intern Program Hiring Process**

The Attorney General's Honors Program ("Honors Program") is the exclusive means by which DOJ hires recent law school graduates and judicial law clerks who have no prior legal experience.  First OIG/OPR Report at 3.  Historically, the Honors Program has been very competitive and the number of applications received in a typical year far surpasses the number of positions that are available.  Id.  Several of DOJ's component divisions participate in the Honors Program hiring process, which is overseen by DOJ's Office of Attorney Recruitment and Management ("OARM").  Id.  Although OARM processes all applications, each component hires its own Honors Program attorneys.  Id.  A similar hiring process also exists for paid summer interns in DOJ's Summer Law Intern Program ("SLIP").  Id. at 3-4.

In 2002, the Honors Program and SLIP hiring process was revamped in response to recommendations from a group of senior officials within the Attorney General's office ("Working Group").  See id. at 4.  These changes, which remained in effect until 2006, were designed to stimulate increased applications, to maintain the prestige of the Honors Program and to help DOJ compete with law firms for the best candidates.  See id. at 4-5.  In order to allow more DOJ

---

[2] The facts set forth in this section are taken primarily from plaintiffs' second amended complaint ("Sec Am. Compl.").  The second amended complaint incorporates two reports issued jointly by DOJ's Office of the Inspector General ("OIG") and Office of Professional Responsibility ("OPR"), which are entitled "An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program" (June 24, 2008) ("First OIG/OPR Report") and "An Investigation of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General" (July 28, 2008) ("Second OIG/OPR Report").  Because the second amended complaint incorporates these two reports, the Court will also consider them in resolving the instant motions.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).


attorneys to participate, particularly political appointees in leadership positions, the hiring process became more centralized in Washington, D.C.  See id. at 4.  To that end, a Screening Committee, composed of several members of the Working Group, was also created to review and approve the candidates who were selected for interviews by the components.  Id. at 5.  The composition of the Screening Committee changed from year to year, and the components were generally unaware who served on the Committee or what criteria it applied in reviewing candidates.  Id.  Moreover, the Screening Committee gave no reasons or explanations for its decision to deselect a candidate from the list of those to be interviewed.  Id.

Through 2005, OARM received very few complaints about the new hiring process or the decisions of the Screening Committee.  Id.  However, in 2006 OARM received a number of complaints regarding the abnormal length of time taken for Screening Committee review and the unusually large number of seemingly qualified Honors Program and SLIP candidates that were deselected for interviews.  Id.  As a result of the complaints, DOJ changed the hiring process once again in 2007, transferring control of the Screening Committee from political appointees to career employees.  Id.  Then, in April 2007, an anonymous letter was sent to the Chairmen of the House and Senate Judiciary Committees from "A Group of Concerned Department of Justice Employees."  Id. at 66.  That letter claimed that a number of highly qualified candidates, who had been selected for interviews by career employees within the individual DOJ components, had been subsequently rejected by the Screening Committee on the basis of their Democratic Party or liberal affiliations.  Id. at 1 n.1.  The OIG and the OPR, which were already investigating issues related to the removal of certain United States Attorneys, decided to expand the scope of their investigation to include the allegations regarding Honors Program and SLIP hiring.  Id. at 1.

On June 24, 2008, the OIG and the OPR issued a joint report summarizing their findings entitled "An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program." Sec. Am. Compl. ¶ 59.  That report serves as the basis for most of the allegations in plaintiffs' second amended complaint.  Central to those allegations is the report's finding that two members of the 2006 Screening Committee, Esther McDonald and Michael Elston, took political and ideological affiliations into account in deselecting candidates for Honors Program and SLIP interviews.  See id. ¶¶ 184-92, 193-99; First OIG/OPR Report at 99.  Plaintiffs also allege, based on the report, that McDonald conducted Internet searches regarding candidates' political and ideological affiliations, printed out such information when it revealed liberal associations and then attached the printouts and her own handwritten comments to the candidates' applications in support of her recommendations to deselect them.  See Sec. Am. Compl. ¶ 62, 196; First OIG/OPR Report at 71-73, 76-77, 82. Because these documents existed only in hard copy, occupied substantial storage space and contained personal information about the applicants, they were placed in a "burn box" and destroyed prior to the initiation of the OIG/OPR investigation.  See First OIG/OPR Report at 68-69.

As for the other individual defendants, plaintiffs focus much of their attention on Monica Goodling, then DOJ's White House Liaison, who they allege was the "principal wielder of authority among the four subcabinet-level individual defendants" and the de facto architect of this unlawful scheme to weed out "ideologically undesirable" candidates.  See Sec. Am. Compl. ¶¶ 88, 95, 175-76, 178.  Plaintiffs further allege that based upon Goodling's general oversight role and her admitted use of Internet "search strings" to screen liberal applicants for other career

positions within DOJ, she also assisted McDonald with her Internet research regarding Honors Program and SLIP applicants.  See id. ¶¶ 179-80.  With regard to former Attorney General Alberto Gonzales, plaintiffs primarily allege that he was complicit in this scheme "[t]hrough his unprecedented, irresponsible abnegation of responsibility," by which he effectively authorized Goodling to orchestrate the unlawful conduct at issue.  See id. ¶ 214.  Likewise, plaintiffs also allege that Louis DeFalaise, Director of OARM, enabled the unlawful conduct because he held a "key oversight role" with regard to career employee hiring matters, he knew of complaints from some components in 2006 that the Honors Program and SLIP hiring process "had been politicized," and yet he "cast[ ] a blind eye" to the problem.  See id. ¶¶ 202, 205, 207.

## II.    Procedural History

Plaintiff Sean Gerlich originated this action on June 30, 2008, less than a week after the first OIG/OPR report was released.  The first amended complaint, filed by five of the current plaintiffs (Gerlich, Coleman, Gooch, Meier, Saul) and one who is no longer part of this action (Zajac), followed on August 15, 2008.  Before all defendants could respond to the amended complaint, plaintiffs moved for leave to amend their complaint for a second time.  This Court granted plaintiffs' motion and the second amended complaint was filed on November 12, 2008.  The second amended complaint, which added three plaintiffs (Faiella, Herber, Spiegel) and defendant DeFalaise, generally alleges that plaintiffs -- all unsuccessful applicants for employment with DOJ -- have been injured by the "politicized" hiring process that plagued the Honors Program and SLIP during 2002 and 2006.[3]  Specifically, the second amended complaint

---

[3] The respective programs to which plaintiffs applied, and the relevant years, are as follows:  Sean Gerlich (Honors Program, 2006), Christopher Coleman (SLIP, 2006), James Gooch (Honors Program, 2002), Benjamin Meier (Honors Program, 2002), James Saul (Honors

asserts fifteen separate counts arising under the Privacy Act (Counts I-VII), the U.S. Constitution (Counts VIII-XIII), the CSRA (Count XIV), and the FRA (Count XV).[4] Defendants have moved to dismiss the second amended complaint in its entirety, pursuant to Rules 12(b)(1) and 12(b)(6). Plaintiffs have opposed the motions. Following its receipt of defendants' reply briefs,[5] the Court held a motions hearing on August 18, 2009 and the motions are now ripe for resolution.

## STANDARD

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979). Therefore, the factual allegations must be presumed true, and plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the

---

Program, 2006), Matthew Faiella (Honors Program, 2006), Daniel Herber (Honors Program, 2006), Ryan Spiegel (Honors Program, 2002). Sec. Am. Compl. ¶¶ 3-10.

[4] Plaintiffs have styled their case as a putative class action and their [71] motion for class certification is currently pending. Several defendants have countered by moving to strike the class allegations from the second amended complaint. See, e.g., McDonald Mot. to Strike Class Allegations (Feb. 16, 2009). On March 9, 2009, the Court stayed all briefing on class certification issues, pending resolution of the motions to dismiss.

[5] After the motions were fully briefed, plaintiffs also filed a number of notices of supplemental authority, and some defendants filed responses, which the Court has also considered in resolving the instant motions.

complaint. Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court -- plaintiffs here -- bears the burden of establishing that the court has jurisdiction. See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-04 (1998)); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998). Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), Leatherman, 507 U.S. at 164, "'plaintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1990)). At the stage of litigation when dismissal is sought, a plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. See St. Francis Xavier Parochial Sch., 117 F.3d at 624. Additionally, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, as long as it still accepts the factual allegations in the complaint as true. See Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n.3; Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir.1992).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court is mindful that all that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555-56; see also Papasan, 478 U.S. at 286.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); Atherton v. District of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).  A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.  This amounts to a "two-pronged approach" under which a court first identifies the factual allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 1950-51.

## ANALYSIS

## I.     Plaintiffs' Constitutional Claims Against the Individual Defendants

Plaintiffs assert what are commonly known as Bivens claims against the individual defendants -- they seek money damages directly under the Constitution for alleged violations of

their constitutional rights.  See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388

(1971).  The Bivens claims are predicated on alleged violations of plaintiffs' First and Fifth

Amendment rights by the individual defendants in connection with the Honors Program and

SLIP hiring process.  See Sec. Am. Compl. ¶¶ 177, 186, 195, 208, 212.  Although federal courts

"have discretion in some circumstances to create a remedy against federal officials for

constitutional violations," courts "must decline to exercise that discretion where 'special factors

counsel[ ] hesitation' in doing so."  Wilson v. Libby, 535 F.3d 697, 704 (D.C. Cir. 2008) (citing

Bivens, 403 U.S. at 396).  "One 'special factor' that precludes creation of a Bivens remedy is the

existence of a comprehensive remedial scheme."  Id. at 705.

          The Supreme Court first addressed this issue in Bush v. Lucas, 462 U.S. 367 (1983), a

case that considered whether a federal employee could obtain money damages under the First

Amendment for an adverse personnel action taken against him in alleged retaliation for critical

comments he had made about his employer to the news media.  See id. at 369.  The Court

declined to recognize such a claim because a complex mix of legislation, executive orders, and

detailed Civil Service Commission regulations comprised an "elaborate, comprehensive scheme"

that provided substantive and procedural remedies for improper federal personnel actions.  Id. at

385.  The Lucas Court also noted that the proper question is "not what remedy the court should

provide for a wrong that would otherwise go unredressed," but rather "whether an elaborate

remedial system that has been constructed step by step, with careful attention to conflicting

policy considerations, should be augmented by the creation of a new judicial remedy for the

constitutional violation at issue."  Id. at 388.  Hence, the Court made clear that "Congress is in a

far better position than a court to evaluate the impact of a new species of litigation between

-10-

federal employees on the efficiency of the civil service."  Id. at 389.  In revisiting the special-

factors analysis several years later in Schweiker v. Chilicky, 487 U.S. 412 (1988), the Supreme

Court further observed that

> the concept of "special factors counselling hesitation in the absence of affirmative
> action by Congress" has proved to include an appropriate judicial deference to
> indications that congressional inaction has not been inadvertent.  When the design
> of a Government program suggests that Congress has provided what it considers
> adequate remedial mechanisms for constitutional violations that may occur in the
> course of its administration, we have not created additional Bivens remedies.

487 U.S. at 423.

More recently, in Wilkie v. Robbins, 551 U.S. 550 (2007), the Supreme Court again

considered whether the existence of alternative means for protecting a constitutionally-based

interest precluded a Bivens remedy.  The Wilkie Court ultimately concluded that the "patchwork"

of "state and federal, administrative and judicial benches applying regulations, statutes and

common law rules" available to the plaintiff was unlike the "'elaborate remedial system[s]'" that

were designed to protect the interests of plaintiffs in Bush and Chilicky, and could not

definitively support an inference that "Congress expected the Judiciary to stay its Bivens hand."

Id. at 554 (quoting Bush, 462 U.S. at 388).  The Court therefore proceeded to the second step of

the special-factors analysis -- a step that was unnecessary in Bush and Chilicky -- and "weighing

the reasons for and against the creation of a new cause of action, the way that common law

judges have always done," it found that other special factors counseled against recognizing a

Bivens remedy for plaintiff's alleged injury.  Id. (citing Bush, 462 U.S. at 378 ("In the absence of

such a [statutory remedy], the federal courts must make the kind of remedial determination that is

appropriate for a common-law tribunal.")).

Consistent with Bush, Chilicky and Wilkie, the D.C. Circuit has articulated several "general principles" governing when the existence of a statutory remedial scheme counsels hesitation in creating a Bivens remedy.  Spagnola v. Mathis, 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc) (per curiam).  "If the comprehensiveness of a statutory scheme cannot be gainsaid and it appears that 'congressional inaction [in providing for damages remedies] has not been inadvertent[,]' courts should defer to Congress' judgment with regard to the creation of supplemental Bivens remedies."  Id. at 227-28 (alterations in original) (quoting Chilicky, 487 U.S. at 423).  When these circumstances exist, "courts must withhold their power to fashion damages remedies" unless Congress has "plainly expressed an intention that the courts preserve Bivens remedies."  Id. at 228.  Moreover, "the Chilicky Court made clear that it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention."  Id. at 227.  Indeed, Spagnola found that a comprehensive statutory scheme precludes a Bivens remedy even when the scheme provides the plaintiff with "no remedy whatsoever."  Id. at 228; see Wilson, 535 F.3d at 709 ("The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue.").  Applying these principles, the D.C. Circuit has held that, for purposes of the special-factors analysis, the CSRA is a comprehensive statutory scheme precluding Bivens remedies.  Spagnola, 859 F.2d at 229.

In light of this authority, the individual defendants assert that the CSRA precludes plaintiffs' Bivens claims.[6]  See, e.g., Gonzales Mem. at 11-15; Goodling Mem. at 4-9.  The Court

---

[6] DOJ, too, has attacked the viability of the Bivens claims in a statement of interest supporting dismissal.  See DOJ Mem. at 32-45.  The individual defendants' alternative arguments in support of dismissal of the Bivens claims need not be reached here.

agrees.  Plaintiffs have alleged that they were denied federal employment through DOJ's Honors

Program or SLIP for unconstitutional reasons.  In <u>Spagnola</u>, the D.C. Circuit established that

"<u>Bivens</u> remedies [do not] exist for civil service employees and applicants who advance

constitutional challenges to federal personnel actions" because the CSRA "affirmatively speaks"

to such claims "by condemning the underlying actions as 'prohibited personnel practices.'"  859

F.2d at 229-30.  As plaintiffs themselves acknowledge in the second amended complaint,

positions within the Honors Program and SLIP are "career" employment positions that are

subject to the "prohibited personnel practice" provisions of the CSRA.  <u>See</u> Sec. Am. Compl. ¶¶

220-21 (citing 5 U.S.C. §§ 2301, 2302).  Thus, plaintiffs can petition the Office of Special

Counsel ("OSC") -- although they have elected not to do so as of yet -- alleging a "prohibited

personnel practice."  <u>See</u> 5 U.S.C §§ 1212, 1214, 2302.  If the OSC determines that the plaintiffs'

allegations are meritorious, it would then be required to report its findings to the agency

involved, in this case DOJ.  <u>See</u> 5 U.S.C. § 1214(b)(2)(B).  If DOJ fails to take action, then the

OSC could request the Merit Systems Protection Board ("MSPB") to order an appropriate

corrective action.  <u>See</u> 5 U.S.C. § 1214(b)(2)(C).  Moreover, these remedies plainly are available

to unsuccessful applicants for career positions, such as plaintiffs in this case.  <u>See</u> 5 U.S.C. §

2302(a)(2)(A)(i) (including an "appointment" within the class of "personnel actions" covered by

the CSRA); <u>Spagnola</u>, 859 F.2d at 225 n.3 (CSRA applies to federal employment applicants as

well as federal employees).

　　　　Although plaintiffs do not seriously contest the applicability of the CSRA, they take issue

with its preclusive effect largely because they are dissatisfied with the remedies that it affords

them.  <u>See, e.g.</u>, Pls.' Mem. at 27 ¶ 8 ("[T]he utterly unrealistic administrative process available

to the plaintiffs here" should not preclude them from pursuing a <u>Bivens</u> remedy.), 36 n.49 ("[G]iven the timing and circumstances of this case, it is utterly unrealistic to think that [plaintiffs] have a CSRA remedy to be pursued.").  Plaintiffs also argue that by offering unsuccessful applicants an opportunity to reapply for the Honors Program, former Attorney General Michael Mukasey has "recognize[d] the non-viability of and supersede[d] any competing CSRA remedy in this case." <u>See</u> <u>id.</u> at 29-30.[7]  These arguments miss the mark because the Supreme Court and the D.C. Circuit have established that the existence of the comprehensive remedial scheme itself is the relevant consideration, not the availability or adequacy of particular remedies.  See <u>Spagnola</u>, 859 F.2d at 227 (citing <u>Chilicky</u>, 487 U.S. at 423) ("[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention.").  Indeed, <u>Spagnola</u> established that a <u>Bivens</u> remedy is precluded by the CSRA even when that scheme provides the plaintiff with "no remedy whatsoever." <u>Id.</u> at 228; <u>see also</u> <u>Wilson</u>, 535 F.3d at 709 ("The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue.").  Hence, neither the perceived lack of remedies for plaintiffs under the CSRA -- even though, in fact, there are remedies available to plaintiffs, as described

---

[7] On September 10, 2008, then Attorney General Mukasey sent letters to rejected 2006 Honors Program applicants and invited them to interview for an Honors Program position. <u>See</u> Pls.' Partial Opp'n to DOJ's Mot. for Enlargement of Time at 4-7 (Oct. 9, 2008).  Plaintiffs assert that this communication was a violation of D.C. Bar Rule of Professional Conduct 4.2 because Mukasey's letter was mailed directly to three of the plaintiffs in this case, rather than to their counsel, while this litigation was pending. <u>See</u> Pls.' Mem. at 13 n.16.  The Court expresses no opinion on this issue, which is not germane to the instant motions.

above[8] -- nor former Attorney General Mukasey's invitation alters the fact that plaintiffs' "constitutional claims are cognizable as 'prohibited personnel practices' within the CSRA system."  See Spagnola, 859 F.2d at 225 n.3.

Nevertheless, plaintiffs contend that "the Court should fully exercise the fundamental judgment that is involved in determining whether to recognize Bivens jurisdiction on the extraordinary facts of this case."  Pls.' Mem. at 8 (emphasis in original).  But plaintiffs would have this Court exercise its "judgment" in a manner that ignores binding precedent -- the wide discretion that plaintiffs desire this Court to exercise simply does not exist within the parameters of the case law.  Even under Wilkie, a case heavily relied upon by plaintiffs, see Pls.' Mem. at 38-40, it is plain that a court's "judgment" in the Bivens arena is highly circumscribed.  It is true that the Wilkie Court "weigh[ed] reasons for and against the creation of a new cause of action, the way common law judges have always done," but it did so only because there was no "'elaborate remedial system'" that governed the plaintiff's claims.  See 551 U.S. at 554 (quoting Bush, 462 U.S. at 388).  If such a system had existed, however, that would have ended the special-factors analysis because it would have answered the question whether "Congress expected the Judiciary to stay its Bivens hand."  See id.; Bush, 462 U.S. at 378 ("In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal.") (emphasis added).  The Wilkie Court only proceeded to step two

---

[8] At the motions hearing, plaintiffs called the Court's attention to a passage from Correctional Services Corp. v. Malesko, 524 U.S. 61 (2001), discussing the extension of Bivens remedies into new contexts:  "So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." Id. at 69.  As indicated in this section, the Court has concluded that plaintiffs do have "an avenue for some redress."

because the answer was unclear.  Here, in contrast, the answer is clear at step one and the Court is permitted to look no further.

Plaintiffs are also insistent that, at the very least, dismissal of their <u>Bivens</u> claims is inappropriate in the absence of jurisdictional discovery, which will "ensure that the Court has a complete picture of this case's fact pattern as the basis for it reaching a careful, case-specific judgment."  Pls.' Mem. at 28.  The Court is unpersuaded by plaintiffs insistence that jurisdictional discovery will alter the analysis here.  Even accepting the allegations of the second amended complaint as true and drawing all reasonable inferences in favor of plaintiffs, as must be done, <u>see</u> <u>Scheuer</u>, 416 U.S. at  236, this case is squarely controlled by <u>Spagnola</u> because it concerns alleged constitutional violations that occurred in the context of a federal employment application process.  Such violations, even those allegedly perpetrated by senior government officials, fall within the scope of the CSRA and they are redressable under the administrative process established by that statute.  To disregard this and instead recognize a <u>Bivens</u> remedy here would ignore the reasoned judgment of Congress and clear Supreme Court and D.C. Circuit precedent. No amount of jurisdictional discovery will alter that.  The Court concludes, then, that because plaintiffs are unsuccessful federal job applicants whose constitutional claims implicate a "prohibited personnel practice," the "comprehensive remedial scheme" of the CSRA applies and this Court must "must decline to exercise [its] discretion" to recognize a <u>Bivens</u> remedy in light of this "special factor."  <u>See</u> <u>Wilson</u>, 535 F.3d at 704-05; <u>Spagnola</u>, 859 F.2d at 229. Accordingly, plaintiffs' <u>Bivens</u> claims (Counts IX-XIII) as well as the individual defendants themselves will be dismissed from this case.

II.     **Plaintiffs' Claims Against DOJ**

    A.     **Privacy Act Claims for Money Damages**

The Privacy Act "regulate[s] the collection, maintenance, use, and dissemination of information" about individuals by federal agencies.  Privacy Act of 1974, Pub.L. No. 93–579, § 2(a)(5), 88 Stat. 1896, 1896.  "The Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  Doe v. Chao, 540 U.S. 614, 618 (2004).  One such form of relief enables an individual to seek money damages when an agency intentionally or willfully fails to comply with the Act's requirements "in such a way as to have an adverse effect on an individual."  5 U.S.C. § 552a(g)(1)(D), (g)(4).  In Counts I through VII of the Second Amendment Complaint, plaintiffs assert that DOJ has violated seven separate provisions of the Privacy Act.

Under the Privacy Act, a "record" is "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual."  5 U.S.C. § 552a(a)(4).  The records at issue here are the Internet printouts and the handwritten notes allegedly created by McDonald during the Screening Committee's 2006 review of Honors Program candidates.  The first OIG/OPR report established, and both parties now acknowledge, that to the extent these records once existed they were destroyed in early 2007.  See First OIG/OPR Report at 68-69.

    1.     **Subsection (e)(7) -- Count I**

Subsection (e)(7) provides that any agency maintaining a system of records shall

"maintain no record describing how any individual exercises rights guaranteed by the First

Amendment unless expressly authorized by statute or by the individual about whom the record is

maintained or unless pertinent to and within the scope of an authorized law enforcement

activity."  5 U.S.C. § 552a(e)(7).  The D.C. Circuit has concluded "that an agency that maintains

any system of records is prohibited from maintaining a record of an individual's First

Amendment activity 'even if [that record] is not subsequently incorporated into the agency's

system of records.'"  Maydak v. United States, 363 F.3d 512, 516 (D.C. Cir. 2004) (quoting

Albright v. United States, 631 F.2d 915, 916-17 (D.C. Cir. 1980)) (emphasis in original).  "[T]he

Act clearly prohibits even the mere collection of such a record, independent of the agency's

maintenance, use, or dissemination of it thereafter."  Albright, 631 F.2d at 918.  Beyond alleging

that the agency maintained[9] the record itself, a damages claim for a violation of subsection (e)(7)

must also allege "that the making of this record had an adverse effect on [plaintiff] as required by

subsection (g)(1)(D) of the Act."  Id. at 921.  Moreover, a plaintiff must allege "'that the agency

acted in a manner which was intentional or willful.'"  Id. (quoting 5 U.S.C. § 552a(g)(4)).

    Plaintiffs have met their pleading burden here.  They allege that McDonald conducted

Internet searches regarding applicants' political and ideological affiliations, including

"organizations to which candidates belonged."  Sec. Am. Compl. ¶ 62, 103.  They further allege

that she either created printouts of such information or made written "comments on the

applications throughout the process concerning the liberal affiliations of candidates."  Id.  As for

the "adverse effect" that these records had on plaintiffs, they have alleged that the making of the

---

[9] Under the Privacy Act "the term 'maintain' includes maintain, collect, use, or
disseminate."  5 U.S.C. § 552a(a)(3).

records adversely affected their search for post-law school employment -- in the form of out-of-pocket expenses, loss of time and emotional distress -- and deprived them of a fair opportunity to obtain the professional and economic benefit of employment in DOJ's Honors Program.  See, e.g., Sec. Am. Compl. ¶¶ 40, 42.  Lastly, with respect to the element of "intentional or willful" conduct, plaintiffs assert that DOJ, acting through its employees, flagrantly disregarded "the legal requirements and prohibitions that are imposed upon it by Privacy Act subsection (e)(7)" and that such disregard constitutes intentional or willful conduct, not mere gross negligence.  See Sec. Am. Compl. ¶¶ 105-06.  Hence, plaintiffs' (e)(7) Privacy Act claim is not deficient as pled.

Nevertheless, DOJ contends that Count I should be dismissed because it is precluded by the CSRA.  See DOJ Mem. at 16-20.  "In light of the exclusive nature of the CSRA's remedies, many courts have held that the CSRA preempts actions under the Privacy Act that seek review of adverse personnel decisions."  Lee v. Geren, 480 F. Supp. 2d 198, 203 (D.D.C. 2007).  The D.C. Circuit has, however, taken a rather narrow view of CSRA preemption in Privacy Act cases.  In Hubbard v. U.S. Envtl. Prot. Agency, Adm'r, 809 F.2d 1 (D.C. Cir. 1986), the court noted the tension between the Privacy Act and the CSRA, and observed that "it would be anomalous to construe the pre-existing Privacy Act to grant the district court power to do indirectly that which Congress precluded directly," namely, to review prohibited personnel practices.  Id. at 5.  But the court went on to state that,

> [o]n the other hand, as the government concedes, the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action actually caused by an inaccurate or incomplete record.  But the obvious need to accommodate the two statutory schemes requires the district courts to analyze the asserted causation link to be certain they are not exceeding their jurisdiction.

Id.  The court opined in Hubbard that the plaintiff "really allege[d] only a wrongful personnel

decision" in the guise of a subsection (g)(1)(C) action.  Id.  But it held that the "bad fit between

the facts asserted by Hubbard and a colorable Privacy Act claim is revealed by Hubbard's <u>failure

to demonstrate the required causal link</u> between the passover document and his failure to obtain

employment."  Id. (emphasis added).  In other words, the court in <u>Hubbard</u> reached the merits of

the claim and then narrowly construed an element of that claim (causation) to avoid conflict with

the CSRA.

This approach was repeated in <u>Kleiman v. Dep't of Energy</u>, 956 F.2d 335 (D.C. Cir.

1992).  There, the plaintiff argued that his job title was listed inaccurately in personnel records

because his actual work assignments corresponded to a different job title at a higher pay grade.

Id. at 337.  The court considered Kleiman's Privacy Act amendment claim to be a "collateral

attack on the original [job classification] personnel decision" that, if successful, would "bypass[]

the 'exhaustive remedial scheme' provided by Congress" in the CSRA.  Id. at 338 (quoting

<u>Carducci</u>, 714 F.2d at 174).  The actual holding of the case, however, hinged on the court's

analysis of the accuracy element of the claim.  See id. at 337 ("The records, then, are accurate:

they correctly reflect the position to which Kleiman officially was assigned.").  And the court

explicitly noted that

> nothing we say today should be taken to cast doubt on <u>Hubbard</u>'s statement that "the
> Privacy Act permits a federal job applicant to recover damages for an adverse
> personnel action <u>actually caused</u> by an <u>inaccurate</u> or incomplete record."
> <u>Hubbard</u>'s holding was based on the "actually caused" language; ours is grounded in
> the reading of "accurate."

Id. at 339 n.5 (emphases added) (citation omitted).  Again, the D.C. Circuit reached the merits of

the Privacy Act claim, but evaluated the plaintiff's claim with an eye to avoiding conflict with the

CSRA.

At the motions hearing, counsel for DOJ argued that plaintiffs have failed to allege the necessary causal link as required by <u>Hubbard</u> and <u>Kleiman</u> and, thus, they are simply using the Privacy Act as a means to collaterally attack a "prohibited personnel practice." According to DOJ, then, the mere collection of information on the Internet concerning plaintiffs' First Amendment activities did not <u>cause</u> the alleged harm -- it was only caused by the subsequent actions of the Screening Committee in taking that information into account and deselecting certain candidates for interviews. But this view of causation is too restrictive and is not supported by <u>Hubbard</u> and <u>Kleiman</u>. It is plain from those cases that but-for causation -- <u>i.e.</u>, the adverse personnel action would not have occurred but for reliance upon the offending record -- is sufficient. The document itself is, of course, not capable of causing harm unless it is reviewed and acted upon. Such is the case here, where plaintiffs have alleged that the collection of information regarding the exercise of their First Amendment rights was a but-for cause of their deselection by the Screening Committee. At this stage of the case, then, and drawing all reasonable inferences in favor of plaintiffs, the Court concludes that plaintiffs have satisfied their pleading burden by alleging that their deselections were caused by the records at issue here. Accordingly, plaintiffs' subsection (e)(7) claim will be allowed to proceed and DOJ's motion will be denied with respect to Count I. The Court is, however, mindful of the tension that often exists between the CSRA and the Privacy Act, and it may be necessary to revisit the preemption issue following discovery.

### 2.    Subsection (e)(5) -- Count II

Subsection (e)(5) provides that any agency maintaining a system of records shall "maintain all records which are used by the agency in making any determination about any

individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary

to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).  "Subsection

(g)(1)(C) provides a civil remedy if an agency fails to satisfy the standard in subsection (e)(5) and

consequently a determination is made which is adverse to the individual."  Deters v. U.S. Parole

Comm'n, 85 F.3d 655, 657 (D.C. Cir. 1996).[10]  Most "adverse determination" claims hinge on

inaccurate or incomplete records.  See, e.g., Lee, 480 F. Supp. 2d at 209-10 (alleging that an

inaccurate record led to an adverse determination); Krieger v. U.S. Dep't of Justice, 529 F. Supp.

2d 29, 49 (D.D.C. 2008) (alleging that an incomplete record led to an adverse determination).

Indeed, DOJ cites plaintiffs' failure to allege that their employment applications were inaccurate

as one of the grounds for dismissal of the subsection (e)(5) claim.  See DOJ Mem. at 24.  But that

argument ignores plaintiffs' allegations that irrelevant records (i.e., the records of their First

Amendment activities) led to an adverse determination against them (i.e., deselection by the

Screening Committee).  By the plain language of (g)(1)(C), relevance stands on equal footing

with accuracy, timeliness and completeness as a basis for pursuing money damages for an

adverse determination.  See 5 U.S.C. § 552a(g)(1)(C).  To state a claim for money damages

under subsection (g)(1)(C), then, a plaintiff must allege that:  "(1) he has been aggrieved by an

adverse determination; (2) the [agency] failed to maintain his records with the degree of

[relevancy] necessary to assure fairness in the determination; (3) the [agency's] reliance on the

---

[10] Subsection (g)(1)(C) provides that an individual may bring a civil action whenever an agency "fails to maintain any record concerning [him] with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to [him] that may be made on the basis of such record, and consequently a determination is made which is adverse to [him]."  As is true for subsection (e)(7) claims, the "system of records" requirement does not apply to subsection (g)(1)(C) claims.  See McCready v. Nicholson, 465 F.3d 1, 12 (D.C. Cir. 2006).

[irrelevant] records was the proximate cause of the adverse determination; and (4) the [agency] acted intentionally or willfully in failing to maintain [relevant] records." Deters, 85 F.3d at 657.

Plaintiffs allege that they suffered an adverse determination (deselection/non-hiring), that DOJ maintained irrelevant records (regarding plaintiffs' First Amendment activities) which undermined the fairness of the hiring process, that DOJ's reliance on those records (or the reliance of its employees, such as McDonald) proximately caused the adverse determination, and that DOJ (again, through its employees, such as McDonald, Elston and others) acted intentionally or willfully in maintaining such records.[11]  Based on those allegations and on the foregoing analysis, the Court concludes that at this stage of the proceeding plaintiffs have met their pleading burden with respect to their subsection (e)(5) claim presented in Count II.[12]

### 3.    Subsections (e)(1), (e)(2), (e)(6), (e)(9), (e)(10) -- Counts III-VII

Plaintiffs' other Privacy Act claims are brought pursuant to subsections (e)(1), (e)(2), (e)(6), (e)(9), and (e)(10).  However, those subsections only apply to records that are contained within a "system of records."  See Maydak, 363 F.3d at 518 ("[T]he requirements contained in interrelated subsections (e)(1), (e)(2), and . . . (e)(10), are triggered only if the records are actually incorporated into a system of records."); Krieger, 529 F. Supp. 2d at 50, 55 (subsections (e)(6) and (e)(9) only apply to records contained within a "system of records").  A "system of

---

[11] Because the Court concludes that plaintiffs have adequately pled proximate causation here, it also concludes that plaintiffs satisfy Hubbard's actual causation requirement.  See 809 F.2d at 5.  Hence, DOJ's preemption arguments fail as to the (e)(5) claim for the same reasons stated earlier.

[12] However, the Court will deny DOJ's motion to dismiss Count II without prejudice because the parties have not briefed the issue of relevance as it relates to subsections (e)(5) and (g)(1)(C) and there appears to be no case law directly addressing the issue.

-23-

records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Hence, to state a claim for relief for a violation of any of those subsections, plaintiffs must necessarily allege that the records at issue -- here the Internet printouts and McDonald's handwritten notes -- were actually incorporated into a "system of records." See Maydak, 363 F.3d at 518; Krieger, 529 F. Supp. 2d at 50, 55. Plaintiffs have not done so.[13] Indeed, they admit that they have not done so, but assert that this failure should be excused because DOJ should not be allowed to benefit from its own misdeeds -- i.e., destruction of the records before they could be incorporated into a "system of records." See Pls.' Mem. at 20.

In support of their position, plaintiffs cite Wilborn v. HHS, 49 F.3d 597 (9th Cir. 1995),[14] for the proposition that DOJ's destruction of documents cannot undermine their Privacy Act claims because to rule otherwise would create the unhealthy incentive for agencies to misplace or destroy documents in order to obfuscate the "system of records" requirement. See Pls.' Mem. at 20. Wilborn is distinguishable, however, because that case concerned the removal and destruction of records already incorporated into a "system of records." See 49 F.3d at 602. There is no such allegation here. Likewise, plaintiffs gain nothing by making the general observation

---

[13] Plaintiffs consistently allege that "Defendant [DOJ] maintained records about plaintiffs in connection with its determination of the results of their Honors Program and [SLIP] applications, records which were part of a system of records within the meaning of the Privacy Act." See, e.g., Sec. Am. Compl. ¶ 119. Such allegations, which amount to nothing "more than labels and conclusions," are plainly insufficient to meet plaintiffs' pleading burden. See Twombly, 550 U.S. at 555-56.

[14] Wilborn was abrogated in part by Doe v. Chao, 540 U.S. 614 (2004), but that abrogation is not relevant here.

that "when a federal agency establishes an employment application process, it necessarily establishes (or incorporates those records into) a record system for them" or that within DOJ such a system of records is maintained by OARM.  See Pls.' Mem. at 18.  Those personnel records -- the ones stored electronically by OARM, and described by Willis in her declaration, see Willis Decl. ¶¶ 5-8 -- are not at issue here.  The documents at issue here are not the electronic versions of plaintiffs' employment applications stored by OARM, but rather the hard copies of those applications used by the 2006 Screening Committee, with McDonald's handwritten notes, and the Internet printouts.  See, e.g., Sec. Am. Compl. ¶ 120.  Despite plaintiffs' contention that such records "unquestionably should have been placed within the applicable Privacy Act system of records involved here," see Pls.' Mem. at 19, the records were destroyed shortly after the 2006 Honors Program and SLIP hiring process was completed, see Sec. Am. Compl. ¶¶ 166-67; First OIG/OPR Report at 68-69.  Thus, they were never "actually incorporated into a system of records."  See Maydak, 363 F.3d at 518.  Nor is it apparent that they ever would have been.  Accordingly, then, plaintiffs have failed to state a claim for relief pursuant to subsections (e)(1), (e)(2), (e)(6), (e)(9), and (e)(10) of the Privacy Act, and Counts III through VII will therefore be dismissed.

### 4.    Standing

Not all of the plaintiffs will be able to pursue the remaining claims for money damages under subsections (e)(7) and (e)(5) of the Privacy Act, however, because several of them lack standing to do so.  Standing "requires a plaintiff to demonstrate the now-familiar elements of injury in fact, causation, and redressability."  Lance v. Coffman, 549 U.S. 437, 439 (2007) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)).  Here, DOJ focuses on causation

and asserts that five of the eight plaintiffs (Gerlich, Coleman, Meier, Gooch, Spiegel) lack standing to pursue money damages under the Privacy Act because these plaintiffs never reached the stage in the hiring process where the violations allegedly occurred (i.e., Screening Committee review).[15]  See DOJ Mem. at 10-13.  Thus, according to DOJ, no causal link between the injury and the unlawful conduct has been alleged.  Id.  Initially, plaintiffs concede that two of the 2002 applicants (Gooch, Spiegel) "are not of the class of plaintiffs to whom [DOJ's] Privacy Act misconduct applies."  Pls.' Opp'n at 21 n.24.  Plaintiff Meier was also a 2002 Honors Program applicant, hence he also lacks standing.  See Sec. Am. Compl. ¶ 6.  As to Gerlich and Coleman, DOJ relies on the declaration of Deana Willis, Assistant Director in DOJ's Office of Attorney Recruitment and Management, to establish that they did not reach Screening Committee review.  See Willis Decl. ¶¶ 29, 41.[16]  Although plaintiffs acknowledge that Gerlich and Coleman would lack standing if they failed to reach Screening Committee review, they insist that discovery is necessary to make that determination -- especially in light of DOJ's error regarding plaintiff Saul's selection for an interview.  See Pls.' Mem. at 14-15 & n.18.

A court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, so long as it still accepts the factual allegations in the complaint as true.  See Jerome Stevens Pharm., 402 F.3d at 1253-54; St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n.3.  Here, the Willis declaration establishes that neither

---

[15] Previously, DOJ asserted that plaintiff Saul also lacked standing to pursue damages claims under the Privacy Act for this same reason, but Saul presented evidence that he was selected for an interview by at least one DOJ component.  See Saul Decl. ¶ 8.  In response, DOJ filed a supplemental version of the Willis declaration, which amended the prior inaccurate statements regarding Saul.  See Supp. Willis Decl. ¶ 4-13.

[16] DOJ also makes this argument with regard to Meier.  See Willis Decl. ¶ 19.

Gerlich nor Coleman were selected for interviews by any of the components to which they applied.  See Willis Decl. ¶¶ 26-29 (Gerlich), 39-41 (Coleman).  As a "reason to doubt" DOJ's representations, plaintiffs cite Gerlich's prior experience working at DOJ and the "strong statements in support of plaintiff Gerlich's Honors Program application" from a supervising attorney.  See Pls.' Mem. at 15 n.18; Sec. Am. Compl. 18.  Likewise, plaintiffs assert that the circumstances surrounding plaintiff Coleman's SLIP application "raise[] suspicion due to the still-unexplained fact that he never received any form of 'rejection.'"  See Pls.' Mem. at 15 n.18; Sec. Am. Compl. 24.  But even accepting these allegations as true, as the Court must, see St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n.3, they do not rise above the level of speculation and hence are insufficient to rebut the jurisdictional information contained in the Willis declaration.  Offering nothing more, plaintiffs Gerlich and Coleman -- as well as Gooch, Spiegel and Meier -- have failed adequately to allege causation and they will be dismissed from the case for lack of standing to pursue the remaining Privacy Act claims.[17]

> **B.    Claims for Equitable Relief**

The remaining claims for equitable relief also present standing issues.[18]  With respect to prospective injunctive relief, plaintiffs lack a cognizable injury.  Plaintiffs seek injunctive relief "in the form of orders enjoining defendant [DOJ] from continuing to violate its legal obligations under the Constitution, the [CSRA], the [FRA], and the Privacy Act."  Sec. Am. Compl. ¶ 240.  "'Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if

---

[17] Because the two Privacy Act claims -- Counts I and II -- are all that remain of plaintiffs' second amended complaint, the Court will dismiss these plaintiffs from the case.

[18] Defendants assert a number of alternative grounds for dismissal of plaintiffs' equitable claims, but for the reasons stated below, the Court need not reach them.

the party alleges, and ultimately proves, a real and immediate -- as opposed to merely conjectural

or hypothetical -- threat of future injury.'" Natural Res. Def. Council v. Pena, 147 F.3d 1012,

1022 (D.C. Cir. 1998) (quoting Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th

Cir.1994)).  It is also well-established that a plaintiff "has standing to seek redress for injuries

done to him, but may not seek redress for injuries done to others." Moose Lodge No. 107 v.

Irvis, 407 U.S. 163, 166 (1972).

Because eligibility for DOJ's Honors Program and SLIP is limited to law students or

recent law school graduates serving in judicial clerkships, plaintiffs are no longer eligible to

apply for those positions.  Consequently, these former applicants cannot, and in fact do not,

allege that DOJ's violations will harm them in the future.  See Wagshal v. Foster, 28 F.3d 1249,

1252 (D.C. Cir. 1994) (a plaintiff lacks standing when he "has alleged no likelihood whatever

that he himself will again suffer the alleged injury").  Moreover, to the extent that plaintiffs assert

claims on behalf of "all those similarly situated," see Sec. Am. Compl. ¶ 1, they lack standing to

seek such injunctive relief on behalf of others.  See Wagshal, 28 F.3d at 1252.  That this case was

filed as a putative class action does not alter the analysis.  See Simon v. E. Ky. Welfare Rts. Org.,

426 U.S. 26, 40 (1976) (actual injury still required to establish standing, even in a class action

context).  Therefore, the Court concludes that plaintiffs lack standing to pursue claims for

injunctive relief against DOJ and those claims will be dismissed.

Plaintiffs also seek declaratory relief with respect to past and ongoing violations of the

U.S. Constitution, the CSRA, the FRA, and the Privacy Act.[19]  To the extent that plaintiffs are

_____

[19] Plaintiffs' claims under the FRA cannot proceed for the independent reason that private litigants are precluded from challenging alleged noncompliance with the requirements of the FRA; instead, that responsibility is left to the administrative enforcement structure.  See

seeking declaratory relief with respect to ongoing or future violations, plaintiffs lack a cognizable injury and those claims fail for the same reasons discussed directly above. See City of Houston, Tex. v. Dep't of Housing and Urban Dev., 24 F.3d 1421, 1429 (D.C. Cir. 1994) (plaintiff must establish standing to seek forward-looking declaratory relief). And to the extent that plaintiffs are seeking declaratory relief with respect to defendants' past conduct,[20] they cannot demonstrate that a declaratory judgment will redress their injuries. See Lance, 549 U.S. at 439 (redressability an element of standing).

Redressability requires "a likelihood that the requested relief will redress the alleged injury." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998); see also Simon, 326 U.S. at 45-46. The plaintiff must "personally [] benefit in a tangible way from the court's intervention." Warth v. Sedin, 422 U.S. 490, 508 (1975). Here, plaintiffs cannot make this showing.

Plaintiffs assert defendants discriminated against DOJ's Honors Program and SLIP applicants based upon their political affiliations. But a declaratory judgment that the Department of Justice violated plaintiffs' rights under the U.S. Constitution, the CSRA, the FRA, and the Privacy Act would not eliminate the alleged effects of this discrimination. Nor would it compensate plaintiffs for the discrimination. Rather, because plaintiffs lack standing, if this

---

Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 149-50 (1980); Armstrong v. Bush, 924 F.2d 282, 294 (D.C. Cir. 1991); Citizens for Responsibility and Ethics in Washington v. Dep't of Homeland Sec., 527 F. Supp. 2d 101, 111-12 (D.D.C. 2007); see also 44 U.S.C. §§ 2905, 3106.

[20] Although most of the declaratory relief sought by plaintiffs concerns DOJ alone, the individual defendants are also named in connection with Count VIII. See Sec. Am. Compl. ¶¶ 162-72, 237. Declaratory relief is inappropriate in individual capacity suits. See Vanover v. Hantman, 77 F. Supp. 2d 91, 100 (D.D.C. 1999).

Court were to grant plaintiffs the declaratory relief that they seek -- i.e., declaring that defendants' past actions were unconstitutional or otherwise unlawful, see Sec. Am. Compl.¶¶ 237-39 -- it would amount to an advisory opinion of the type that Article III strictly prohibits.  See Steel Co., 523 U.S. at 101; Dynaquest Corp. v. U.S. Postal Serv., 242 F.3d 1070, 1076 (D.C. Cir. 2001). Because the declaratory relief sought by plaintiffs would require the Court to exceed its limited jurisdiction by issuing an advisory opinion, the remainder of plaintiffs' claims for declaratory relief will be dismissed for lack of standing.

## CONCLUSION

For the foregoing reasons, the Court will grant the individual defendants' motions to dismiss the Bivens claims (Counts IX through XIII) against them.  DOJ's motion to dismiss will be granted in part and denied in part.  The Court will grant DOJ's motion with respect to Counts III through VII under the Privacy Act.  All equitable claims will also be dismissed.  However, DOJ's motion will be denied with respect to Counts I and II, and plaintiffs Saul, Faiella and Herber may proceed with those claims under subsections (e)(7) and (e)(5) of the Privacy Act. The other five plaintiffs will, however, be dismissed from the case for lack of standing to pursue these remaining Privacy Act claims.  A separate Order accompanies this Memorandum Opinion.

<div style="text-align:center">

/s/ John D. Bates
JOHN D. BATES
United States District Judge

</div>

Dated:   September 16, 2009