DEPOSITION OF MICHAEL J. ELSTON
CONDUCTED ON TUESDAY, AUGUST 10, 2010

1 (Pages 1 to 4)

---

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF COLUMBIA
 3   -----------------------x
 4   SEAN M. GERLICH, et al., )
 5      Plaintiffs,    ) Civil Action
 6   vs.              ) No. 1:08-cv-1134(JDB)
 7   UNITED STATES DEPARTMENT )
 8   OF JUSTICE,           )
 9      Defendant.       )
10   -----------------------x
11
12        Deposition of MICHAEL J. ELSTON
13              Washington, DC
14           Tuesday, August 10, 2010
15                9:28 a.m.
16
17
18
19
20   Job No.: 4438
21   Pages: 1 - 305
22   Reported by: John L. Harmonson, RPR
```

Page 2

```
 1      Deposition of MICHAEL J. ELSTON, held at the
 2   offices of:
 3
 4
 5        PROJECT ON GOVERNMENT OVERSIGHT
 6        1100 G Street, NW
 7        Suite 900
 8        Washington, DC 20005
 9        (202) 509-2300
10
11
12
13
14      Taken pursuant to the Federal Rules of Civil
15   Procedure, subject to such stipulations as may be
16   attached hereto or recited herein, before John L.
17   Harmonson, Registered Professional Reporter, Notary
18   Public in and for the District of Columbia, who
19   officiated in administering the oath to the witness.
20
21
22
```

Page 3

```
 1                APPEARANCES
 2   ON BEHALF OF PLAINTIFFS:
 3        DANIEL J. METCALFE, Esquire
 4        4801 Massachusetts Avenue, NW
 5        Washington, DC 20016
 6        (301) 509-2300
 7   ON BEHALF OF DEFENDANT:
 8        BRAD P. ROSENBERG, Esquire
 9        U.S. Department of Justice
10        Civil Division, Federal Programs Branch
11        20 Massachusetts Avenue, NW
12        Washington, DC 20001
13        (202) 514-3374
14   ON BEHALF OF THE WITNESS:
15        ROBERT N. DRISCOLL, Esquire
16        Alston & Bird, LLP
17        950 F Street, NW
18        Washington, DC 20004
19        (202) 756-3300
20   ALSO PRESENT:
21        NATALIA MEDINA, Legal Assistant
22        MATTHEW BACA, DOJ Intern
```

Page 4

```
 1              C O N T E N T S
 2   EXAMINATION OF MICHAEL J. ELSTON          PAGE
 3      By Mr. Metcalfe                5
 4      By Mr. Rosenberg             286
 5      By Mr. Metcalfe              291
 6      By Mr. Rosenberg             300
 7      By Mr. Metcalfe              301
 8
 9
10               E X H I B I T S
11           (Attached to transcript)
12   ELSTON DEPOSITION EXHIBIT               PAGE
13   Ex. 6  Memorandum from L. DeFalaise to Heads  125
14         of Offices, Boards, Bureaus and
15         Divisions; April 26, 2007
16
17
18
19
20
21
22
```

## Page 5

```
 1            PROCEEDINGS
 2            MICHAEL J. ELSTON,
 3   after having been first duly sworn, was examined and
 4   did testify under oath as follows:
 5                Washington, D.C.
 6                9:28 a.m.
 7       MR. METCALFE:  We're on the record at 9:28
 8   this morning, and the witness has been sworn.  And
 9   before we go ahead, I just want to introduce for the
10   record Natalia Medina, sitting to my left, who is an
11   attorney and member of the bar, but she's here in the
12   capacity as a legal assistant.
13       And Brad, you might want to introduce --
14       MR. DRISCOLL:  With me is Matthew Baca, who
15   is a summer law intern at the Justice Department who
16   is working on this case.
17              EXAMINATION
18   BY MR. METCALFE:
19      Q.  Mr. Elston, in summary, I intend to ask you
20   questions covering specific time periods, and then if
21   any are remaining, which might or might not be the
22   case, questions about certain specific aspects of the
```

## Page 6

```
 1   Department of Justice's June 24, 2008, Inspector
 2   General report.
 3       The questioning for each time period will
 4   be distinct.  For some of them I might ask you a
 5   question or two first in order to establish as contour
 6   with clear precision, but by focusing on specific time
 7   periods we can make things clearer and more efficient
 8   and more economical all the way around, I think.
 9       And likewise, I will refer to that
10   June 24, 2008, report as "the report" for convenience.
11   And if I intend a question to make reference to
12   another Inspector General report, which is dated
13   July 28th of that year, I will do that specifically.
14   So "the report" will mean June 24th.
15       And I should acknowledge, I think, or
16   mention the fact right up front for efficiency's sake
17   that I recognize that you don't necessarily agree with
18   any aspect of that June 24th, 2008, report in
19   particular.  As a matter of fact, you've stated that
20   very specifically in a filing in this case.
21       So you can take any question that I ask
22   about that as having that recognition on my part built
```

## Page 7

```
 1   in so I won't be repeating it every time.  I'm
 2   recognizing that you don't necessarily agree with any
 3   particular aspect of the report.
 4       My objectives here this morning include
 5   both clarity and efficiency in this deposition, so I
 6   specifically invite you, and at least at the outset
 7   your counsel and also Justice Department counsel, to
 8   interrupt at any time if in your or their reasonable
 9   judgment I have used an unclear word or term or
10   created an ambiguity or the like; or if they have any
11   concern that you might be responding to a question
12   based upon your misunderstanding of it, in which case
13   I'll try to do a better job of asking the question
14   based upon what you tell me.
15       In your case in particular, I especially
16   invite you not to hesitate to interrupt me, to
17   interrupt your own response, or to abruptly return to
18   a previous question or response if at any time you
19   think it helps our clarity, completeness or efficiency
20   here today to do so.
21       We have both advantages and disadvantages
22   here.  One advantage is that you're an attorney, so we
```

## Page 8

```
 1   might have an easier time than otherwise in ensuring
 2   accuracy and precision and completeness in our
 3   questions and answers.  But I'm also mindful here that
 4   we have a disadvantage as to timing, and I will be
 5   talking about events and circumstances that largely
 6   occurred nearly four years ago.  And at least in some
 7   respects this will be a matter of my asking you to
 8   respond to questions to the best of your recollection
 9   notwithstanding that.
10       So I generally ask that before answering
11   questions for which this is a factor, you pause for
12   whatever time you need in order to be confident that
13   you are remembering responsive information to the very
14   best of your ability to do so, and that if you
15   subsequently recall something new in an area already
16   covered, you mention that right away.
17       For example, if I ask you whether there was
18   any instance of a certain thing occurring during an
19   established time period and you answer yes, and then I
20   ask you to describe all such instances, and then you
21   describe only three such instances but subsequently
22   remember a fourth, in that event please interrupt the
```

141

1  reached a wrong assumption with respect to what you
2  wanted disposed of?
3      A.  Monica was an outstanding assistant. I
4  think she had very good judgment. I think that if she
5  had any question about the disposition of something,
6  she would ask me. And as I sit here today, I don't
7  have any recollection of an instance where she got rid
8  of something that I would prefer not.
9          And again, even if that had happened, it
10  wouldn't have been a big deal, because virtually
11  everything that we worked with in ODAG was copies or
12  on computers. So it was always possible to obtain
13  another copy from the component where the document
14  originated.
15      Q.  Do you recall ever discussing the
16  disposition of these records, and I think it's clear
17  which records we're talking about, with Deputy
18  Attorney General Paul McNulty?
19      A.  I don't accept the characterization of them
20  as records. They're working copies of records of the
21  Office of Attorney Recruitment and Management.
22          I would be surprised if I ever had any

142

1  conversation with the Deputy Attorney General about
2  them.
3      Q.  Do you recall ever discussing the
4  disposition of these applications, we'll use that
5  word, with the Deputy Attorney General?
6          MR. ROSENBERG: Object in light of
7  Mr. Elston's testimony. I think they are copies of
8  applications.
9          THE WITNESS: I don't believe that I had
10  any conversation with the Deputy Attorney General
11  regarding the Honors Program applications or their
12  disposition at any time. I don't recall. I don't
13  know even in what context that would have come up.
14  BY MR. METCALFE:
15      Q.  Do you recall having any conversation --
16  and I guess again I'm going to make the same
17  reference -- to the disposition of -- I'll call them
18  the content of the boxes, how about that? Honors
19  Program and SLIP, two boxes, two sets of contents, all
20  the copies of applications in there.
21          Do you recall having any communication with
22  anyone in the Justice Management Division about that?

143

1      A.  I'm thinking a while because I'm trying to
2  give your question some thought.
3      Q.  Please, Mr. Elston, take as much time as
4  you like. I certainly encourage that, as you know.
5  And I appreciate your taking the time to recall as
6  best as you can.
7      A.  As I sit here today, to the best of my
8  recollection, I can't think of any reason why I would
9  have had a conversation with anyone from the Justice
10  Management Division about these things.
11          Now, DOJ org terms in my head is a little
12  bit rusty. I don't remember if OARM is part of JMD of
13  if it's a separate component. So the only person that
14  I can think of that I would have had a conversation
15  with about the disposition of the copies of the
16  applications that were in the boxes that we've been
17  discussing would have been Lou.
18          And if OARM is in JMD, I may have had a
19  conversation with him -- well, I think I've already
20  said I had a conversation with him early on about what
21  he wanted done with them, whether he needed them back.
22  And to the best of my recollection, he said that he

144

1  didn't.
2          And certainly at no time following the
3  Honors Program or the Summer Law Intern Program review
4  process did he ever come and ask me for them or send
5  someone to pick them up or in any way indicate that he
6  wanted those documents.
7          So that's the only person I can think of
8  that I would have had a conversation with. To the
9  best of my recollection, the only one occurred very
10  early in the process. I can't think of anybody else
11  that I would have had a conversation with about that.
12      Q.  I appreciate your thinking long and hard
13  about that to make the best use possible of your
14  memory today. And you are correct that OARM is sort
15  of an unusual entity in that it's organizationally
16  within JMD but it's functionally under the Deputy
17  Attorney General. It's really the only entity in the
18  Department quite like that within my experience or my
19  own recollection.
20          So when I say JMD, I really do mean not to
21  include that even though technically OARM is in that.
22          So then my next question is broader. We're

145

1  now talking beyond the two boxes.  Do you recall
2  having any communication with anyone in JMD about
3  records disposition in general?
4       And again, we're not including OARM even
5  though it's technically within JMD.
6       MR. ROSENBERG:  I'm just going to object
7  because while Mr. Metcalfe was formerly an employee of
8  the Justice Department, to the extent that the
9  question is predicated on Mr. Metcalfe's understanding
10 of the Justice Department's organization structure,
11 that assumes facts that are not in evidence.
12      MR. METCALFE:  Did you mean, Mr. Rosenberg,
13 with respect to OARM or with regard to JMD on records
14 disposition in general?
15      MR. ROSENBERG:  Any representations that
16 you make regarding Justice Department policies or the
17 organization of the Justice Department is a
18 representation that does not put any of those facts
19 into evidence.
20      So I would just caution the witness to
21 answer based on his understanding of the organization
22 of the Justice Department.

146

1       MR. METCALFE:  Well, I'll just make very
2  clear, if it wasn't sufficiently clear to you,
3  Mr. Rosenberg, I was speaking about OARM just to try
4  to help the witness then to speak to the fact that yes
5  indeed, as he thinks, it is part of JMD.  And that's
6  not what we're talking about here.
7       If your objection had to do with records
8  disposition and the Justice Management Division in
9  general, that's another matter entirely.
10 BY MR. METCALFE:
11    Q.   So let me ask the question again, and with
12 the clear premise, I hope, that we're not talking
13 about OARM, which is part of JMD.
14      My question is:  Do you recall today ever
15 having any communication, using that word more broadly
16 than conversation, with anyone in the Justice
17 Management Division about records disposition in
18 general?
19      MR. ROSENBERG:  And I think I need to renew
20 that objection, because you just characterized OARM as
21 being within JMD.  Offhand, I don't know whether
22 that's the case or not, but I don't think the witness

147

1  should be answering a question based on plaintiffs'
2  counsel's characterization of the organization of the
3  Justice Department.
4  BY MR. METCALFE:
5     Q.   I tell you what, I am perfectly comfortable
6  including OARM within JMD.  I was trying to help
7  things to exclude it.  But let's try it this way.
8       Please answer that question even without
9  excluding OARM from JMD.
10    A.   I feel very bad about this, because there
11 is a very nice man who I think is part of JMD who is
12 the federal records guy.  I saw him with some
13 frequency, like maybe once every couple of months,
14 while I was in the Office of the Deputy Attorney
15 General.  I was under the impression that he was the
16 person sort of in charge of making sure that we
17 complied with I think it's the Federal Records Act,
18 something along those lines.
19      And very early on, when I first joined the
20 Office of the Deputy Attorney General while I was
21 still on detail from the U.S. Attorney's Office in
22 Alexandria, he introduced himself, came into my office

148

1  and introduced himself, and we had a conversation
2  about -- I think he maybe even gave me a little
3  pamphlet that talked about responsibilities under the
4  Federal Records Act.
5       It would be too formal to say he gave me a
6  class in the Federal Records Act, but he certainly
7  conveyed information to me regarding the
8  responsibility of the Office of Deputy Attorney
9  General to maintain records that fell within the
10 Federal Records Act.
11      And we occasionally had conversations about
12 different things over the course of the next 18 months
13 or so.  I can't remember how long I was there.  20
14 months I think.
15      And in fact, I consulted him on the first
16 memo that the Deputy Attorney General signed relating
17 to changes to the Honors Program in 2007.  Because it
18 had already been signed and had already gone to the
19 executive secretariat, I had some concern about
20 whether it could be called back and simply gotten rid
21 of or whether it was something that had to be kept.
22 And he said it had to be kept.  So it was kept but

149

1  never issued.  Kept and never issued.
2       And I wish I could remember his name.  But
3  I was aware of his role and his responsibilities.  We
4  had conversations.  Based on our conversations, I
5  formed the very clear impression that documents that
6  belonged to other components that were given to us for
7  information purposes, for use as working copies, were
8  not the kinds of things that needed to be kept.
9       And again, now I'm telling you about
10 something that occurred getting close to five years
11 ago, and that the key thing was decisions, things
12 where the Deputy Attorney General made formal
13 decisions about one thing or another that were
14 committed to writing in some way.
15      And we talked about e-mails and how lots of
16 people thought they didn't fall within the Federal
17 Records Act, but if they embodied the Deputy Attorney
18 General's decision on an issue, that e-mail should be
19 kept.
20      But I remember having a conversation about
21 whether documents belonged to one component or
22 another, who was responsible for keeping it.  Because,

150

1  quite frankly, I didn't want ODAG to be responsible
2  for keeping records of all the components that
3  reported to ODAG.  Either directly or through the
4  Associate Attorney General, every component of the
5  Department of Justice reports to the Office of the
6  Deputy Attorney General.
7       We certainly didn't have in the small area
8  on the fourth floor space to retain every single thing
9  that was submitted by a component to the Deputy
10 Attorney General for informational purposes or for,
11 you know, informal consultations.
12      We had lots of meetings with component
13 heads where they would come in and they would tell us
14 about the work of their component.  I think you
15 probably attended a meeting like that shortly after
16 Paul became Deputy Attorney General because he met
17 with every component head.
18 BY MR. METCALFE:
19   Q.  I attended several of them indeed.
20      Would it help your recollection, not that
21 it probably matters that much, if I suggest that it
22 might have been Ron Plavchan.

151

1   A.  I think that's right.  Yes.
2   Q.  Mr. Plavchan was a long-time Federal
3  Records Act expert, for lack of a better phrase, in
4  the Justice Management Division, who would have
5  exactly that sort of dealing with someone in the
6  Attorney General's Office, the Deputy Attorney
7  General's Office or the Associate Attorney General's
8  Office.
9   A.  So we got lots of material that came from
10 other components.  And based on my conversations with
11 him, I formed the belief and adopted this policy
12 within ODAG as chief of staff not to retain documents
13 submitted by other components as a regular course.
14      So if Alice Fisher as chief of the criminal
15 division came in and reported on a series of cases and
16 gave us some handouts, we might use those for the
17 meeting.  If the Deputy Attorney General wanted to
18 retain his copy for future reference, he would retain
19 it, he would retain it.
20      If Ron Tempest who had criminal division in
21 his portfolio wanted to retain it for the next meeting
22 to more of what had been said at the previous meeting,

152

1  fine.  But we did not keep those forever.  There was
2  no requirement that we keep other components'
3  documents as permanent records of the Office of the
4  Deputy Attorney General.
5   Q.  Did you ever inform Mr. Plavchan of your
6  practice in relation to Ms. Keasley and the removal of
7  records by her from your office?
8   A.  I'm not aware of Ms. Keasley removing any
9  records subject to the Federal Records Act from my
10 office.
11  Q.  Did you ever inform Mr. Plavchan of your
12 practice with Ms. Keasley of removing pieces of paper
13 of any type from your office?
14  A.  Well, I've already said that we had
15 occasional conversations, and early on one very
16 detailed conversation where I got a general
17 understanding of the Federal Records Act and what the
18 Deputy Attorney General's Office had to keep and what
19 it didn't have to keep.
20      And based in part on that conversation, I
21 developed a practice that I used in the Deputy
22 Attorney General's Office for the entire time that I

301

1  MR. ROSENBERG: That's it.
2            EXAMINATION
3  BY MR. METCALFE:
4     Q.  With respect to that answer you gave
5  regarding Mr. Fridman, is the same so regarding
6  Ms. McDonald?
7        MR. ROSENBERG: I think that's been asked
8  and answered multiple times.
9        THE WITNESS: Yeah. And it requires a lot
10 of explanation which I've already given.
11       MR. METCALFE: We can just cap it off with
12 the word "yeah."
13       MR. ROSENBERG: I think you can do that.
14       THE WITNESS: I'm saying yes to
15 Mr. Rosenberg, not to your question.
16       MR. METCALFE: I understand.
17       MR. ROSENBERG: Just to be clear, that yeah
18 did not relate to the question. We objected to that
19 question.
20       MR. METCALFE: I think Mr. Rosenberg has
21 clarified that with great precision and accuracy.
22       MR. ROSENBERG: That's what I'm here for.

302

1     (Whereupon, signature having not been waived, the
2  deposition of MICHAEL J. ELSTON was concluded at
3  5:07 p.m.)
4
5
6
7        ACKNOWLEDGEMENT OF DEPONENT
8        I, MICHAEL J. ELSTON, do hereby acknowledge
9  that I have read and examined the foregoing
10 testimony, and the same is a true, correct and
11 complete transcription of the testimony given by
12 me, and any corrections appear on the attached
13 Errata sheet signed by me.
14
15
16 _____    _____
17    (DATE)              (SIGNATURE)

303

1            REPORTER'S CERTIFICATE
2        I, JOHN L. HARMONSON Registered Professional
3  Reporter and Notary Public, do hereby certify that
4  MICHAEL J. ELSTON, after having been first duly
5  sworn by me to testify to the truth, did testify as
6  set forth in the foregoing pages, that the testimony
7  was reported by me in stenotype and transcribed
8  under my personal direction and supervision, and is
9  a true and correct transcript.
10       I further certify that I am not of
11 counsel, not related to counsel or the parties
12 hereto, and not in any way interested in the outcome
13 of this matter.
14       SUBSCRIBED AND SWORN TO under my hand and
15 seal this 19th day of August, 2010.
16
17 My commission expires October 14, 2010.
18
19
20 _____
21 Notary Public in and for
22 the District of Columbia

304

1            E R R A T A   S H E E T
2     IN RE: Gerlich v. US Department of Justice
3  RETURN BY: _____
4  PAGE   LINE    CORRECTION AND REASON
5  ____   ____   _____
6  ____   ____   _____
7  ____   ____   _____
8  ____   ____   _____
9  ____   ____   _____
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18 ____   ____   _____
19 ____   ____   _____
20 ____   ____   _____
21 _____   _____
22   (DATE)          (SIGNATURE)

```
                                                      305
 1         E R R A T A   S H E E T   C O N T I N U E D
 2     IN RE:  Gerlich v. US Department of Justice
 3    RETURN BY: _____
 4    PAGE   LINE    CORRECTION AND REASON
 5    ____   ____    _____
 6    ____   ____    _____
 7    ____   ____    _____
 8    ____   ____    _____
 9    ____   ____    _____
10    ____   ____    _____
11    ____   ____    _____
12    ____   ____    _____
13    ____   ____    _____
14    ____   ____    _____
15    ____   ____    _____
16    ____   ____    _____
17    ____   ____    _____
18    ____   ____    _____
19    ____   ____    _____
20    ____   ____    _____
21    _____    _____
22       (DATE)         (SIGNATURE)
```