## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SEAN M. GERLICH, et al.,

     Plaintiffs,

       v.

UNITED STATES DEPARTMENT
OF JUSTICE, et al.,

     Defendants.

Civil Action No. 08-1134 (JDB)

## MEMORANDUM OPINION

This case arises from a dark chapter in the United States Department of Justice's history. Plaintiffs are unsuccessful applicants for employment with the Department of Justice ("DOJ") who assert claims arising from the well-publicized misconduct of senior DOJ officials who apparently rejected certain applicants based upon their political affiliations. This Court previously dismissed some of plaintiffs' claims, including all of the claims against individual defendants who are former and current DOJ officials. Plaintiffs have remaining claims against defendant DOJ for monetary damages under the Privacy Act of 1974. The Court also previously dismissed several of the original plaintiffs for lack of standing to bring these remaining Privacy Act claims. Now pending before the Court are cross-motions for summary judgment filed by the three remaining plaintiffs and by DOJ. Also pending before the Court are plaintiffs' motion for spoliation sanctions and DOJ's motion for leave to file an amended answer.

Plaintiffs claim that the Justice Department violated the Privacy Act in 2006 in its administration of the Attorney General's Honors Program, the program by which DOJ hires recent law school graduates and judicial law clerks. The Privacy Act generally prohibits

1

government agencies from maintaining records describing how an individual exercises First Amendment rights.  Plaintiffs allege that the Department found such information about them on the Internet, supplemented their applications for the Honors Program with that information, and denied them interviews on the basis of the information.  The Justice Department does not deny that DOJ officials conducted this activity with respect to some, but not all, applicants to the 2006 Honors Program.  Because the relevant files have been destroyed, however, DOJ maintains that plaintiffs cannot prove that inappropriate records were created about them specifically.  Plaintiffs counter that the destruction of the files constituted spoliation and that they are therefore entitled to an inference that inappropriate records were created about them.  More specifically, they contend that the destruction of the files constituted spoliation because it violated the Federal Records Act.

The Court agrees with plaintiffs that misconduct from senior government officials should not be condoned.  Nonetheless, as much as the Court might disapprove of certain conduct, the evidence before it must be objectively analyzed under the law.  As explained below, the Court finds that destruction of the relevant files did not constitute spoliation.  Without a spoliation inference, plaintiffs have failed to offer evidence on which a finder of fact could reasonably hold the Department liable under the Privacy Act.  Hence, the Court will deny plaintiffs' motions for spoliation sanctions and summary judgment and grant the Justice Department's motion for summary judgment.  For the reasons set out below, the Court will also grant DOJ's motion for leave to file an amended answer.

I.  Background

a.  <u>Allegations of Misconduct in the Honors Program and Summer Law Intern Program Hiring Process</u>[1]

The Attorney General's Honors Program is the exclusive means by which DOJ hires recent law school graduates and judicial law clerks who have no prior legal experience. OIG/OPR Report at 3.  Historically, the Honors Program has been very competitive and the number of applications received in a typical year far surpasses the number of positions that are available.  <u>Id.</u>  Several of DOJ's component divisions participate in the Honors Program hiring process, which is overseen by DOJ's Office of Attorney Recruitment and Management ("OARM").  <u>Id.</u>  Although OARM processes all applications, each component hires its own Honors Program attorneys.  <u>Id.</u>  A similar hiring process also exists for paid summer interns in DOJ's Summer Law Intern Program ("SLIP").  <u>Id.</u> at 3-4.

In 2002, the Honors Program and SLIP hiring process was revamped.  <u>See id.</u> at 4. Among other things, in order to allow more political appointees in leadership positions to participate, the hiring process became more centralized in Washington, DC.  <u>See id.</u> at 4.  To that end, a Screening Committee was created to review and approve the candidates who were selected for interviews by the component divisions.  <u>Id.</u> at 5.  Although the composition of the Screening Committee changed from year to year, the conduct currently at issue involves the Screening Committee as constituted in 2006.

---

[1] The facts set forth in this section are taken primarily from plaintiffs' second amended complaint ("Sec. Am. Compl.").  The second amended complaint incorporates a report issued jointly by DOJ's Office of the Inspector General ("OIG") and Office of Professional Responsibility ("OPR"), entitled "An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program" (June 24, 2008) ("OIG/OPR Report").  Because the second amended complaint incorporates this report, the Court will also consider it in resolving the instant motions.  <u>See</u> <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997).  The second amended complaint also incorporates an additional report issued jointly by OIG and OPR, entitled "An Investigation of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General" (July 28, 2008).  This report is not relevant to the present motions.

The 2006 Screening Committee consisted of Michael Elston, the Deputy Attorney General's Chief of Staff, Daniel Fridman, an Assistant U.S. Attorney on detail to the Deputy Attorney General's office, and Esther Slater McDonald, a Counsel to the Associate Attorney General.  Id. at 37-38.  According to the protocol developed informally by the Screening Committee, Ms. McDonald first reviewed the applications of those candidates who were selected for interviews by DOJ components.  Id. at 71.  Ms. McDonald also conducted Internet searches to obtain further information about the candidates.  Id. at 72.  Ms. McDonald made notations on applications reflecting her impressions of the content of the applications as well as information found on the Internet and attached print-outs of certain Internet search results to some applications.  Id. at 71-73, 82.  Ms. McDonald then separated the applications into categories based on whether she thought each candidate should be "deselected" from the interview list.  Id. at 72-73.  Ms. McDonald next passed the applications to Mr. Fridman, who also made annotations on applications and separated the applications into similar categories.  Id.  Mr. Fridman then passed the applications to Mr. Elston, who separated the applications into final categories indicating which candidates were deselected from interviews.  Id. at 72, 81.  The Screening Committee deselected 186 out of the 602 Honors Program candidates who had been selected for interviews by DOJ components; the Committee gave no reasons or explanations for its decision to deselect a candidate from the list of those to be interviewed.  Id. at 5, 38.  The components were allowed to appeal the Screening Committee's decision via e-mail to Mr. Elston. Id. at 38.  The components appealed 32 of the deselections, and 16 were granted.  Id.

From 2002 through 2005, OARM received very few complaints about the new hiring process or the decisions of the Screening Committee.  Id. at 5.  However, in 2006 OARM received a number of complaints regarding the abnormal length of time taken for Screening

Committee review and the unusually large number of seemingly qualified Honors Program and SLIP candidates who were deselected for interviews.  Id.  As a result of the complaints, DOJ changed the hiring process once again in 2007, transferring control of the Screening Committee from political appointees to career employees.  Id.  Then, in April 2007, an anonymous letter was sent to the Chairmen of the House and Senate Judiciary Committees from "A Group of Concerned Department of Justice Employees."  Id. at 66.  That letter claimed that a number of highly qualified candidates, who had been selected for interviews by career employees within the individual DOJ components, had been subsequently rejected by the Screening Committee on the basis of their Democratic Party or liberal affiliations.  Id. at 1 n.1.  OIG and OPR, which were already investigating issues related to the removal of certain United States Attorneys, decided to expand the scope of their investigation to include the allegations regarding Honors Program and SLIP hiring.  Id. at 1.

On June 24, 2008, OIG and OPR issued the joint report summarizing their findings.  Sec. Am. Compl. ¶ 59.  That report serves as the basis for the allegations in this case.  Plaintiffs now assert that the creation and maintenance of records containing First Amendment information by Ms. McDonald violated the Privacy Act.

b.  Procedural History

This case has a fairly long procedural history in this Court.  Plaintiff Sean Gerlich originated this action on June 30, 2008, less than a week after the OIG/OPR report was released. The first amended complaint followed on August 15, 2008.  Before all defendants could respond to the amended complaint, plaintiffs moved for leave to amend their complaint for a second time. This Court granted plaintiffs' motion and the second amended complaint was filed on November 12, 2008.  The second amended complaint generally alleges that plaintiffs — all unsuccessful

applicants for employment with DOJ — have been injured by the "politicized" hiring process that plagued the Honors Program and SLIP during 2002 and 2006.  Specifically, the second amended complaint asserts fifteen separate counts arising under the Privacy Act (Counts I-VII), the U.S. Constitution (Counts VIII-XIII), the Civil Service Reform Act (Count XIV), and the Federal Records Act (Count XV).

On September 16, 2009, the Court dismissed plaintiffs' claims arising under the U.S. Constitution, the Civil Service Reform Act, and the Federal Records Act.  See Gerlich v. U.S. Dep't of Justice, 659 F. Supp. 2d 1, 8-12, 18-20 (D.D.C. 2009).  These claims included all the claims against the defendants who are current or former DOJ officials, so those defendants were dismissed from the case.  See id. at 18-20.  The Court also dismissed plaintiffs' claims for equitable relief.  See id..

Plaintiffs' remaining claims are against the Department of Justice for monetary damages and arise under the Privacy Act of 1974, 5 U.S.C § 552a (the "Act").  In Counts I through VII of the Second Amended Complaint, plaintiffs assert that DOJ violated seven separate provisions of the Act.  Regarding the first two claims (Counts I and II), the Court concluded that the plaintiffs had satisfied their pleading burden.  See Gerlich, 659 F. Supp. 2d. at 13-16.  The Court dismissed the five other claims (Counts III through VII), because the provisions relied on in those claims include a requirement that the documents at issue be "'actually incorporated into a system of records'" and the documents here were not.  See id. at 16-17 (quoting Maydak v. United States, 363 F.3d 512, 516 (D.C. Cir. 2004)).  The Court also concluded that only three of the plaintiffs — James Saul, Matthew Faiella and Daniel Herber — had standing to bring the remaining two Privacy Act claims and, accordingly, dismissed the other named plaintiffs from the suit.  See

Gerlich, 659 F. Supp. 2d at 17-18.  The three remaining plaintiffs were all applicants to the 2006

Honors Program.  Sec. Am. Compl. ¶¶ 3-10.

On September 29, 2009, plaintiffs moved for partial reconsideration of the Court's

dismissal of some of plaintiffs' claims and dismissal of some plaintiffs from the suit.  The Court

denied plaintiffs' motion for partial reconsideration in November 2009.  See Mem. and Order of

Nov. 13, 2009 [Docket Entry 116].   Plaintiffs then moved for an entry of final judgment on their

constitutional claims.   The Court denied entry of final judgment in December 2009.  See Mem.

and Order of Dec. 4, 2009 [Docket Entry 126].  On November 20, 2009, plaintiffs moved to

certify a class comprising virtually all individuals who applied, but were not selected, for the

Honors Program and SLIP in 2006.  The Court denied class certification in April 2010.  See

Mem. Op. and Order of Apr. 19, 2010 [Docket Entry 133].  Plaintiffs then moved for

reconsideration of the denial of class certification.   The Court denied plaintiffs' motion for

reconsideration of the denial of class certification in June 2010.  See Order of June 4, 2010

[Docket Entry 139].  The parties thereafter proceeded with discovery.

On May 20, 2011, the three remaining plaintiffs moved for summary judgment.  DOJ filed

a cross-motion for summary judgment on June 27, 2011.  On July 25, 2011, plaintiffs moved for

imposition of spoliation sanctions in connection with their motion for summary judgment.  On

August 19, 2011, DOJ moved for leave to file an amended answer.  After receiving the parties'

briefing, the Court held a hearing on October 14, 2011 on the pending motions.  On October 17,

2011, the Court ordered the parties to submit supplemental briefing.  See Minute Order of Oct.

17, 2011.  The parties then filed their supplemental briefs and the pending motions are now ripe

for resolution.

II.  DOJ's Motion for Leave to File an Amended Answer

Before addressing the substance of plaintiffs' claims, the Court will address the Department of Justice's motion for leave to file an amended answer.  The Department seeks to amend its answer, originally filed in October 2009, in order to add the affirmative defense of mitigation of damages.  See Def.'s Mem. in Supp. of its Mot. for Leave to File an Am. Answer [Docket Entry 170] ("Def.'s Am. Mem.").  The Department indicates that this defense involves a September 2008 letter from the Attorney General offering remedial interviews to applicants, including the plaintiffs, whom the Screening Committee had deselected from interviews for the Honors Program.  Id. at 5 n.4.  By the terms of the letter, deselected applicants had to respond within two weeks in order to receive a remedial interview.  See Def.'s Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ. J. [Docket Entry 158] ("Def.'s SJ Mem.") Exs. J, K, L.  None of the three plaintiffs did so.  The Department attributes the need to amend its answer to "oversight by counsel." Id. at 3.

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give" leave to amend a pleading "when justice so requires."  Whether to grant a motion to amend is within the sound discretion of the district court.  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  However, it is an abuse of that discretion to deny a motion to amend without a "justifying" or sufficient reason.  Foman v. Davis, 371 U.S. 178, 182 (1962).  These reasons include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies . . . undue prejudice to the opposing party . . . futility of amendment, etc." Id.  Generally, under Rule 15(a) the non-movant bears the burden of persuasion that a motion to amend should be denied.  See Dove v. Washington Metro. Area Transit Auth., 221 F.R.D. 246, 247 (D.D.C. 2004); see also Gudavich v. District of Columbia, 22 Fed. Appx. 17, 18 (D.C. Cir. Dec. 27, 2001) (noting the non-movant "failed to show prejudice from the district court's action in

allowing the motion to amend").  A court may, however, "deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss." Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 945 (D.C. Cir. 2004); see also Foman, 371 U.S. at 182.

Here, DOJ argues that there is no prejudice to plaintiffs because plaintiffs appear to have anticipated the mitigation defense and also previously received notice of the defense by means of the Department's related interrogatories.  Def.'s Am. Mem. at 4-5.  Plaintiffs oppose the motion for leave to amend.  They argue that the Department should be barred from procedural leniency now since it previously opposed plaintiffs' class certification on procedural grounds and that the defense that the Department seeks to add is without merit.  Pls.' Opp'n to Def.'s Mot. for Leave to Am. its Answer [Docket Entry 171] at 3-14.  Furthermore, plaintiffs contend that they are prejudiced by the late amendment because two of the three plaintiffs made employment decisions subsequent to the Department's October 2009 answer and were not given sufficient notice prior to then.  Id. at 15-19.

Plaintiffs' arguments in favor of denying the motion are unavailing.  It is not relevant that the Department previously opposed plaintiffs' class certification on procedural grounds, since the standard for class certification is quite different from the standard for granting leave to amend.  Furthermore, it is hardly futile for the Department to argue that plaintiffs failed to mitigate damages by declining a remedial offer to interview for the very jobs that are the subject of this suit.  Finally, the remedial offer that is the subject of the amendment came and went before the Department initially filed its answer.  It is hard to see how plaintiffs are prejudiced by an amendment to the answer regarding an event that happened before the answer's filing.  Accordingly, the Court will grant the Department's motion for leave to file an amended answer.

III.  Privacy Act Claims

The Privacy Act "regulate[s] the collection, maintenance, use, and dissemination of information" about individuals by federal agencies.  Privacy Act of 1974, Pub. L. No. 93–579, § 2(a)(5), 88 Stat. 1896, 1896.  "The Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  Doe v. Chao, 540 U.S. 614, 618 (2004). One such form of relief enables an individual to seek money damages when an agency intentionally or willfully fails to comply with the Act's requirements "in such a way as to have an adverse effect on an individual."  5 U.S.C. § 552a(g)(1)(D), (g)(4).

Under the Privacy Act, a "record" is "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual."  Id. § 552a(a)(4).  The records at issue here are the handwritten notes and print-outs allegedly created by Ms. McDonald from Internet searches performed during the Screening Committee's 2006 review of Honors Program candidates.  The first OIG/OPR report established, and both parties now acknowledge, that to the extent these records once existed they were destroyed in early 2007.  See First OIG/OPR Report at 68-69.  The destruction of the records is discussed in more detail below.

As noted, the Court previously dismissed the Privacy Act claims in Counts III through VII of the Second Amended Complaint because plaintiffs did not allege their files were incorporated into a "system of records," as required by the provisions at issue in those counts. The remaining Counts I and II assert that DOJ has violated subsections (e)(5) and (e)(7) of the Act, which do not require the files to have been incorporated into a system of records.

a.  Subsection (e)(7) — Count I

Subsection (e)(7) provides that any agency maintaining a system of records shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7).  The D.C. Circuit has concluded "that an agency that maintains any system of records is prohibited from maintaining a record of an individual's First Amendment activity 'even if [that record] is not subsequently incorporated into the agency's system of records.'"  Maydak v. United States, 363 F.3d 512, 516 (D.C. Cir. 2004) (quoting Albright v. United States, 631 F.2d 915, 916-17 (D.C. Cir. 1980)) (alteration in original).

Beyond establishing that the agency maintained the record itself, a damages claim for a violation of subsection (e)(7) requires "that the making of this record had an adverse effect on [plaintiff] as required by subsection (g)(1)(D) of the Act."  Albright, 631 F.2d at 921.  Moreover, a plaintiff "must establish that 'the agency acted in a manner which was intentional or willful.'"  Id. (quoting 5 U.S.C. § 552a(g)(4)).

Plaintiffs here assert that Ms. McDonald conducted Internet searches regarding applicants' political and ideological affiliations, including "organizations to which candidates belonged."  Sec. Am. Compl. ¶ 62, 103.  Plaintiffs further assert that she both created print-outs of such information and made written "comments on the applications throughout the process concerning the liberal affiliations of candidates."  Id.  As for the "adverse effect" that these records had on plaintiffs, plaintiffs assert that the making of the records adversely affected their search for post-law school employment — in the form of out-of-pocket expenses, loss of time and emotional distress — and deprived them of a fair opportunity to obtain the professional and

economic benefit of employment in the Honors Program.  See, e.g., Sec. Am. Compl. ¶¶ 40, 42.

Finally, with respect to the element of "intentional or willful" conduct, plaintiffs assert that DOJ,

acting through its employees, flagrantly disregarded "the legal requirements and prohibitions that

are imposed upon it by Privacy Act subsection (e)(7)" and that such disregard constitutes

intentional or willful conduct, not mere gross negligence.  See Sec. Am. Compl. ¶¶ 105-06.

     The Justice Department previously argued that Count I should be dismissed because it is

precluded by the Civil Service Reform Act.  See Gerlich, 659 F. Supp. 2d at 14. The Court

rejected this argument, concluding that it has an obligation to "reach[] the merits of the Privacy

Act claim" while being "mindful of the tension that often exists between the CSRA and the

Privacy Act." Id. at 14-15.  The Department also contended that plaintiffs failed to allege a

causal link between the Privacy Act and the adverse effect the records had on the plaintiffs

because "the mere collection of information on the Internet concerning plaintiffs' First

Amendment activities did not cause the alleged harm — it was only caused by the subsequent

actions of the Screening Committee." Id. at 15.  The Court rejected this argument, concluding

that it was sufficient for plaintiffs to allege that "the adverse personnel action would not have

occurred but for reliance upon the offending record." Id.

b.  Subsection (e)(5) — Count II

     Subsection (e)(5) provides that any agency maintaining a system of records shall

"maintain all records which are used by the agency in making any determination about any

individual with such accuracy, relevance, timeliness, and completeness as is reasonably

necessary to assure fairness to the individual in the determination."  5 U.S.C. § 552a(e)(5).

"Subsection (g)(1)(C) provides a civil remedy if an agency fails to satisfy the standard in

subsection (e)(5) and consequently a determination is made which is adverse to the individual."

<u>Deters v. U.S. Parole Comm'n</u>, 85 F.3d 655, 657 (D.C. Cir. 1996).[2]  To prevail on a claim for money damages under subsection (g)(1)(C), a plaintiff must establish that:  "(1) he has been aggrieved by an adverse determination; (2) the [agency] failed to maintain his records with the degree of [relevancy] necessary to assure fairness in the determination; (3) the [agency's] reliance on the [irrelevant] records was the proximate cause of the adverse determination; and (4) the [agency] acted intentionally or willfully in failing to maintain [relevant] records."  <u>Id.</u> at 657.

Plaintiffs assert that they suffered an adverse determination (deselection/non-hiring), that DOJ maintained irrelevant records (regarding plaintiffs' First Amendment activities) which undermined the fairness of the hiring process, that DOJ's reliance on those records (through its employees) proximately caused the adverse determination, and that DOJ (again, through its employees) acted intentionally or willfully in maintaining such records.

c.  <u>Conduct Violating the Privacy Act</u>

It is important to be clear about what conduct would constitute a Privacy Act violation under plaintiffs' remaining claims and what would not.  Performing Internet searches on the plaintiffs would not in and of itself constitute a Privacy Act violation, even if the searches were related to plaintiffs' First Amendment activities.  Subsections (e)(5) and (e)(7) both provide restrictions on how an agency "maintain[s]" "records."  The Act defines "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular

---

[2] Subsection (g)(1)(C) provides that an individual may bring a civil action whenever an agency "fails to maintain any record concerning [him] with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to [him] that may be made on the basis of such record, and consequently a determination is made which is adverse to [him]."  As is true for subsection (e)(7) claims, the "system of records" requirement does not apply to claims made under subsections (e)(5) and (g)(1)(C).  <u>See</u> <u>McCready v. Nicholson</u>, 465 F.3d 1, 12 (D.C. Cir. 2006).

assigned to the individual." 5 U.S.C. § 552a(a)(4).  Under the Privacy Act, "the term 'maintain' includes maintain, collect, use, or disseminate."  Id. § 552a(a)(3).  The D.C. Circuit has thus concluded that the Act "clearly prohibits even the mere collection of such a record, independent of the agency's maintenance, use, or dissemination of it thereafter."  Albright, 631 F.2d at 918. While this language is fairly broad, it nonetheless includes a requirement that there be a "record;" that is, the information must have been committed to some form.  Hence, the Court finds that a "record" (such as a written annotation or print-out) must have been created from an Internet search in order to implicate the Act.

Furthermore, the Department of Justice's use of political or ideological affiliation in civil service hiring does not, in and of itself, violate the Privacy Act.  This conduct is certainly inappropriate, and could conceivably be the basis of some other claim.  But as far as the Privacy Act is concerned, in order to prevail plaintiffs must show that an inappropriately maintained record caused their injury.  Hence, to prevail on their Privacy Act claims here, plaintiffs must show that their deselection was caused by an inappropriate record rather than information gleaned from the applications that they themselves submitted to the Department.

IV.  Evidence

The key issue at this point is whether Ms. McDonald created records containing First Amendment information about the three plaintiffs.  It is undisputed that Ms. McDonald performed Internet searches regarding, among other things, publications written by some applicants and the group membership of some applicants.  It is also undisputed that she sometimes printed out the information she found on the Internet and sometimes made annotations on specific applicants' files regarding information found on the Internet, and that these annotations and print-outs led to some of the Screening Committee's decisions.  The

question, however, is whether Ms. McDonald took this action regarding these three specific plaintiffs. The Court has been presented with evidence regarding Ms. McDonald's Internet search history, but not with any direct evidence as to which of her searches resulted in the creation of annotations or print-outs. The actual materials used by the Screening Committee were apparently destroyed shortly after the Committee's decisions were made. Plaintiffs argue that this destruction violated the Federal Records Act and therefore constituted spoliation, entitling them to an inference that Ms. McDonald did, in fact, create inappropriate records about them.[3] The Court is not convinced.

a. Evidence in the Record

The Court has been presented with relatively direct as well as some indirect evidence regarding the creation of records about plaintiffs. The more direct form of evidence is certain information about the Internet searches actually performed by Ms. McDonald. OIG and OPR, as part of their investigation into the activity in question, obtained from Ms. McDonald's computer the "search history" of Internet searches that she conducted on 2006 Honors Program applicants. See Def.'s Supplemental Mem. [Docket Entry 182] at 11. This search history, relevant portions of which were submitted to the Court, included searches on two of the three plaintiffs — Mr. Faiella and Mr. Herber — but not on Mr. Saul. See Def.'s Supplemental Mem. at 11; see id. Ex. 4.

The Department argues that, since OIG and OPR were able to retrieve evidence of Internet searches conducted on many other Honors Program applicants but not on Mr. Saul, the

---

[3] Even if plaintiffs received such an inference, thereby establishing that the Department maintained inappropriate records about them, they would still, of course, need to establish the other elements of a Privacy Act claim, such as that the violation was willful. Because the Court decides that plaintiffs cannot establish that inappropriate records were created about them, the Court does not reach the other elements required for a Privacy Act claim.

evidence establishes that Ms. McDonald did not conduct searches on Mr. Saul. See Def.'s Supplemental Mem. at 12-13. Plaintiffs' counsel disputes that the evidence gathered from Ms. McDonald's computer shows Ms. McDonald did not search for Mr. Saul's name. Plaintiffs' counsel argues that the search of Ms. McDonald's computer may not have been "comprehensive" or sufficiently accurate and notes that Justice Department officials are encouraged to work from home computers, which have not been examined. See Pls.' Supplemental Mem. [Docket Entry 183] at 9-13.

The Court has therefore been presented with convincing evidence that Ms. McDonald performed Internet searches on two of the three plaintiffs. This evidence does not reveal whether Ms. McDonald created print-outs or annotations regarding these two plaintiffs, as she did about some applicants. With respect to the third plaintiff, Mr. Saul, it is possible that Ms. McDonald performed a search that was not found in the examination of her Internet history. Nonetheless, the fact that Ms. McDonald's search history contained searches on many other applicants but not on Mr. Saul is strong evidence weighing against his claim that Ms. McDonald found inappropriate information about him and committed such information to a record. And plaintiffs have presented no affirmative evidence that an Internet search was performed on Mr. Saul.

The Court has also been presented with indirect evidence regarding the creation of records about plaintiffs. There is information available on the Internet about all three plaintiffs that may have been relevant to Ms. McDonald's searches — that is, information reflecting their "liberal political or ideological affiliations." See Pls.' Statement of Material Facts as to Which There Is No Genuine Issue [Docket Entry 154-2] at 3-5; Pls.' Supplemental Mem. Exs. 2 and 3. Moreover, the Court has been presented with the applications that each of the three plaintiffs submitted to DOJ. See Def.'s SJ Mem. Exs. E, F, G. With respect to Mr. Saul, the Court has

also been presented with internal documents from the Department of Justice indicating that he was originally accepted for an interview with DOJ's Environmental and Natural Resources Division but was ultimately instead scheduled for an interview with the Civil Division, apparently due to the intervention of the Screening Committee. See Pls.' Mem. in Opp'n to Def.'s Cross-Mot. for Summ. J., in Further Supp. of Pls.' Mot. for Summ. J., and in Supp. of Their Mot. for Imposition of Spoliation Sanctions [Docket Entry 161] ("Pls.' Opp'n Mem.") Ex. 2. Since the Screening Committee generally only acted by preventing certain applicants from receiving an interview with DOJ, the treatment of Mr. Saul was apparently quite unusual.

The parties have each emphasized particular facts reflected in this indirect evidence. DOJ suggests that plaintiffs may have been deselected by the Screening Committee on the basis of information on the face of their applications, rather than information found on the Internet and added to their applications. The members of the Screening Committee apparently relied on both ideological and academic considerations in deciding whom to deselect from interviews. See OIG/OPR Report at 71-84. DOJ argues that information relevant to these factors was apparent on the face of each of the three plaintiffs' applications. The Department notes that one plaintiff, Mr. Herber, appeared to have been in the bottom half of his law school class and stated in his application that he had previously worked for two environmental organizations that the Screening Committee could have perceived as "liberal." See Def.'s SJ Mem. at 14-16. The application of another plaintiff, Mr. Faiella, contained multiple typographical errors. See id. at 15. The third plaintiff, Mr. Saul, stated in his application that he had previously worked for an environmental organization that could have been perceived as "liberal." See id. at 16; see also Def.'s Reply Mem. in Supp. of its Cross-mot. for Summ. J. and Mem. in Opp'n to Pls.' Mot. for Imposition of Spoliation Sanctions [Docket Entry 168] ("Def.'s Reply Mem.") at 5-8. Plaintiffs,

in response, maintain that Mr. Herber had "manifestly strong overall credentials," that the typographical errors on Mr. Faiella's application "actually are minimal," and that the jobs indicated on Mr. Herber's and Mr. Saul's resumes were "merely summer employment."  Pls.' Opp'n Mem. at 12-14.

Plaintiffs, on the other hand, stress that "there was considerable information reflecting their 'liberal political or ideological affiliations' . . . that was readily available to Ms. McDonald on the Internet."   Pls.' Mem. in Supp. of their Mot. for Summ. J. [Docket Entry 154-1] ("Pls.' SJ Mem.") at 8 n.12.  Plaintiffs maintain that this information "transcended what was contained in their respective applications" and "conveyed much information about their political/ideological affiliations and orientations."  Pls.' Opp'n Mem. at 16 n.29.  Plaintiffs emphasize the relevance of some of the information available on the Internet, such as statements by Mr. Saul in an environmental advocacy newsletter.  Pls.' Supplemental Mem. at 13 n.19.  Plaintiffs also argue that the fact that the Screening Committee deselected Mr. Saul for an interview with one division but offered him an interview with another suggests that it "was acting on the basis of exceptional information."  Id. at 13.

Finally, the Court has been presented with portions of depositions from various former Justice Department officials.  These depositions include testimony from Ms. McDonald and Mr. Elston, but not Mr. Fridman.  The Justice Department emphasizes testimony from Ms. McDonald indicating that she made notations regarding information obtained from the Internet on only a "subset" of applications and that "it was not common for [her] to print anything out and attach it to an application."   Def.'s SJ Mem. at 14; see McDonald Tr. at 197:11-12.[4]  The

---

[4] Some portions of Ms. McDonald's deposition testimony cited by the Court were submitted as Exhibit B to DOJ's summary judgment motion and other cited portions were submitted as

Department also notes that Ms. McDonald did not remember the three plaintiffs by name and that plaintiffs' counsel did not take Ms. McDonald up on her repeated offers to have her memory refreshed by the plaintiffs' applications.   Def.'s SJ Mem. at 14 n.5; <u>see</u> McDonald Tr. at 181:8-12; <u>see also</u> Def.'s Reply Mem. at 3-4.   Additionally, the Department notes testimony from Ms. McDonald and Mr. Elston that the majority of Ms. McDonald's deselection recommendations concerned academic credentials or errors in the applications themselves.   Def.'s Reply Mem. at 5-6; <u>see</u> McDonald Tr. at 159:7-10, 289:18-290:1; Elston Tr. at 67:16-19.   Plaintiffs emphasize testimony from Ms. McDonald indicating that Mr. Elston said, in reference to the destruction of the Screening Committee's files, "at least that's <u>one</u> thing I did right."  Pls.' SJ Mem. at 28; <u>see</u> McDonald Tr. at 261:19-262:2.

b. <u>Spoliation</u>

The most direct evidence of whether Ms. McDonald created inappropriate records about the plaintiffs would, of course, be the records themselves.   The Screening Committee used paper copies of the applications in its review.   OIG/OPR Report at 68.   These files, however, were destroyed shortly after the Screening Committee completed its review of Honors Program applications, prior to the initiation of the OIG/OPR investigation and prior to the filing of the current suit.   <u>See id.</u> at 68-69.   According to the OIG/OPR report, Mr. Elston gave the Screening Committee's files to his staff assistant after completing his review, and the staff assistant placed the files in a "burn box" for destruction shortly thereafter.   <u>Id.</u> at 68-69, 81.   Mr. Elston testified that his usual practice was to have his assistant destroy personnel-related documents when he was done using them.   <u>See</u> Elston Tr. at 137:4-138:5.

---

Exhibit 1 to plaintiffs' summary judgment motion.  The cited portion of Mr. Elston's deposition testimony was submitted as Exhibit C to DOJ's summary judgment motion.

Plaintiffs maintain that the destruction of the Screening Committee materials violated the Federal Records Act.  Accordingly, plaintiffs have moved for spoliation sanctions against the Department and seek an inference that Ms. McDonald created records containing First Amendment information about them.

1.  Legal Framework and DOJ Action

The D.C. Circuit "has recognized the negative evidentiary inference arising from spoliation."  Talavera v. Shah, 638 F.3d 303, 311 (D.C. Cir 2011) (citing Webb v. D.C., 146 F.3d 964 (D.C. Cir. 1998)).  This inference is an "evidentiary presumption that the destroyed documents contained favorable evidence for the party prejudiced by their destruction."  Talavera, 638 F.3d at 311.  More specifically, "violation of a regulation requiring document preservation can support an inference of spoliation."  Id. (citing cases).  "[T]he obligation to preserve records attaches as long as the party seeking the inference is 'a member of the general class of persons that the regulatory agency sought to protect in promulgating the rule.'"  Id. at 311-12 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001)).  The Talavera court thus held that a spoliation inference was appropriate when a U.S. Agency for International Development employee destroyed notes regarding a job interview in violation of both an Office of Personnel Management regulation requiring him to keep the notes for two years and an Equal Employment Opportunity Commission regulation requiring him to keep the notes for one year.  Talavera, 638 F.3d at 312.

Here, plaintiffs contend that a spoliation inference is appropriate because the destruction of the Screening Committee's records violated the Federal Records Act, 44 U.S.C. § 2901 et

seq.[5]  "The Federal Records Act is a collection of statutes governing the creation, management, and disposal of records by federal agencies."  Pub. Citizen v. Carlin, 184 F.3d 900, 902 (D.C. Cir. 1999).  The FRA mandates that "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."  44 U.S.C. § 3101.  Each agency head "shall establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. § 3102, and "shall establish safeguards against the removal or loss of records he determines to be necessary and required by regulations of the Archivist [of the United States]," id. § 3105.  The Act defines records as "all . . . documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them."  Id. § 3301; see Armstrong v. Bush, 1 F.3d 1274, 1283 (D.C. Cir. 1993) ("To qualify as a record under the FRA, a document must satisfy a two-pronged test.  It must be (1) 'made or received by an agency' . . . and (2) 'preserved or appropriate for preservation by that agency' . . . .").

Furthermore, the FRA requires the Archivist of the United States to "provide guidance and assistance to Federal agencies with respect to ensuring adequate and proper documentation

---

[5] As noted above, the Court previously dismissed plaintiffs' claim for declaratory relief under the Federal Records Act (Count XV of the second amended complaint).  See Gerlich, 659 F. Supp. 2d at 19 & n.19.

of the policies and transactions of the Federal Government and ensuring proper records

disposition," 44 U.S.C. § 2904(a), and requires the Administrator of General Services to "provide

guidance and assistance to Federal agencies to ensure economical and effective records

management by such agencies," id. § 2904(b).  To that end, the Archivist and the Administrator

are required to, among other things, "promulgate standards, procedures, and guidelines with

respect to records management" and "conduct inspections or surveys of the records and the

records management programs and practices within and between Federal agencies."  Id. §

2904(c).  In accordance with this duty, the National Archives and Records Administration

("NARA") has promulgated a regulation in which "[s]everal key terms" from the FRA are

"further explained."  36 C.F.R. § 1222.10(b).  NARA has defined "appropriate for preservation"

to mean "documentary materials made or received which, in the judgment of the agency, should

be filed, stored, or otherwise systematically maintained by an agency because of the evidence of

agency activities or information they contain, even if the materials are not covered by its current

filing or maintenance procedures."  Id.  An additional NARA regulation further explains that

"agencies must distinguish between records and nonrecord materials by applying the definition

of records" contained in the statute and regulations.  Id. § 1222.12(a).  Finally, this NARA

regulation states that "[w]orking files, such as preliminary drafts and rough notes, and other

similar materials, are records that must be maintained to ensure adequate and proper

documentation" if "[t]hey contain unique information, such as substantive annotations or

comments[,] that adds to a proper understanding of the agency's formulation and execution of

basic policies, decisions, actions or responsibilities."  Id. § 1222.12(c).

 In 1981, the Department created a records disposition schedule for Honors Program and

SLIP applications.  See Def.'s Supplemental Mem. at 4.  This schedule, which was approved by

the predecessor to NARA, calls for "application materials," including "a four page DOJ application and law school transcript" and other "[o]ptional materials" (such as resumes), to be preserved for one year.  Id. Ex. 1.  The schedule applied to materials from applicants who did not accept employment under the program; the materials from those who did accept employment were incorporated into the employees' official personnel file.  Id.  In 2009 (after the events at issue in this case took place), the Department created a new disposition schedule for Honors Program and SLIP materials.  Id. at 5.  This schedule, which was approved by NARA, calls for the fifteen-year preservation of information submitted by the applicant (such as name, address, program to which the applicant is applying, experience, and academic record) as well as certain information about the applicant's movement through the Honors Program application process.  Id. Ex. 2.  Specifically, the disposition schedule calls for the preservation of information about "DOJ components to which the candidate applied, interviews by components, selection as finalist by component, offer extended by component, [and] acceptance or declination."  Id.

Plaintiffs contend that the Department violated the Federal Records Act and the accompanying regulatory provisions when it destroyed the materials used by the Screening Committee.  They argue that the Screening Committee's files "became a set of 'federal records' under the Federal Records Act during the Screening Committee's particular deselection process in 2006" because the files contained "'unique information, such as substantive annotations or comments' . . . required to be maintained to 'ensure adequate and proper documentation' of the Screening Committee's decision-making process."   Pls.' Supplemental Mem. at 6 (quoting 36 C.F.R. § 1222.12(e)).  Plaintiffs object to the characterization of these materials as "random notes" or "scraps of paper."  Pls.' Supplemental Mem. at 5-6.  They also contend that the fact that the Justice Department's disposition schedule now requires the maintenance of Honors Program

records for fifteen years confirms the "importance of preserving Honors Program records in particular." Id. at 7.  Finally, plaintiffs assert that they are members of the classes sought to be protected by the FRA, citing the statute's requirement that agency heads shall preserve records "to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." Id. at 8 (quoting 44 U.S.C. § 3101).

2.  Analysis of Spoliation Claim

The problem with plaintiffs' spoliation argument is that, in the Court's view, the Federal Records Act does not directly require specific documents to be preserved, but rather requires agencies to decide which materials are or are not "appropriate for preservation."  A decision by an agency about what records ought to be preserved might itself be subject to challenge as inconsistent with the FRA.  Furthermore, since the FRA requires agencies to make records management decisions, the absence of any decision-making by an agency might warrant a spoliation inference.  But when, as here, an agency develops a records disposition policy under the FRA and officials take action in compliance with that decision, a spoliation inference is, in the Court's view, not available after the fact on the basis of arguments that the agency previously made the wrong decision under the FRA or that the FRA itself directly governs the documents at issue.  The Justice Department made such a decision about which Honors Program materials to preserve, and that decision was that internal deliberations about candidates would not be preserved.  The destruction of the Screening Committee's working files was consistent with that policy.  Given that backdrop, plaintiffs are not entitled to a spoliation inference.

There is some authority for the proposition that an interested person can, under certain circumstances, challenge an agency's decision under the Federal Records Act as to what materials should be preserved.  In American Friends Service Committee v. Webster, 485 F.

24

Supp. 222, 226, 231 (D.D.C. 1980), individuals who were "subjects of FBI investigations or alleged victims of FBI activities," among other plaintiffs, sought access to several years of FBI field office files.  For two of the years in question, the agency's records disposition schedules indicated that closed field office files should generally be destroyed, while a records disposition schedule for a third year indicated that files should be preserved or destroyed at the discretion of "non-professional FBI personnel" on the basis of five general criteria.  Id. at 229 n.13, 231.  The D.C. Circuit held on appeal that "private parties whose rights may have been affected by government actions" had standing to challenge the FBI's records disposition policies.  American Friends, 720 F.2d 29, 57 (D.C. Cir. 1983).  That court concluded that the disposition schedule with the five criteria was not arbitrary and capricious because it "provide[s] sensible guidance to agency personnel," but nonetheless concluded that all three schedules were deficient because the agency, among other things, failed to explain how it was taking into account "the legal rights of persons directly affected by the FBI's activities."  Id. at 68.  Similarly, in Armstrong v. Bush, plaintiffs challenged the National Security Council's decision not to preserve any of its internal e-mail communications, including "lengthy substantive—even classified—'notes' that, in content, are often indistinguishable from letters or memoranda."  1 F.3d at 1279.  The court concluded that the FRA "surely cannot be read to allow the agency by fiat to declare 'inappropriate for preservation' an entire set of substantive e-mail documents generated by two administrations over a seven-year period."  Id. at 1283.

If a Department employee had destroyed agency materials in violation of a records disposition schedule, that destruction would likely warrant a spoliation inference.  Although the Talavera decision dealt with destruction of agency materials in violation of formal regulations, the court relied on the decision in Byrnie v. Town of Cromwell, which the court characterized as

holding "that where there was a written policy requiring document preservation and documents had been destroyed in violation of that policy, the obligation to preserve records attaches as long as the party seeking the inference is 'a member of the general class of persons that the regulatory agency sought to protect in promulgating the rule.'" 638 F.3d at 311 (quoting Byrnie, 243 F.3d at 109). The decisions in American Friends and Armstrong make clear that "private parties whose rights may have been affected by government actions" are within the statute's "zone of interest." Since the Screening Committee's actions clearly affected the plaintiffs, if the materials used by the Committee had been subject to preservation by a records disposition schedule, then destruction of materials in violation of that policy would likely constitute spoliation.

The situation might also be different if the Attorney General had simply ignored his duties under the Federal Records Act to decide which Honors Program materials are "appropriate for preservation." Under such circumstances, the Department of Justice would have violated the legal duty placed on it by the FRA to decide which materials should be preserved. A spoliation inference might therefore be appropriate.

In this case, however, the Justice Department, in accordance with the FRA, made a records disposition decision with respect to Honors Program materials; the materials sought by plaintiffs were simply outside the bounds of the applicable records dispositions schedule. Plaintiffs do not argue otherwise. Rather, they contend that the FRA and its accompanying regulations themselves provide a directive equivalent to the regulations in Talavera or Byrnie.

The Court finds, however, that the FRA requires agency heads to make decisions about what records to preserve, but does not itself directly classify specific materials as records requiring preservation. The FRA consistently indicates that "the head of each Federal agency" shall take action, including making and preserving "adequate and proper documentation" of

agency action and developing a records management program.   See 44 U.S.C. §§ 3101, 3102,

3105.  The Act does not define "adequate and proper documentation" or prescribe with any detail

what the requirements are for agencies or agency employees.  Similarly, while the Act offers a

definition of "records" that could be extremely broad — "all . . . documentary materials

regardless of physical form or characteristics"  — it limits that definition to materials "preserved

or appropriate for preservation."  Id. § 3301; see Armstrong, 1 F.3d at 1283.  The term

"appropriate for preservation" is inherently subjective, and the NARA regulation defining that

term makes clear that the determination is subject to "the judgment of the agency."  36 CFR §

1222.10(b).  Likewise, the NARA regulations direct agencies to "distinguish between records

and nonrecord materials."  Id. § 1222.12(a).  The D.C. Circuit in Armstrong accordingly

emphasized that "the agency undoubtedly does have some discretion to decide if a particular

document satisfies the statutory definition of a record."  1 F.3d at 1283.

It is true that NARA regulations also, in one instance, indicate more specifically that

"[w]orking files, such as preliminary drafts and rough notes" must be maintained by agencies —

provided that "[t]hey contain unique information, such as substantive annotations or comments[,]

that adds to a proper understanding of the agency's formulation and execution of basic policies,

decisions, actions or responsibilities."  Id. § 1222.12(c).  But it cannot be the case that all

"working files," no matter how preliminary or how minor, are appropriate for preservation.  This

regulation can only be interpreted as a directive to agency heads that these type of materials

would be "appropriate for preservation" if they add to a "proper understanding" of agency

decision-making.  One can argue about whether or not DOJ made the right judgment regarding

whether preserving informal deliberation records would contribute to a "proper understanding"

of how Honors Program decisions were made.  But it is nonetheless true that this regulation does not directly apply to the materials in question.

In fairness to plaintiffs, it should be noted that no one at the Department of Justice appears to have given any thought to whether the materials used by the Screening Committee were appropriate for preservation.  This thoughtlessness is troublesome, but DOJ nonetheless did, in accordance with its duty under the FRA, create a records disposition schedule that chose to preserve certain information regarding Honors Program hiring — and, by implication, to disregard other information.  The records disposition schedule that DOJ created and NARA's predecessor approved did not preserve any of the Department's internal deliberations about whom to offer interviews or to hire.   Plaintiffs seek a spoliation inference about materials in this category.  There is therefore every reason to believe that DOJ chose not to preserve the type of materials about which plaintiffs seek an inference.

Plaintiffs are not, as in American Friends or Armstrong, seeking to challenge an agency head's decision about what records should be preserved.  Rather, they argue that the FRA and its accompanying regulations address the materials in question.  But the FRA addresses general decisions made by agencies, not specific materials.  Furthermore, as the Department now accurately points out, if a spoliation inference could be generated directly from the FRA, the court's analysis of the regulations in Talavera would have been superfluous, since the FRA, which applies to all federal agencies, certainly applied to the agency there.  See Def.'s Supplemental Mem. at 10.  Hence, this Court finds that where, as in the present case, an agency has made a policy decision about the disposition of certain materials under the FRA, action taken in compliance with that policy does not warrant a spoliation inference.

In sum, the members of the Screening Committee, whether knowingly and intentionally or not, took action in accordance with Justice Department policy regarding Honors Program records disposition.  If DOJ had not performed its duty under the FRA to make a records management decision, that would be a different situation.  If plaintiffs sought to challenge the Department's general records disposition decision, that would also be different.  And if DOJ officials had violated Department policy, that too would be a different case.  But the Court cannot, after the fact, infer spoliation from the destruction of documents in accordance with Department policy. Plaintiffs' motion for imposition of spoliation sanctions will therefore be denied and the summary judgment motions will be considered without a spoliation inference.

V.  Summary Judgment Standard

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 323.

The satisfaction of the moving party's summary judgment burden is influenced by the party bearing the burden of proof at trial.  10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice And Procedure § 2727 (3d ed. 1998).  "If the moving party will bear

the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331. On the other hand, if the burden of persuasion at trial would be on the non-moving party, "the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.  If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." Id. (citations omitted); see also id. at 328 (White, J., concurring).  "Thus, where the nonmoving party shoulders the burden of proof at trial, the movant's burden is met by a sufficient 'showing . . . that there is an absence of evidence to support the nonmoving party's case.'" Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1032 (D.C. Cir. 1988) (quoting Celotex, 477 U.S. at 325) (alteration in original).

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  Moreover, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

VI.  Application of Summary Judgment Standard

The Court must apply the principles of summary judgment to the evidence in the context of plaintiffs' claims.  Under the Privacy Act, the plaintiff bears the burden of proving the

elements of the claim, except when plaintiff seeks disclosure of records.  Reuber v. United States, 829 F.2d 133, 141 & n.58 (D.C. Cir. 1987);  Mervin v. FTC, 591 F.2d 821, 827 (D.C. Cir. 1978); see also Maydak, 630 F.3d at 178.   Hence, with respect to plaintiffs' motion for summary judgment, plaintiffs (as moving parties bearing the burden of proof) must support their motion with credible evidence that would entitle them to a directed verdict if not controverted at trial. Celotex, 477 U.S. at 331.  With respect to the Department's motion, the Department (as moving party not bearing the burden of proof) meets its burden if it makes a sufficient showing that there is an absence of evidence to support plaintiffs' case.  Frito-Lay, 863 F.2d at 1032.

The issue, then, is whether there is sufficient evidence that the Department created records containing First Amendment information about these three plaintiffs.  Without evidence of the actual records themselves, and without a spoliation inference, the relevant evidence is the following:  (1) the history of specific Internet searches performed by Ms. McDonald; (2) information on the Internet about the three plaintiffs that may have been relevant to Ms. McDonald's searches; (3) each plaintiff's application to the Honors Program; (4) internal DOJ documents regarding Mr. Saul's interview; and (5) testimony from Ms. McDonald and Mr. Elston.

As noted previously, the Court has been presented with evidence that Ms. McDonald performed Internet searches on two plaintiffs.  But these facts do not necessarily show that Ms. McDonald created inappropriate records about these plaintiffs, since she testified (and plaintiffs have not disputed) that she only annotated files or made print-outs for "some" candidates on whom she performed searches.  Since neither Ms. McDonald nor Mr. Elston could remember the plaintiffs specifically, all that remains in the record is plaintiffs' applications to DOJ, the arguably relevant information on the Internet, and the unusual treatment of Mr. Saul.

The Department has presented plausible arguments about why the Screening Committee could have rejected each of the three applications on its face — without reference to any Internet information — for reasons ranging from typographical errors to unimpressive academic credentials to "liberal" affiliations reflected on plaintiffs' resumes.  Plaintiffs have also presented information available on the Internet that could plausibly have influenced the Screening Committee after being added to the applications by Ms. McDonald.  On the other hand, although the treatment of Mr. Saul was unusual, it is difficult to see how the Screening Committee's choice to switch his interview from an environmental division to the Civil Division suggests that the Committee relied on information from the Internet, especially given that Mr. Saul's application itself contained environmental affiliations and no evidence exists suggesting that an Internet search was even performed on Mr. Saul.

Regarding plaintiffs' motion for summary judgment, there is certainly not enough evidence to entitle plaintiffs to a directed verdict if the evidence were uncontroverted at trial. Since the Department has made plausible arguments that each of the applications could have been rejected on its face and there is no evidence that Ms. McDonald made annotations or print-outs about these three plaintiffs, a reasonable jury could conclude that plaintiffs have not met their burden of proof.  Plaintiffs' motion for summary judgment must therefore be denied.

The call is closer regarding the Department's motion for summary judgment.  Still, the Department has made a sufficient showing of the absence of evidence supporting plaintiffs' case. Plaintiffs' applications alone could plausibly have caused the Screening Committee to deselect them, as could the information on the Internet about the plaintiffs.  Given conflicting, plausible accounts — as to which neither side relies on evidence, as opposed to conjecture — the plaintiff, as the party with the burden of proof, must produce further probative evidence in support of its

claims. Without the Screening Committee's files, it is difficult to see what further information could shed light on the matter, and plaintiffs have not indicated that they intend to offer any additional probative evidence.[6] We will simply never know whether the Screening Committee relied on the plaintiffs' applications or on information added to their files as a result of Internet searches.  The plaintiffs have therefore failed to offer evidence on which a finder of fact could reasonably hold the Department liable.  This is not a situation of a conflict (or genuine dispute) as to the facts, but rather one of a paucity of proof by plaintiffs on their Privacy Act claims, on which they have the burden of proof and hence the burden of producing adequate evidence now. In the absence of sufficient probative evidence, the Department's motion for summary judgment must be granted.

VII.  Conclusion

        This case reflects extremely troubling behavior from high-ranking Department of Justice officials.  This Court, and others, have often condemned that conduct.  Even so, plaintiffs have not met their burden to prevail on the Privacy Act claims presented in this case.  An adverse inference from spoliation of evidence is not warranted here, and in the absence of additional probative evidence, plaintiffs cannot prove that they themselves were injured as a result of Privacy Act violations.  Accordingly, for the reasons explained above, plaintiffs' motions for spoliation sanctions and for summary judgment will be denied, and the Department of Justice's motions for leave to file an amended answer and for summary judgment will be granted.  A separate order has been issued on this date.

---

[6] At the hearing on October 14, 2011, plaintiffs indicated that they would seek a bench trial rather than a jury trial if their motion for summary judgment was denied.  Plaintiffs have not indicated that they would introduce any further evidence in such a proceeding beyond what is presently before the Court.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  December 15, 2011