UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SEAN GERLICH, et al.,             .
                                  .
          Plaintiffs,             .
                                  .  CA No. 08-1134 (JDB)
      v.                          .
                                  .
UNITED STATES DEPARTMENT          .  Washington, D.C.
OF JUSTICE, et al.,               .  Friday, October 14, 2011
                                  .  9:30 a.m.
          Defendants.             .
                                  .
. . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          DANIEL J. METCALFE, ESQ.
                             American University
                             Washington College of Law
                             4801 Massachusetts Avenue, NW
                             Washington, D.C. 20016-8181
                             202-274-4134


For Defendant                BRAD P. ROSENBERG, ESQ.
Department of Justice:       JOHN R. TYLER, ESQ.
                             U.S. Department of Justice
                             Civil Division
                             20 Massachusetts Avenue, NW
                             Washington, D.C. 20001
                             202-514-2356


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             Official Court Reporter
                             U.S. Courthouse, Room 6714
                             333 Constitution Avenue, NW
                             Washington, D.C. 20001
                             202-354-3186



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have civil action 08-1134, Sean Gerlich, et al. versus the United States Department of Justice.  We have Mr. Daniel Metcalfe representing the plaintiffs.  We have Mr. Brad Rosenberg, Mr. John Russell Tyler, and Mr. Rory Skaggs representing the Department of Justice.

THE COURT:  All right.  We're here on a series of motions.  We've got motions for summary judgment filed by each side.  There also is what I'll refer to as a spoliation motion and a motion to amend with respect to the answer filed by the defendant.  Lots of briefing, and I appreciate that.  And the claims that we're here on are obviously two Privacy Act claims.

This matter, as opposed to the litigation, has a history, and not all of it particularly favorable to the Department of Justice.  But that's not what we're here on.  We're here on the claims in this case, which are Privacy Act claims under (e)(5) and (e)(7) by the three plaintiffs, and that's the focus I'd like.

I'll have a lot of questions undoubtedly during the course of the session this morning.  And to the extent that you can give direct, clear answers to those questions, I will appreciate that greatly.

I think the order that I'd like to proceed in -- and I'm figuring that each side will have less than an hour of time, and

you ought to bear that in mind.  But I thought that maybe it
would go, first the -- and with respect to spoliation, you can
just work that into your presentation however you want, and with
respect to the motion for amended complaint, you can just work
that into your presentation however you want, to whatever extent
and however you would like to do it.  So I'm not separating
those out, and I'm focusing, obviously, on the motions for
summary judgment.

I thought I would hear first from the department, then from
the plaintiff, and then I'll give the department a chance to
respond and I'll give the plaintiff the last word.

So unless that is not suitable for you, I would turn first
to the defense table.

MR. ROSENBERG:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ROSENBERG:  I'd like to start with just a very
brief overview regarding the department's philosophy on this
case.

THE COURT:  Philosophy on the case.  That's an
interesting proposition.  I usually don't hear first the
philosophy of a litigant on the case.  But go ahead.

MR. ROSENBERG:  I think we share the Court's
philosophy that we're here on the claims of this case.  And one
of the fundamental issues --

THE COURT:  That's not a philosophy, but go ahead.

1          MR. ROSENBERG:  It is in the department's view,

2     because there are certainly wrongs that occurred at the

3     Department of Justice in the fall of 2006.  I believe that when

4     Mr. Tyler presented the department's case at the motion to

5     dismiss stage, he referred to it as a dark day in the Justice

6     Department's history.

7          We have not shied away from that in any way.  We have tried

8     to right the wrongs that occurred.  But the question here is

9     whether the Privacy Act claims of these three particular

10    plaintiffs is the proper vehicle for them to seek the redress

11    that they're seeking.  And we think the answer to that simply is

12    no, that this really is a square peg that the plaintiffs are

13    trying to fit into a round hole.

14         One of the reasons for that, and one of the fundamental

15    purposes of the Privacy Act is to ensure accuracy in

16    record-keeping, but in this case, we still have no idea whether

17    there were any records created by Esther McDonald as part of her

18    2006 screening process.

19         THE COURT:  Well, that is not true.  We have some

20    idea, from her deposition and the IG report, that records were

21    created.  She has said, has she not, and the IG has said from

22    the evidence it developed, which did not include an interview of

23    her, that Internet searches were performed, at least on some,

24    probably on many candidates, and that that resulted in some,

25    few, whatever adjective we want to apply to it, records being

1    produced in the form of either annotations regarding what she

2    was looking at or printed materials.

3        We know that, don't we?  We may not know it with respect to

4    these three plaintiffs, but we know that that was done.

5            MR. ROSENBERG:  That is absolutely correct.  We know

6    that she conducted some Internet searches for some applicants.

7    We even know that she conducted some Internet searches as to two

8    of the applicants at issue in this case.  But what we don't know

9    and what --

10           THE COURT:  How do we know that?

11           MR. ROSENBERG:  The Inspector General's Office, as

12   part of their investigation, imaged Esther McDonald's hard

13   drive, and we have a copy of that which we produced to

14   plaintiffs as part of discovery.

15           THE COURT:  But it's not in the materials provided to

16   me, is it?

17           MR. ROSENBERG:  No.  Plaintiffs were not provided

18   that.

19           THE COURT:  Nor have you.  That was a question I was

20   going to have.  Don't you have access to materials -- and it's a

21   question for Mr. Metcalfe, obviously, as well.  Don't you have

22   access to the materials from the IG investigation report that

23   would indicate whether Internet searches were performed with

24   respect to these three plaintiffs?

25           MR. ROSENBERG:  Well, yes, we do.  In fact, the IG's

1    office noted, I think in a footnote somewhere in the page 60 to

2    70 range of their report, that they were able to reconstruct

3    some of the searches that Esther McDonald conducted on her hard

4    drive.

5        Now, they also noted that just because you can reconstruct

6    the searches that she made in 2006 doesn't necessarily mean that

7    you can see what she saw, because by the time the IG conducted

8    its investigation, it was 2008.  Now it's --

9        THE COURT:  I'm only asking whether there is evidence

10   that Internet searches were performed with respect to these

11   three plaintiffs, and you're telling me that the record shows

12   that for two of them there were Internet searches --

13       MR. ROSENBERG:  There were Internet searches for

14   Mr. Faiella and Mr. Herber.  There was no evidence of any

15   Internet searches for Mr. Saul.  And that material was produced

16   to plaintiffs, but it does not appear in any of the filings

17   before the Court.

18       THE COURT:  And hypothetically, if there was evidence

19   not only that there were Internet searches, for two or all

20   three, use whichever you want, but also that notations were made

21   and/or that printouts were made, those would be records with

22   respect to (e)(5) and (e)(7) of the Privacy Act, although for

23   (e)(7) you have to go further and see whether they are First

24   Amendment activity.

25       MR. ROSENBERG:  Well, just to back up on that, we

1   would also say that for (e)(5) you would have to make a

2   determination as to whether those records were relevant to a

3   decision, because you could have a record that's found on the

4   Internet that could be relevant.

5           THE COURT:  True enough.

6           MR. ROSENBERG:  The department's view is that the

7   Internet searches in and of themselves are not records.  It's

8   just what appears on the computer screen.  But that at least for

9   purposes of Privacy Act, if Esther McDonald makes substantive

10  notations or prints materials out, then those would be records

11  subject to the Privacy Act.

12          THE COURT:  Now, when you say that Internet searches

13  are not within the purview of the Privacy Act, how do you deal

14  with the language in Albright that says that the act prohibits

15  even the mere collection?

16          MR. ROSENBERG:  Our view is that this would not be

17  collection.  We've read this court's opinion at the motion to

18  dismiss stage as holding that.

19          THE COURT:  Well, I congratulate you for reading it.

20          MR. ROSENBERG:  I've always found it good to show

21  deference to the judge who's presiding over my case.  But in

22  this Court's opinion at the motion to dismiss stage it noted

23  that the records at issue were either the printouts or the

24  substantive notations that were made on applications and that

25  may or may not have been made on the applications at issue here.

1    Internet records by themselves, however, they're ephemeral.

2    They appear on a computer screen, and then when you move on they

3    more often than not go away, and there's no act of collecting

4    information, at least as that term is contemplated within the

5    context of the Privacy Act.  Otherwise, every time anyone ever

6    looks at anything on the Internet could be --

7         THE COURT:  Or speaks to anyone or listens to anyone.

8         MR. ROSENBERG:  Or speaks to anyone or listens to

9    anyone or even arguably the copies of law journals that are in a

10   library.  That would be a collection of First Amendment-related

11   information because they are books that reflect works written by

12   authors.  Or a copy of the *Washington Post* in the library might

13   report on a protest that's occurring downtown, and if that

14   happens to be in a government building, under that view, it's

15   collected and therefore violates the Privacy Act.

16       That can't be a proper read of the term "collection,"

17   because otherwise it turns the Privacy Act on its head.  The

18   notion of the Privacy Act is that the government should not be

19   collecting records about people.  And the Privacy Act, of

20   course, came about in the 1970s --

21       THE COURT:  So with respect to (e)(5) and the

22   maintenance requirements under (e)(5), if a determination were

23   made in the department, and it were made based on an annotation

24   that someone put down on someone's resume, let's say, and then

25   that was not retained, that might be something within (e)(5),

1   but if all of that was done orally, then it would not be.

2          MR. ROSENBERG:  That would be correct.  That would be

3   correct.  And indeed, I'm not even sure under that hypothetical

4   that --

5          THE COURT:  It may or may not be that (e)(5) would

6   prohibit it.  I agree with you.

7          MR. ROSENBERG:  And that raises one of the issues

8   here, is that we don't know in the context of these particular

9   plaintiffs what annotations, if any, were actually made.

10      Plaintiffs have made much of the point that the copies that

11  Esther McDonald created were destroyed a long time ago, but that

12  doesn't mean that plaintiffs weren't entitled to and couldn't

13  obtain discovery to try to determine how the decision-making

14  process unfolded as to these three plaintiffs, which goes to the

15  issue of causation, or set the foundation for their spoliation

16  claim by attempting to determine what these records would have

17  been as to these three plaintiffs.  For example --

18         THE COURT:  But it may be, and indeed it's quite

19  possible in this situation, is it not, that they never would be

20  able to ascertain whether records were created based on the

21  Internet searches of these three?

22         MR. ROSENBERG:  Well, it's a hypothetical.  We don't

23  know the answer to that because plaintiffs didn't try, and the

24  government's view is that plaintiffs didn't try as part of a

25  strategy of their case.

1          THE COURT:  What should they have done in discovery

2     that they didn't do?

3          MR. ROSENBERG:  First of all, if they would have taken

4     a deposition of Esther McDonald --

5          THE COURT:  Didn't they do that?

6          MR. ROSENBERG:  No.  No, they didn't.  Plaintiffs

7     should have shown Esther McDonald the copies of their

8     applications and asked her what her reactions to their

9     applications would have been.

10         It's possible, for example -- in fact, it's likely in light

11    of the fact that Esther McDonald didn't conduct any Internet

12    searches for James Saul -- that she could have voted to deselect

13    him based on information contained on the face of his

14    application.

15         That's entirely consistent with the undisputed evidence in

16    this case, that most of Esther McDonald's deselections were

17    based on information on the application, or based on grades, or

18    based on typos that were on the face of the applications

19    themselves.

20         THE COURT:  Has anyone ever talked to Ms. McDonald?

21         MR. ROSENBERG:  Talked to her... I'm unclear.  Talked

22    to her informally?

23         THE COURT:  To see what she did here.

24         MR. ROSENBERG:  Not as to these three plaintiffs, no.

25         THE COURT:  Not as to these three plaintiffs.

1          MR. ROSENBERG:  Well, we had an eight-hour deposition

2     of Ms. McDonald.

3          THE COURT:  That's what I asked a moment ago, and you

4     said they didn't depose her.  They did depose her; they just

5     didn't ask her about these three plaintiffs.

6          MR. ROSENBERG:  That's correct.  In fact, she

7     repeatedly said to Mr. Metcalfe, if you'll show me a copy of an

8     application, I might remember something.  But plaintiffs'

9     counsel didn't show her any copies of the applications, and we

10    think that was part of a deliberate strategy, because plaintiffs

11    noted in one of their briefs that it was never part of their

12    case to show how Esther McDonald treated these three particular

13    applicants.

14         So it's a strategy to rely, we think, on a spoliation

15    doctrine, to avoid asking the tough questions and perhaps

16    getting a bad answer, as they probably would have for Mr. Saul,

17    that Esther McDonald didn't conduct Internet searches for

18    Mr. Saul, and even if she did conduct Internet searches

19    regarding the other two applicants, plaintiffs would still need

20    to prove that records were created.

21         So the first thing plaintiffs could have done and should

22    have done is ask Ms. McDonald, do you remember these three

23    applicants, and then shown her the copies of their applications.

24    Plaintiffs also could have shown her the Internet searches that

25    Ms. McDonald conducted to try to refresh her recollection as to

1    how she voted on these particular applicants.  But that's not

2    all the plaintiffs didn't do.

3           THE COURT:  What else didn't they do?

4           MR. ROSENBERG:  What else didn't they do?  Well, let

5    me back up and explain the process as it worked for the

6    screening committee.  Esther McDonald would review the -- she

7    was generally the first person to view the applications.  She

8    would vote yes, no, or sometimes she wouldn't vote at all.  And

9    by the way, it wasn't even really a vote, she was very clear in

10   her deposition that it was nothing more than a recommendation.

11          She would then forward those materials on to Dan Fridman,

12   who was the career attorney from the Southern District of

13   Florida.  And I don't think there's any dispute between the

14   parties that Mr. Fridman didn't do anything wrong in this case,

15   that he voted based on what he perceived to be the merits.

16          THE COURT:  Indeed, he had raised concerns even at the

17   outset as to what his task was.

18          MR. ROSENBERG:  That's correct.  And he would vote

19   yes, or recommend yes or no or maybe, and then those materials

20   were forwarded to Mr. Elston.  Now, if both Ms. McDonald and

21   Mr. Fridman voted no on a particular applicant, that applicant

22   was deselected, and according to the testimony, Mr. Elston

23   didn't even review the application.  It was only in cases of

24   split recommendations, as it were, that Mr. Elston would make

25   the final decision.

1          So Mr. Fridman is a key component of this causation chain.

2    Ms. McDonald makes a recommendation, goes to Fridman, then goes

3    to Elston.  Plaintiffs didn't depose Mr. Fridman at all, so we

4    have no idea how he voted on these three applicants.  For all we

5    know -- and it's actually quite likely based on the undisputed

6    deposition testimony, he would have voted no as to Mr. Herber

7    and Mr. Faiella.

8          THE COURT:  Wait a minute.  Wait a minute.  That may

9    be a bit of a stretch to say that it's quite likely.  It's quite

10   possible.

11         MR. ROSENBERG:  It's quite possible, based on the

12   deposition testimony, that Mr. Fridman and Ms. McDonald agreed

13   that applicants should be deselected for poor grades or for

14   typos.  And Mr. Fridman and Mr. Herber had poor grades and

15   typos.

16         THE COURT:  Well, one fit in one category; the other

17   fits in the other category, more cleanly.

18         MR. ROSENBERG:  But regardless -- we could speculate

19   about that.  But that proves -- or that demonstrates that

20   plaintiffs haven't met their burden of proof, because in this

21   court's opinion and in the Privacy Act, you have to show

22   causation, that the record caused the deselection, which means

23   plaintiffs have to prove the elements as part of the chain of

24   causation.

25         And there is a missing link in that chain of causation,

```
1   because if Mr. Fridman voted no -- and we have no idea -- we can

2   assume, I think, that he didn't take any notes that Esther --

3           THE COURT:  You say you have to show that for

4   causation.  You mean causation with respect to either an (e)(5)

5   or an (e)(7) claim?

6           MR. ROSENBERG:  Yes.

7           THE COURT:  And you mean causation in the sense of

8   recovering damages through (g)(4) for a violation.

9           MR. ROSENBERG:  Through either (g)(4) or (g)(1)(C) for

10  (e)(5), or (g)(1)(D) for (e)(7).  But the record has to cause

11  the harm, because if the record doesn't cause the harm, then

12  whether or not there's a Privacy Act violation in theory, under

13  (e)(5) or (e)(7), plaintiffs haven't met their burden of proof

14  and are not entitled to damages.  And there's that gap in the

15  causation chain.

16      Now, we know, just to be clear, from the IG's report, that

17  the Inspector General did show Mr. Fridman Mr. Saul's

18  application, and Mr. Fridman apparently said to the IG that this

19  is an applicant for whom he probably would have voted yes.

20      That said, when the IG's office showed that same clean

21  application -- just what was in the system at the time -- to

22  Mr. Elston, Mr. Elston had a very negative reaction to that

23  application.  He said he probably would have voted no.  And

24  that's just based on the information contained on the face of

25  the application.
```

1    So that raises another thing that the plaintiffs could have

2    and should have done as part of discovery.  They could have and

3    should have shown Mr. Elston the copies of the application,

4    because they could have asked him, how do you think you would

5    have voted based on the information contained on the face of

6    this application?

7    And if he said, as he did in the case of Mr. Saul to the

8    IG's office, that he probably would have voted no, then there's

9    a causation problem there because plaintiffs can't show and

10   don't have any evidence to show that Mr. Elston would have taken

11   any records that Esther McDonald created into account.

12   Plaintiffs lean heavily on their spoliation theory, and

13   I'll get to that in a moment, but this causation argument is

14   independent of the spoliation theory.

15   Even if this court finds that an adverse inference is

16   appropriate -- and to be clear, we don't think there's a basis

17   for that.  But even if this court finds that the adverse

18   inference is appropriate and these records would have existed,

19   all that does is get plaintiffs to the first step, which is to

20   say, okay, there were records that existed that violated the

21   Privacy Act.

22   Plaintiffs would still need to show that those records

23   caused the harm that plaintiffs complain of in this case.  And

24   they had opportunities through discovery to try to prove up that

25   causation.

1          THE COURT:  Why does a plaintiff have to prove its

2    case through discovery?  Why can't a plaintiff decide, if

3    there's enough in a case percolating, why can't a plaintiff

4    decide, geez, I don't want to take these witnesses and preserve

5    their testimony on these crucial issues by examining them and

6    getting them to actually speak to these records and what they

7    recall?  I've talked to Mr. Fridman, and indeed, I even made a

8    phone call to Mr. Elston, and he -- and I refreshed his

9    recollection, and he remembered these things.  Why do I have to

10   depose them and create that testimony?

11        If the defendant wants to argue that there's no evidence of

12   that, the defendant can ask those questions through a

13   deposition.  What's the obligation of a plaintiff to create that

14   evidence through discovery?

15          MR. ROSENBERG:  The Celotex case, Your Honor, which at

16   summary judgment says that the government can point to the

17   absence of proof on plaintiff's claim, and if there is no

18   evidence that would allow the plaintiff to go forward, then

19   summary judgment should be entered for the defendant.

20        These are the elements of a Privacy Act claim.  And it goes

21   back to the overall theory that we talked about at the beginning

22   of this argument, that there were many remedies available for

23   these plaintiffs.  They could have taken Attorney General

24   Mukasey up on his offer in 2008 to interview.  They could have

25   pursued a CSRA claim through the Office of Special Counsel.

```
1     They chose not to.  They chose to go down this route.  And

2   for better or for worse, this route, involving civil litigation,

3   incorporates the requirements of the Federal Rules of Civil

4   Procedure, including the requirements on summary judgment that

5   plaintiffs have to be able to show that they can provide

6   evidence on each of the elements of their claim.

7     It also incorporates the very strict requirements of the

8   Privacy Act.  And plaintiffs are attempting to fit the square

9   peg into a round hole and litigate what is in essence a CSRA

10  claim through the context of the Privacy Act.

11    There were lots of opportunities that plaintiffs had.  We

12  think they chose not to take advantage of those opportunities

13  because they wanted to rely upon the bad fact, that we all have

14  discussed, that the department engaged in some unfortunate

15  events in the fall of 2006, and then rely upon the fact that the

16  copies of these applications were destroyed no later than the

17  fall of 2006 or early 2007, to be able to avoid proving the

18  elements of their claim.  And they've been explicit about that

19  in their briefs, that asking the specific questions about the

20  elements of their own Privacy Act claim was not a part of the

21  case as they anticipated it.

22            THE COURT:  Let's talk for a second about willfulness.

23            MR. ROSENBERG:  Okay.

24            THE COURT:  Is there any evidence that any of the

25  members of the screening panel were aware of the Privacy Act?
```

 1            MR. ROSENBERG:  Based on what I recall, I believe the
 2     evidence generally was no.
 3            THE COURT:  Any evidence that they were trained with
 4     respect to the Privacy Act?
 5            MR. ROSENBERG:  At that time, no.
 6            THE COURT:  Any evidence that they received any
 7     training with respect to carrying out their functions on the
 8     screening committee?
 9            MR. ROSENBERG:  My recollection on that is no,
10     Your Honor.
11            THE COURT:  So we have the Department of Justice
12     setting up a committee that was looking at hundreds of
13     applications for very important, prestigious positions in the
14     Department of Justice, and was conducting an initial screening
15     function that actually deselected large numbers of people,
16     whether appropriately or inappropriately -- that's the function
17     of the committee, to say no to a large number of people.  And it
18     was doing so through a process in the context of which the
19     members of that screening committee received zero training on
20     anything relating to conducting their functions, and zero
21     training with respect to the Privacy Act.
22        Does that sound like the agency flagrantly disregarding the
23     rights of the applicants, flagrantly disregarding the
24     constraints of the Privacy Act?
25            MR. ROSENBERG:  No.

 1          THE COURT:  Why not?

 2          MR. ROSENBERG:  And here's why.  With respect, the

 3   department disagrees with this court's view that searching the

 4   Internet, and plaintiffs' view as well, that searching the

 5   Internet and either printing publicly available information from

 6   the Internet or making notations based on that information is a

 7   violation of the Privacy Act.  The department continues to hold

 8   that view.

 9          THE COURT:  Let's be clear.  When we say a violation

10   of the Privacy Act in that sense, we're talking about is

11   inconsistent with (e)(7).  Not gives rise to damages, but is

12   inconsistent with (e)(7).

13          MR. ROSENBERG:  That is our view.  Now, whether that

14   view is right or wrong -- and I would anticipate that the Court

15   thinks that view is wrong -- there certainly would be no basis

16   back in the fall of 2006 for somebody to think that they were

17   violating the Privacy Act by searching the Internet.

18       This is a very novel claim.  We're not aware of another

19   Privacy Act case based on searching the Internet and finding

20   information about people.  In fact, plaintiffs, in one of their

21   briefs, described the practice as very common and making sense

22   as a practical matter.

23       Now, to be sure, they then distinguished that note by

24   saying, yeah, it's common and practical in the private sector,

25   but what happened in the government is topsy-turvy and totally

1    different.

2          THE COURT:  So if what happened here, with respect to

3    one applicant, was that an Internet search was done, as a result

4    of which -- and none of this, let's say, was on the applicant's

5    resume -- as a result of which it was discovered by Ms. McDonald

6    that the applicant had participated in a demonstration that

7    actually was critical of a program or position of the Department

8    of Justice, and that record was printed out and on it was put a

9    notation that this demonstration activity by applicant X is

10   reprehensible and should never be tolerated of anyone within the

11   Department of Justice, and that was kept by the department with

12   the materials relating to that candidate's application for an

13   honors position.  That would not raise any concerns under

14   (e)(7)?

15         MR. ROSENBERG:  Let me make sure that I understand the

16   hypothetical.  Somebody finds information on the Internet from a

17   publicly available source, prints that information out, and then

18   it is attached to an application.  The department's view --

19         THE COURT:  With an annotation.

20         MR. ROSENBERG:  With an annotation.

21         THE COURT:  As I've described it.

22         MR. ROSENBERG:  With an annotation.

23         THE COURT:  Why is that not -- and it's kept by the

24   department.  Why is that not maintaining a record describing how

25   an individual exercises rights guaranteed by the First

1    Amendment?  Why is it not?

2            MR. ROSENBERG:  I suppose under a literal

3    interpretation of that statute, it would fit within that

4    definition.

5            THE COURT:  So you don't like the language of the

6    statute.  You want to tell me something else as to what the

7    statute means?  What is it that that means if not what the

8    language says?

9            MR. ROSENBERG:  In terms of just the requirements of

10   (e)(7).  It's a slippery slope, Your Honor, because once you say

11   that Internet information --

12           THE COURT:  Well, you may not like a slippery slope

13   and where it results, but we start with the language of the

14   statute.  How is that not within that language of the statute?

15           MR. ROSENBERG:  Well, let's assume for purposes of

16   this hypothetical that it is, because I don't have a particular

17   response to that question.  This whole inquiry arose in the

18   context of whether this is intentional or willful conduct.  And

19   at the time, regardless of whether it fits within the language

20   of the statute or not -- the Privacy Act is, I think all people

21   would admit, a relatively obscure statute -- there's no basis to

22   believe that Esther McDonald thought that she was doing anything

23   wrong at the time that she was searching the Internet, nor is

24   there any basis to believe --

25           THE COURT:  Is the test really what the individual

1    thought, or is the test really focused on the agency?  This is

2    an interesting question to me under the Privacy Act.

3                MR. ROSENBERG:  That is an interesting question, and

4    I'd not thought of it directly that way before.

5                THE COURT:  Well, the language of the Privacy Act

6    speaks of the agency acting in a manner that was intentional or

7    willful.

8                MR. ROSENBERG:  Well, under either test I think

9    plaintiffs can't show intentional or willful conduct, because if

10   it's the individual, neither Ms. McDonald nor Mr. Elston felt

11   they were doing anything wrong, and they weren't aware --

12               THE COURT:  But if the reason they didn't think they

13   were doing anything wrong was that the department purposefully

14   failed to train them in any way with respect to their duties or

15   with respect to the Privacy Act, and indeed, there was wholesale

16   activity of this sort going on within the Department of Justice

17   even in other arenas, and the department just turned its back on

18   it and failed to train anyone or caution anyone, why might that

19   not be flagrant disregard under the language of the cases

20   telling us what the willfulness standard means?

21               MR. ROSENBERG:  Because there's no evidence of that,

22   Your Honor.  If we're looking at what the department did --

23               THE COURT:  There isn't?  I thought we had evidence

24   that both the tax and the antitrust divisions, after learning of

25   deselections, went ahead and did this same kind of thing, to

1    follow up on it and discovered publications and so forth and so

2    on through their Internet searches.  Why weren't they doing the

3    same thing when they did that?

4           MR. ROSENBERG:  I'm not sure what the Court's

5    referring to on that.

6           THE COURT:  Read pages 49 to 52 of the IG's report.

7           MR. ROSENBERG:  On the IG's report -- and I'll take a

8    look at the IG's report when I sit down.  But to back up, I

9    don't think there's any evidence that the tax division and the

10   antitrust division were conducting -- that I'm aware of, were

11   conducting independent searches.  Whether they were or not, that

12   still doesn't raise --

13          THE COURT:  It did it after learning of people being

14   deselected.

15          MR. ROSENBERG:  Perhaps as part of a remedial process

16   to find out why these individuals --

17          THE COURT:  Well, that's right.  But just because it's

18   a remedial process, if it violates the Privacy Act, doesn't make

19   it right.  My question is there seems to be sort of a freedom

20   within the department to conduct these Internet searches and to

21   look into, arguably, First Amendment activity, perhaps for good

22   reasons in some instances, perhaps for not so good reasons in

23   other instances.  Doesn't that give a flavor of an agency that

24   is in flagrant disregard of the requirements under the Privacy

25   Act?

1          MR. ROSENBERG:  No.  Because the first time, based on

2     the evidence that I recall, that any issue came up regarding a

3     possible Privacy Act violation was, I believe, in December of

4     2006, which was well after all of these Internet searches were

5     conducted.  So any of the Internet searches that either occurred

6     in the IG report as part of this remedial process, or pursuant

7     to Esther McDonald, were conducted at a time when the department

8     didn't have -- certainly didn't have the intent to violate the

9     Privacy Act, and at best, assuming this is a Privacy Act

10    violation -- which the Court has held, at least for purposes of

11    the motion to dismiss -- there was no reasonable basis for the

12    department to believe at that time, based on how common this

13    practice was, that this would violate the Privacy Act.

14          THE COURT:  But in response to my earlier

15    hypothetical, you haven't given me any reason to believe that

16    the hypothetical I posed to you about the demonstration and the

17    one-page record of that with an annotation, you haven't given me

18    any reason to believe that that's not within the scope of

19    (e)(7).

20          MR. ROSENBERG:  I have not, Your Honor.

21          THE COURT:  And that certainly is something that,

22    given what we know about what happened, not with respect to

23    these three plaintiffs necessarily, but with respect to the

24    applicants for the Honors Program in 2006, that certainly is

25    something that could well have transpired.

1        MR. ROSENBERG:  That may have happened with some

2   applicants.  Again, the undisputed testimony shows that in most

3   cases --

4        THE COURT:  But you think that even if that happened

5   with some applicants, it would not be within (e)(7)?  I'm not

6   saying that those applicants could then succeed in recovering

7   damages because of willfulness or other considerations with

8   respect to the other provisions of the Privacy Act.  But in

9   terms of being within (e)(7), I don't see how the department can

10  convince me that that wouldn't be within (e)(7).  And you're not

11  really trying --

12       MR. ROSENBERG:  I'm not trying to convince you

13  otherwise.  This conversation arose in the context of the

14  intentional or willful requirement.  And whether it did violate

15  (e)(7) or not, there's no evidence, and plaintiffs haven't

16  offered any meaningful evidence that this was an intentional or

17  willful violation.  And again, that's their burden.

18     They certainly haven't offered any evidence as to these

19  three particular plaintiffs, because they never asked any

20  questions about it.  And the Privacy Act is a very

21  individualized statute.  It relates to records kept about

22  specific people.

23       THE COURT:  I don't think the right focus would be on

24  these three individual plaintiffs with respect to the

25  willfulness, because we don't really have any reason to believe,

through any of the record before me, that there was a different intent with respect to the review Ms. McDonald did for one applicant versus another.  There was the same reason for doing it.  What was found and therefore what then happened after that would vary depending upon the individual applicant.  But in terms of the activity of the search and then the maintenance of any record resulting from that search, that's pretty much the same for all the candidates who were subjected to such searches. Seems to me the better focus for willfulness is on the doer, either the individual or the agency.

MR. ROSENBERG:  Well, I'm not here to argue with what the Court thinks is the better focus, but I would say that there is an argument, I think it's a good argument, that intentional or willful conduct is individualized because it depends on how Esther McDonald may or may not have reacted to a particular application.  She may or may not have conducted an Internet search on a given applicant.  If she did conduct an Internet search, she may or may not have made notations that reflected that Internet search.  And so her intent is going to turn based on her reaction to what she sees on each individual application.

THE COURT:  You're right in the sense that there can only be a Privacy Act violation if there was a record created and maintained, and it related to the exercise of First Amendment activity.  So, yes, to that extent it does turn on the individual candidate, because for some there would be and for

1    others there wouldn't be.

2         But in terms of the intent, it's either McDonald's or the

3    screening committee's or the agency at large's intent that

4    matters.  That's where the willfulness test goes.  And if I

5    reach that issue, does the department think I should be looking

6    at the agency's willfulness or Ms. McDonald's willfulness?

7              MR. ROSENBERG:  I think in the context of this case,

8    in which the department has disowned the actions of the

9    screening committee in the fall of 2006, it would be appropriate

10   to look at the individuals.  But we think that under either

11   test, either the individuals or the department, plaintiffs can't

12   meet their burden of showing willful or intentional conduct.

13             THE COURT:  And for the individuals it's primarily

14   because -- certainly for Ms. McDonald, probably for Mr. Elston

15   as well, to the extent we have a full record on that, they

16   thought private employers were doing this and they saw no reason

17   why they couldn't do this in their capacity within the

18   Department of Justice.

19             MR. ROSENBERG:  That's correct.  And Ms. McDonald was

20   a new employee, which the IG report had noted.  She had only

21   been at the department for about a month.  And that may have

22   been a mistake, but it doesn't rise to the high standard for

23   intentional and willful conduct, which in this circuit, it is an

24   awfully high standard.

25             THE COURT:  What do you think Ms. Goodling meant, when

1    informed that Ms. McDonald had been selected for the screening

2    committee, and she said something to the effect of, oh, good,

3    she's done this kind of thing before?

4              MR. ROSENBERG:  I don't really have a view on what she

5    meant by that.  There's no evidence, though, that, based on

6    Ms. McDonald's deposition testimony, that she felt she was doing

7    anything that was incorrect at the time.  Plaintiffs have spent

8    countless hours in depositions and through discovery to try to

9    ascertain some link between -- some meaningful link between

10   Ms. Goodling and Ms. McDonald.  The best I can recall is they

11   might have gone to a picnic together at some point at the very

12   beginning of Ms. McDonald's career at DOJ.

13       But we don't really think the deposition testimony of

14   either Ms. Goodling or former Attorney General Gonzales really

15   bears on the issue in this case, which is whether the Privacy

16   Act was violated as to these three plaintiffs.

17             THE COURT:  Let's talk about the absence of records,

18   the record destruction a little bit.  Do you think (e)(5) puts

19   any affirmative obligation on the Department of Justice to

20   maintain records for some period of time?

21             MR. ROSENBERG:  (E)(5), no, it does not.

22             THE COURT:  Even though it uses the word "maintain."

23             MR. ROSENBERG:  It uses the word "maintain," but it

24   also uses that word "maintain" in the context of a

25   determination.  So an agency has to maintain records relating to

1    a determination that it has or presumably will make.

2         THE COURT:  Well, there must be some period of time

3    that they have to maintain it.  Even if it's just at the time of

4    the determination, it's some period of time.

5         MR. ROSENBERG:  These records or these documents were

6    maintained until they were no longer needed, which is after the

7    screening committee's work was done, after all appeals from the

8    screening committee's work was done.

9         THE COURT:  Do we know that they weren't destroyed

10   until after all appeals were done?  Do we know that the sweep of

11   Mr. Elston's office by his staff assistant actually with respect

12   to the records of the 170-odd applicants, that all of that was

13   done after appeals with respect to the applicants were

14   completed?

15        MR. ROSENBERG:  Based on my understanding of the

16   timeline, that would be correct.  The appeals took place in, I

17   want to say October of 2006.  They might have bled into

18   November, but I don't think so.  The documents were destroyed

19   either in late 2006 or very early 2007.  It was certainly at a

20   point when the screening committee's work was done and

21   Mr. Elston had no reason to believe that he would ever need

22   these documents again.

23        THE COURT:  Although it's possible that he wasn't even

24   consulted with respect to the destruction of the documents.

25        MR. ROSENBERG:  We think that's correct.  The IG's

report noted that Mr. Elston's secretary or assistant destroyed
the documents without first consulting with him.  And Mr. Elston
during his deposition couldn't recall exactly what happened, but
there's certainly the likelihood that his secretary destroyed
these documents.  And it was in the department's view an
innocuous destruction.  We know that plaintiffs have attempted
to make light of that destruction based on Ms. McDonald's
deposition testimony --

          THE COURT:  I'm not sure they're making light of it,
but I understand the thrust of what you're saying.

          MR. ROSENBERG:  So I don't know if the Court -- maybe
this would be a good time to address some of the spoliation
issues.

          THE COURT:  That's where we are, but let me get you
there by taking you through one additional step.  It does seem
to me that (e)(5) has some affirmative obligation in it to
maintain records accurately, et cetera, et cetera, for some
period of time, but it's not a very specific period of time.
It's just with respect to a determination, so it's got to be at
the time of the determination, and maybe that means a little bit
afterwards.  But there's not much more to any requirement that
(e)(5) would place.  What about the Federal Records Act?

          MR. ROSENBERG:  Well, the Federal Records Act does
not, for purposes of what this court has to decide in this
case -- and let me back up for a second.  We don't think the

1    Court needs to get to the spoliation issue because plaintiffs

2    have failed to prove causation, which they could have done

3    without these records.

4         But if this court is going to analyze the scope of the

5    Federal Records Act, plaintiffs have failed to seek any

6    discovery on the exact status of what these, what we call copies

7    of documents were, and it would be their burden of proof on a

8    spoliation claim to show that these were in fact records subject

9    to the FRA.

10        THE COURT:  Let's talk about the FRA and any

11   regulations that DOJ has promulgated under them, because that's

12   law; that's not facts to ascertain through discovery.  The FRA

13   does require an agency, the DOJ in this instance, to promulgate

14   procedures for destruction of records.  Are there such

15   procedures?

16        MR. ROSENBERG:  For this, for the records -- I don't

17   want to use the term "records," but for the documents at issue

18   here, which are the hard-copy printouts of applications, we're

19   not aware of any records retention policy for those documents.

20   There was a subsequent records disposition schedule I believe

21   for the electronic version of these documents, which were kept

22   by OARM throughout this process.  And I can double-check on

23   that, but I don't believe there was anything at the time for

24   these hard-copy printouts.

25        THE COURT:  So what you're telling me is that under

1   the Federal Records Act and any regulations that DOJ has -- or

2   maybe you're not telling me this, but let me say this and you

3   can react to it.  If an application process involves not only an

4   electronic set of materials that an applicant submits, and maybe

5   even some additional materials that are created within the

6   agency, but also those involved in the process print out copies

7   of those materials or even go and get additional materials

8   through the Internet; even though it's a formal process and part

9   of that formal process, the Federal Records Act and implementing

10  regulations would not apply to those records that, for example,

11  a screening committee member or an interview committee --

12  wouldn't apply to those copies of materials that are printed out

13  that may reflect, through annotations or otherwise, reasons for

14  determinations being made.  You think those are not subject to

15  the Federal Records Act and the regulations that the DOJ has?

16          MR. ROSENBERG:  I have two responses to that.  I think

17  the answer is it depends a bit.  But the first response is the

18  use of the hard-copy printouts was not a formal part of the

19  screening process.  In fact --

20          THE COURT:  What do you mean, it wasn't a formal part?

21          MR. ROSENBERG:  It was anticipated that the electronic

22  versions of the applications would be made available to the

23  members of the screening committee.  And my recollection from

24  the evidence is that the members of the screening committee

25  either didn't like electronic versions or were technology averse

 1    and so they asked for hard-copy printouts instead, which they

 2    received.

 3         So in that sense this process of using hard-copy printouts

 4    of the applications was not anticipated at the beginning of the

 5    2006 Honors Program interview process.

 6         But I think the second and more direct point is whether

 7    these documents are subject to the Federal Records Act depends

 8    on the document itself.  And plaintiffs would like --

 9              THE COURT:  You understand that the "depends" position

10    is not necessarily one that leads me to grant summary judgment.

11    This hasn't been briefed to any extent by either side.  Indeed,

12    the DOJ regulations that you're referring to -- on my

13    insistence, but that you're referring to -- haven't even been

14    provided to the Court in the context of the briefing.

15         Can I really conclude, based now on your argument that,

16    since you keep lacing it with "it depends on the record," "it

17    depends on the hard copy versus the electronic," et cetera, can

18    I really make a determination whether these records are subject

19    to the Federal Records Act or the DOJ regulations thereunder?

20              MR. ROSENBERG:  We think the answer is you can make a

21    determination on plaintiffs' spoliation motion, which is a

22    separate motion from the summary judgment --

23              THE COURT:  Well, answer my question.  Can I make a

24    determination whether the records that we're talking about --

25    the records that give rise to a possible claim under (e)(5) or

1    (e)(7), can I make a determination whether those records at the

2    time, in 2006-2007, were subject to the Federal Records Act and

3    the Department of Justice's regulations regarding destruction of

4    records?

5            MR. ROSENBERG:  You can make a determination that

6    plaintiffs have offered no evidence that there would have been

7    any records that would have been subject to the Federal Records

8    Act, and therefore a spoliation adverse inference doesn't even

9    come into play.

10        Again, this goes back to what plaintiffs could have done

11   during the deposition of Esther McDonald.  They could have shown

12   her the copies of the applications.  They could have shown her

13   the Internet searches and asked her, do you recall making any

14   notations about these applicants?  And depending on what her

15   answer was, they could have followed up with a question, do you

16   recall whether there was anything substantive or was it just a

17   scribble?

18            THE COURT:  The problem I'm having a little bit, but

19   you may be right, but basically the argument is -- there are two

20   arguments now.  One argument is, well, geez, maybe -- there's an

21   admission, concession, acknowledgement, whatever you want to

22   call it, by the department, and the Court has also made the same

23   kind of observation, that this was a dark day.  And you even

24   said some -- referred to some wrongdoing.  But the department's

25   position is, through failures by the plaintiffs and their

1   attorney, they haven't developed the evidence with respect to

2   these three people, so they can't proceed and get relief under

3   the Privacy Act.

4       And with respect to the spoliation claim or records

5   retention part thereof, they haven't, through the summary

6   judgment process, sufficiently developed that, and therefore --

7   even though it may be true -- they shouldn't get any relief from

8   this court.

9           MR. ROSENBERG:  I don't think they were failures on

10  the part of plaintiffs' counsel.  I think it was an intentional

11  strategy.

12          THE COURT:  All right.  Either intentional decision or

13  failures, whichever it may be.

14          MR. ROSENBERG:  But that's an important distinction.

15  Plaintiffs in their reply brief on the spoliation motion, on

16  page 18 at note 26, said Ms. McDonald's specific recollection of

17  plaintiffs' applications was never essential to their Privacy

18  Act claims.  They therefore made a decision, a litigation

19  strategy decision not to ask her any questions about the

20  treatment of their own applications, and instead decided to

21  throw the dice with the spoliation motion, which they didn't

22  raise until after the government had filed its cross-motion for

23  summary judgment.

24      Put that aside for a moment.  Those are litigation

25  decisions the plaintiffs have made, and they should be required

to live with those litigation decisions at the summary judgment
stage.

     For purposes of the spoliation argument and the Federal
Records Act, we would also point out that the Federal Records
Act doesn't even provide a basis for spoliation and is in direct
conflict with this circuit's decision in Talavera.  And we know
that the Court is familiar with the Talavera decision, and quite
frankly we like the District Court's decision a little bit more,
but it is what it is.  But the one thing --

          THE COURT:  Flattery will get you nowhere, but go
ahead.

          MR. ROSENBERG:  The one thing that the Court of
Appeals made absolutely clear in Talavera is that not only do
you have to show that records were destroyed in violation of a
regulation, but that plaintiff was a member of the class
intended to be protected by those regulations.  Plaintiffs have
identified no such regulations before this court.

     Instead, in fact, plaintiffs expressly disavow the
regulations that were cited in Talavera, and instead say the
Federal Records Act as a whole should give rise to a spoliation
motion.  If that's the case, then there's no reason why the D.C.
Circuit would have said in its opinion that you have to cite
specific regulations and that you're a member of the class.

     Because plaintiffs are not members of a class intended to
be protected by the FRA.  They're not archivists, and the FRA is

1    a general record-keeping statute for the government.  And so

2    holding that the FRA can impose a spoliation requirement, which

3    is what the plaintiffs ask this court to do, would expand

4    exponentially the record-keeping requirements of the government.

5    Because any scrap of paper that had not previously been

6    considered a record, but that arguably could be, would now have

7    to be kept for essentially all time under the guise that either

8    you have to create a records destruction schedule for every

9    scrap, every outline of every argument, every Post-it note that

10   contains some sort of thought as to a process that's unfolding

11   in the government, or else the government could face a

12   spoliation claim under the FRA.

13        THE COURT:  It would help me to be able to look at the

14   language of the FRA and the regulations to determine whether the

15   records at issue here are actually within the scope of either

16   the statute or the regulatory provisions.  And I'm not laying

17   all that at your doorstep.

18        MR. ROSENBERG:  I think the Court, while it may be

19   helpful, the Court doesn't need to reach that decision, because

20   it can make the threshold decision, can the FRA itself give rise

21   to a spoliation claim.  And we think, based on a fair reading of

22   Talavera, the answer is no, because otherwise it throws out that

23   part of the D.C. Circuit's holding that you have to be a member

24   of a specific class intended to be protected by the regulations.

25   Because, after all, if the FRA could give rise to the spoliation

requirement, the D.C. Circuit could have simply said, well, the FRA requires that --

THE COURT:  You said that already.  Let's focus on regulations under the FRA.  Your argument would be that those regulations could never give rise to a spoliation claim because those regulations too are only for the benefit of others, archivists, et cetera, not for the benefit of those as to whom the records are created.

MR. ROSENBERG:  Yes.  And in fact, we think that is supported by numerous decisions under the FRA noting that it's a general record-keeping statute, and it's supported by the D.C. Circuit's very recent decision in Talavera.  Because otherwise there was no reason to identify the OPM and EEOC regulations at issue.

THE COURT:  Are the DOJ regulations, is the sole source for them or impetus for them the Federal Records Act?

MR. ROSENBERG:  Which DOJ regulations are --

THE COURT:  Whatever the ones you're talking about are, that relate to destruction of records.  Because nobody's cited them to me --

MR. ROSENBERG:  I'm not sure there are specific DOJ regulations that would relate to any of the documents at issue here, other than I believe there was a subsequent destruction schedule for the electronic versions.  I can double-check on that when I take my break.  But I don't think there were any

1    specific records -- I'm not aware of any internal DOJ

2    regulations relating to the documents at issue here.

3         So plaintiffs chose to roll the dice with the FRA, and we

4    just don't think that's an appropriate basis for a spoliation

5    claim.  There's certainly no legal support for that.

6              THE COURT:  If there is a spoliation claim, if the FRA

7    or even (e)(5), the plaintiffs think that (e)(5) can give rise

8    to the spoliation -- to records retention requirements, how

9    would I assess it?

10             MR. ROSENBERG:  Well, we think you would look at what

11   happened in the context of Mr. Elston's secretary destroying the

12   documents without first asking Mr. Elston, OARM telling

13   Mr. Elston that they did not need the copies of these documents

14   back, and in fact a belief within the department that the

15   documents shouldn't be kept around because they contained

16   personally identifiable information, such as Social Security

17   numbers.  There was no reason to believe that these documents

18   would be needed again.  So we think that those factors should be

19   taken into account.

20        In terms of what the inference is, I don't know --

21             THE COURT:  Before we get there, there also may be a

22   requirement in terms of the state of mind necessary, that there

23   was a culpable state of mind.  Do you think negligence is

24   enough?

25             MR. ROSENBERG:  There are cases that say that

1    negligence is --

2            THE COURT:  Some of which I've written.

3            MR. ROSENBERG:  Yes.  So I don't think we would

4    dispute that.  We do think that that would have to be taken into

5    account in terms of the overall analysis of whether a spoliation

6    sanction is appropriate.  And certainly, bear in mind that, for

7    example, let's say this court would impose --

8            THE COURT:  And should it be up to the Court to assess

9    those various factors and determine whether there's spoliation,

10   and then what the remedy, if you will, or result of that

11   spoliation should be?  Is that for the Court to determine or for

12   a jury to determine?

13           MR. ROSENBERG:  In the context of a case like this,

14   there's no jury trial.  So I don't know -- I would say in this

15   case it would be for a court to determine, because then you

16   would be impaneling a jury just for the question of whether

17   there's spoliation.  I'm not aware of any -- I haven't run

18   across that question before, to be honest, but I don't see a

19   basis for a jury to decide it.

20           THE COURT:  What do you rely on to reach the

21   conclusion that there can be no jury trial in this case?

22           MR. ROSENBERG:  I had not thought of that possibility

23   until you asked the question.  But what I would say is, in the

24   context of this case, which is a Privacy Act violation, in which

25   no jury trial is available.  If there were a trial, it would be

```
 1   a bench trial and we all --

 2              THE COURT:  Does the statute say that or does some

 3   case say that?

 4              MR. ROSENBERG:  I'd have to go back and double-check.

 5   I've been operating under the assumption and I think there is

 6   case law that says it's a bench trial.  I can double-check on

 7   that, Your Honor, and follow up.

 8              THE COURT:  There is a jury demand in this case, and

 9   you haven't filed anything saying that there should not be a

10   jury trial.

11              MR. ROSENBERG:  I'd have to follow up on that,

12   Your Honor.

13              THE COURT:  All right.

14              MR. ROSENBERG:  But in terms of spoliation, I just

15   want to make one thing clear, that even if there is an adverse

16   inference, for example, that these documents, whatever they

17   were, existed, it doesn't relieve plaintiffs of any of their

18   other obligations, including the obligation that they show

19   causation, which they can't do because they didn't ask the

20   proper questions and chose not to ask the proper questions

21   during the deposition.  They would still need to show intention

22   or willful conduct, and they would still need to show damages.

23              THE COURT:  What would you do with this case?  What if

24   there had been only 10 applicants, and you have the same sort of

25   general assessment that Internet searches were done with respect
```

1    to many of the applicants, and with respect to some of them

2    there were printouts created, and with respect to a few of them

3    or some of them there were annotations made based on those

4    Internet searches, and that the Internet searches did go into

5    such things as membership in associations.  And I had before me

6    all 10 of those plaintiffs, but we still had a situation where,

7    although it was clear that they had all been subjected to

8    Internet searches -- so I'll change it from many to all -- there

9    was no evidence as to which ones had printouts or annotations

10   flowing from those Internet searches.  Should that case also be

11   thrown out?

12          MR. ROSENBERG:  Well, it would be plaintiffs' burden

13   in that case, just as in this one, to attempt to prove that the

14   records at issue were the proximate cause of the deselection.

15   So they would have to determine -- and it would presumably be

16   easier in that case -- which records related to which

17   applicants.  And even assuming that a record existed --

18          THE COURT:  Wouldn't it be up to the fact-finder to

19   determine if they had satisfied that burden, not through a

20   summary judgment proceeding, but through a trial-like proceeding

21   where the fact-finder actually heard the evidence and listened

22   to the relevant witnesses?

23          MR. ROSENBERG:  If there was a dispute in the

24   evidence, such as a dispute of a material fact, or if there were

25   questions of credibility, then ultimately it would get past

 1    summary judgment and would be up to a fact-finder.  But

 2    plaintiffs have a threshold requirement of showing some

 3    evidence.  And here they haven't done that.  They haven't shown

 4    any evidence.

 5              THE COURT:  Stick to my hypothetical for a moment.  If

 6    the hypothetical was as I framed it, with 10 applicants, 10

 7    plaintiffs, wouldn't you want to throw that to the fact-finder,

 8    be it a jury or a judge, to draw the inferences, assess the

 9    credibility, and make the determination?  Isn't that what we

10    have such proceedings for?  Rather than in a summary judgment

11    context to say, well, many, some, you know, yeah, probably, but

12    I'm not sure?  How can you resolve that on summary judgment?

13    That's got to go to the ultimate determination by the

14    fact-finder, doesn't it?

15              MR. ROSENBERG:  It may be a cold answer to give, but

16    the purpose for summary judgment is to weed out claims after

17    extensive discovery.  Plaintiffs had the opportunity to depose

18    four witnesses.  They could have deposed more if they wanted.

19    They had the opportunity to depose the former Attorney General

20    of the United States, and deposed him for close to eight hours.

21    Yet they didn't ask a single question about how their own

22    applications were treated.

23              THE COURT:  He wouldn't have known that.

24              MR. ROSENBERG:  Well, I don't know why we deposed the

25    Attorney General in the first place, to be honest, but we did.

1    Plaintiffs had that opportunity, to pursue the discovery they

2    wanted, and they got the discovery they wanted, but the

3    discovery they sought is not discovery that's relevant to their

4    claims.

5         And again, this goes back to the fact that they had

6    remedies; they have the CSRA remedy, they had the opportunity to

7    interview.  The department has tried to do right, but they chose

8    to litigate a Privacy Act claim, and that claim has specific

9    requirements.  And they're now trying to sidestep those

10   requirements.  And summary judgment is appropriate in a case

11   like this, to require that plaintiffs at least show that they

12   have some evidence to present to a jury, or a court in a bench

13   trial, rather than rely on conjecture.  And that's what we have

14   right now.

15            THE COURT:  So in the hypothetical that I posed with

16   the 10 applicants, 10 plaintiffs, the same result you think

17   should be reached on summary judgment, even though, as you said,

18   well, in that situation, it would be easier to prove.  The

19   reason it would be easier to prove is because inferences can be

20   drawn from the evidence.

21            MR. ROSENBERG:  Well, but let's take the other

22   extreme, Your Honor --

23            THE COURT:  Which may not be as available here where

24   you have three plaintiffs, 170 applicants, and perhaps not quite

25   as much certainty as to who was subjected to Internet searches.

1          MR. ROSENBERG:  There's actually undisputed evidence.

2     We know that two of the three were subjected to Internet

3     searches --

4          THE COURT:  You say it's undisputed evidence.  It

5     isn't in the record before me until you just mentioned it.

6          MR. ROSENBERG:  Well, not the Internet searches,

7     there's no undisputed evidence of that.  But there is undisputed

8     evidence that Esther McDonald, even when she conducted Internet

9     searches, only a subset of those cases did she actually make

10    notations.

11        But let's take the other extreme for just a moment,

12    Your Honor.  Recall that plaintiffs originally wanted to certify

13    this case as a class action.  And if they have their way,

14    they'll have the Court of Appeals reverse this court's decision.

15    And if this court subsequently grants class certification, what

16    would plaintiffs do?  They would again attempt to avoid the

17    requirement that they show a Privacy Act violation as to each

18    individual plaintiff, and presumably, presumably have the Court

19    find that the Privacy Act was violated as to everyone.

20        THE COURT:  I'm not sure -- with the Privacy Act, I'm

21    not sure exactly how it would play out.  With another statute,

22    for instance a Title VII statute, I know how it would play out.

23    It would play out that there would be a generalized liability

24    finding or not, and if there was a liability finding of

25    discrimination with respect to the class, then there would be

1    individual relief proceedings to determine whether an individual

2    class member had been subjected to the discrimination and was

3    entitled to damages, and if so, how much.

4         With the Privacy Act, it's not quite as clear because

5    there's not the historical evolution or development of the law,

6    and there's the question about declaratory judgment and a

7    generalized finding.  But it seems to me that if you had a class

8    action under the Privacy Act, you'd probably still go with a

9    generalized liability determination to see whether there was

10   generalized violation of, let's say (e)(7) for present

11   discussion purposes.

12        And then you'd go forward through the other provisions of

13   the Privacy Act to determine if any of the plaintiffs, a large

14   class as opposed to three, were entitled to relief personally

15   under the Privacy Act.  And you'd have the same problems with

16   respect to each of them that you're articulating, as to whether

17   there's specific proof that can be developed for them.  But I

18   think that's approximately how it would flow.

19             MR. ROSENBERG:  Let me just respond to that.  And I'm

20   mindful of this court's note that we should only take an hour,

21   and I'd like to reserve a few minutes for reply.

22             THE COURT:  I'll give you those few.

23             MR. ROSENBERG:  I think, though, there's a difference

24   here in the Privacy Act.  And what flagged that for me in your

25   question was you asked will there be a showing of general

```
 1    liability.  And the question is general liability as to what?

 2    If the general liability is to the question of whether the

 3    Department of Justice took political considerations into

 4    account --

 5              THE COURT:  That's not the issue under the Privacy

 6    Act.

 7              MR. ROSENBERG:  But that's what the plaintiffs are

 8    attempting to do here.

 9              THE COURT:  I understand that.  I understand that.

10    But with a Privacy Act claim, even if they had a class action,

11    that would not be the issue.  The issue would be, in general,

12    whether there were records maintained, or not maintained,

13    depending on which provision, in violation of (e)(5) or (e)(7).

14              MR. ROSENBERG:  Let's take your example to the next

15    step then.  Let's assume this is how the Court would adjudicate

16    a Privacy Act class action.  Plaintiffs presumably would come up

17    and they would say, as they have in this case, well, there are

18    no records as to the particular, the individual class members.

19    Therefore, everyone should be entitled to recovery under the

20    Privacy Act.  Which is essentially what they're saying here for

21    these three plaintiffs.

22              THE COURT:  They are, to some extent.

23              MR. ROSENBERG:  And what this court just noted --

24              THE COURT:  But in a class action that might not be

25    that much of a problem, so long as you had the individualized
```

 1    determinations to follow, to see what if any relief individuals

 2    were entitled to under the Privacy Act.

 3              MR. ROSENBERG:  And if that's the requirement for a

 4    class action, that you have to show the individual elements and

 5    the individual relief, then it certainly should be the

 6    requirement when there were only three plaintiffs, and

 7    plaintiffs had the opportunity to take the discovery that they

 8    needed.

 9         I'd like to address the issue of damages just for a brief

10    moment.

11              THE COURT:  Take a moment.

12              MR. ROSENBERG:  There are a couple of aspects to

13    damages in this case.  One of the elements -- an element of

14    liability in a Privacy Act claim is showing fact of damage.  And

15    we've made an argument that plaintiffs are not entirely thrilled

16    by, that plaintiffs have failed to show fact of damage.  And the

17    argument in a nutshell is this.  The damages the plaintiffs are

18    seeking here, for example, a book that Mr. Herber I believe

19    bought so that he could train up on how to be a better lawyer,

20    some bar dues, out-of-pocket expenses for additional resumes,

21    are not directly attributable to the failure to obtain the

22    interview, because it's more likely than not that these

23    candidates would not have received job offers from the Justice

24    Department, and therefore would have incurred these expenses

25    anyway.

1          THE COURT:  But might it not be true -- I don't know

2     if it is or not -- that someone could convincingly argue to a

3     finder of fact on damages that, all right, here are the expenses

4     I incurred.  It was to travel for other job applications shortly

5     thereafter -- shortly after this one, and those kinds of

6     expenses.  And I wouldn't have incurred those if I had gotten

7     the interview at the Department of Justice.  I would have at

8     least held off and wouldn't have incurred them.  Might that not

9     be an argument that the jury could, or the fact-finder if it's

10    me, could accept as sufficiently specific rather than

11    speculative for purposes of awarding damages?

12          MR. ROSENBERG:  I think I can do you one better.  I

13    think there could be categories of damages, and we're not saying

14    plaintiffs can't ever show any damages, but there could be some

15    categories of damages that might be directly attributable to the

16    alleged Privacy Act violation that took place here and the

17    failure to obtain an interview.  For example, if a plaintiff

18    said, well, I was so --

19          THE COURT:  And by the way, the Department of Justice

20    did not call it deinterviewing.  The Department of Justice

21    called it deselecting.  But go ahead.

22          MR. ROSENBERG:  It was deselecting for an interview,

23    so ultimately it's the same process.  An interview is the first

24    step, or maybe the second step.  First step is you apply.

25    Second step, applications are reviewed, interview, and then you

```
1   have to receive a recommendation from the interview, and you

2   have to go through all these other steps afterwards.  So it's

3   part of a multistep process.

4            THE COURT:  But sticking on the issue we were talking

5   about in terms of the expenses and so forth.  Then we'll get

6   back to the interview, which we will.

7            MR. ROSENBERG:  Okay.  Great.  Plaintiffs could have

8   said, for example, I was so emotionally scarred by my failure to

9   obtain even the interview with the Department of Justice that I

10  had to go to a psychiatrist, and I had $500 in psychiatry bills

11  that are directly attributable to the fact that I didn't get

12  that interview.  Well, that would be a damage that could arise

13  from the interview and that's not attributable to anything else.

14       Here, by contrast, all of the damages that they're seeking

15  are equally attributable to the fact that they were already

16  looking for lots of different jobs anyway, and they're not

17  attributable to the fact that they were deselected for an

18  interview.

19           THE COURT:  Maybe, maybe not.  It all depends.

20  Somebody might be able to make a colorable/convincing argument

21  to a fact-finder that some of the expenses were attributable to

22  being denied an interview through the Department of Justice

23  Honors Program, because if they had been granted that interview

24  they wouldn't have done these other things, because that was the

25  job they wanted.
```

1          But it seems to me that that kind of damages issue we're a

2     little premature on.  I don't see why that needs to be a

3     centerpiece of a summary judgment determination.  It is more

4     important, however, to look at this issue of it's only an

5     interview, as opposed to the job, because not everybody who gets

6     an interview gets a job.  And your argument is that they can't

7     really demonstrate that damages were caused because even if

8     they'd obtained interviews, that doesn't mean they would have

9     been selected, correct?

10          MR. ROSENBERG:  Yes.

11          THE COURT:  Isn't the denial of an interview the

12     denial of an opportunity to be selected?

13          MR. ROSENBERG:  Yes.

14          THE COURT:  How is the denial of an interview --

15     hypothetically and allegedly here, because of First Amendment

16     activity or political activity -- how is the denial of an

17     interview any different than if a selecting official had said to

18     a screening panel, look at all the applications and tell me who

19     should be interviewed, but by the way, if you see any

20     application that's an African American, just throw it in the

21     trash?

22          Now, do you think that the African American applicant whose

23     application was thrown in the trash through that selection

24     process would not have a cause of action and damages resulting

25     therefrom?

```
 1              MR. ROSENBERG:  Let me respond three ways, Your Honor.

 2     First is --

 3              THE COURT:  What?  Yes, no and maybe so?

 4              MR. ROSENBERG:  It depends on what the cause of action

 5     is.  I mean, it sounds like that might be a Title VII cause of

 6     action.  I'm admittedly not a Title VII expert.  But Title VII

 7     is a unique statutory scheme --

 8              THE COURT:  I'm only talking about damages, though,

 9     rather than cause of action.  We're not in the cause of action

10     stage.  We're in the damages stage.  Do you think that person

11     wouldn't have damages that flowed from not being selected?

12              MR. ROSENBERG:  Depends on what those damages are in

13     the context of that case.  Every damages inquiry is going to be

14     different.  And plaintiffs are attempting to obtain -- they have

15     to show fact of damage at the summary judgment stage.  They have

16     to show that they have evidence showing that they were damaged

17     in some way that can get through summary judgment.

18              THE COURT:  But it only has to be a little bit.

19              MR. ROSENBERG:  Has to be enough of whatever the

20     summary judgment --

21              THE COURT:  Indeed, why does it have to be anything

22     other than just an abstract fact of damage, because the

23     provision in the Privacy Act says that even if you can't show

24     actual damages, you get a thousand dollars?

25              MR. ROSENBERG:  Well, you have to show some damage.
```

```
 1              THE COURT:  You have to show some damage, that's
 2    right.
 3              MR. ROSENBERG:  And it could be, as Mr. Metcalfe
 4    has --
 5              THE COURT:  You don't have to show quantifiable
 6    damages.
 7              MR. ROSENBERG:  I think it does have to be
 8    quantifiable.  It could just be that postage stamp in theory.
 9    Could be a penny, arguably, or a dollar, some de minimis amount.
10    But you have to show the fact of damage.  And plaintiffs, first
11    of all, I would say -- one of the requirements of summary
12    judgment is that plaintiffs offer a statement of facts that are
13    undisputed.  And they don't really offer any meaningful facts at
14    this stage, and certainly don't offer any on damages other than
15    a cross-reference to their interrogatory answers before they
16    were supplemented.
17              THE COURT:  Is the Department of Justice's argument
18    here that there was zero damage to these plaintiffs?  And assume
19    we're just talking -- assume for a second that there's a
20    violation, because otherwise you don't get to damages.  I mean,
21    the Privacy Act is a little more subtle than that.  But assume
22    that there's maintenance of a record inconsistent with (e)(7),
23    or failure to maintain a record inconsistent with (e)(5).  Does
24    the department say that there's zero damage to these applicants?
25    You mentioned before a postage stamp.  Aren't there some
```

1      incidental, maybe very minor expenses involved here?

2              MR. ROSENBERG:  I gave the postage stamp as a general

3      example of some *de minimis* amount.  But I think based on the

4      damages that these three plaintiffs have offered, no.  They have

5      not shown any damages that are attributable to, at this point,

6      what we would assume to be a Privacy Act violation, assuming all

7      the other elements are met.  And that's because whatever these

8      expenses were were equally attributable to all the other

9      expenses that they would have incurred anyway as part of their

10     job search process.  And moreover, it's more likely than not, it

11     was a two-thirds chance that these plaintiffs would not have

12     received a job offer anyway.

13             THE COURT:  What if the statistics, rather than one

14     out of three -- is it one out of three who got an interview were

15     selected?

16             MR. ROSENBERG:  Roughly, yes.

17             THE COURT:  What if the statistics instead were that

18     nine out of 10 were selected?

19             MR. ROSENBERG:  That would be harder for us to make

20     the argument.  But the hypothetical I was going to use was what

21     if it was one out of a thousand, only one out of a thousand

22     people got a job offer as a result of the interview.  I think

23     anyone would be hard pressed to say, and survive summary

24     judgment, at least --

25             THE COURT:  But nine out of 10 would survive summary

1    judgment.

2         MR. ROSENBERG:  Probably.  I would say at least that

3    would undercut our argument.

4         THE COURT:  Where's the line drawn on surviving

5    summary judgment with respect to this damages issue and the

6    likelihood of being selected?

7         MR. ROSENBERG:  Preponderance of the evidence.  50

8    percent.

9         THE COURT:  But you're just making that up, aren't

10   you?  Is it really up to the finder of fact, the jury or the

11   judge as fact-finder, to decide whether if only nine out of 10

12   were selected, or only five out of 10 were selected, or only

13   3-1/3 out of 10 were selected, or only one out of 10 were

14   selected, isn't that for the jury, for the fact-finder to assess

15   and determine what damages, if any, should flow?

16        MR. ROSENBERG:  That's why we have a preponderance of

17   the evidence standard under tort law.  I'm not just making that

18   up.  The Privacy Act --

19        THE COURT:  You're implying -- go ahead.

20        MR. ROSENBERG:  I'm sorry, Your Honor.  The Privacy

21   Act incorporates tort law standards, and tort law standards is

22   that to show damage --

23        THE COURT:  I'm not familiar, and I'm not sure you've

24   cited anything that would say, in a selection-type context, that

25   if you can't show that more than 50 percent of whatever it is,

1    the applicants who got an interview or whatever the definitional

2    term is, were selected, you can't recover anything.  I'm not

3    familiar with any law that says that.

4              MR. ROSENBERG:  Well, I would fall back, though,

5    Your Honor, on the fact that plaintiffs have not offered any

6    undisputed factual evidence that they have been damaged, other

7    than a cross-reference to their interrogatories.  That's not

8    enough to survive summary judgment.

9              THE COURT:  They've offered, belatedly perhaps,

10   through the process of updating their interrogatories, but

11   they've offered lost income for two of them.

12             MR. ROSENBERG:  Right.

13             THE COURT:  And if it were nine out of 10 who were

14   selected, would you really argue that that isn't a valid -- you

15   might quibble or contest how they calculated that, but isn't

16   that the kind of damages assessment that's made every day in

17   cases, often through expert witnesses?

18             MR. ROSENBERG:  Well, that actually raises an

19   excellent point, that plaintiffs have not offered any expert

20   witnesses on their damages, which is what one would have

21   expected in this case.

22             THE COURT:  But again, I'm not sure there's a

23   requirement as a matter of law that to survive summary judgment

24   the plaintiff must have an expert witness on damage calculation.

25   There is in some contexts such a requirement, in some

1    malpractice and other contexts, a requirement that you have to

2    have expert witnesses.  There is none for a damages assessment

3    that I'm aware of in a case like this or any similar type of

4    case.

5              MR. ROSENBERG:  I agree with that.  That's correct,

6    Your Honor.  But what makes the Privacy Act unique compared to

7    perhaps some other statutes -- and there are other statutes like

8    the Privacy Act, I'm sure, too -- is that fact of damage, as

9    opposed to the actual computation of the amount of damage, is a

10   fundamental element of the Privacy Act claim itself, which means

11   that to survive summary judgment plaintiffs must show that they

12   have evidence that their damages are directly attributable or

13   arose from the allegedly wrongful conduct.  And we rely upon the

14   fact that there was only a one out of three chance that they

15   would have received interviews anyway.

16        Let me just speak to mitigation for just one moment.  And

17   this also raises --

18              THE COURT:  Only one moment.

19              MR. ROSENBERG:  One moment.  Plaintiffs have been

20   offered the exact same opportunity to interview.  They would

21   have had the same, if not even a slightly better, chance of

22   obtaining the job offer.  It would have put them into the exact

23   same position as they would have been in had they originally

24   received interviews with the Justice Department.  We'd move to

25   amend our answer.

1    Plaintiffs' complaint did not contain a request for lost

2    wages, did not become an issue until discovery.  We regret that

3    we did not nonetheless include the mitigation defense as a line

4    in our answer, but we request that in light of the fact that

5    plaintiffs have been permitted to amend already, that we be

6    permitted to amend our answer for the reasons set forth in our

7    brief.

8         THE COURT:  And mitigation would not totally wipe out

9    the lost wages argument.  It would only mitigate it from a point

10   in 2008 when the offer of an interview was made through Attorney

11   General Mukasey's letter.

12        MR. ROSENBERG:  That's correct.  And I believe it's

13   the date, based on the case we cited in our reply brief, Grace

14   v. the City of Detroit, was the date by which plaintiffs would

15   have had to respond to Attorney General Mukasey's letter.  It's

16   not even clear that's mitigation so much as an offset.  So it's

17   not even clear that we need that as an affirmative defense, but

18   it only would preclude damages for lost wages from that date

19   forward for those two plaintiffs.

20        THE COURT:  All right.  Thank you.

21        MR. ROSENBERG:  Thank you.

22        THE COURT:  We're going to take a short break.  The

23   court reporter and I would prefer to take our break now rather

24   than go another hour and a half without a break.

25        (Recess from 10:53 a.m. to 11:02 a.m.)

```
1              THE COURT:  Mr. Metcalfe.

2              MR. METCALFE:  Thank you, Your Honor.

3              THE COURT:  Mr. Rosenberg thinks that the Privacy Act

4    is an obscure statute.  Having spent your life with the Privacy

5    Act and FOIA, what's your view?

6              MR. METCALFE:  Well, my view is that it's an important

7    statute that should be respected and followed, and when it is

8    not, it's important that that be handled accordingly, in

9    litigation if necessary.

10             Let me say that, first, Mr. Rosenberg has said a number of

11   things that I'm not sure where he gets a lot of it from.  I have

12   enormous respect for him.  I have come to develop enormous

13   respect for him in this case.  But I'm not going to try to

14   respond to every last thing that he said.  What I propose to do,

15   if it sounds all right to Your Honor, is just make three primary

16   points and then have more question and answer back and forth, as

17   I think Your Honor is prepared and inclined to do.

18             The first primary point is one that arose near the end of

19   the first session this morning, and that has to do with the

20   Federal Records Act.  Your Honor said, can I really conclude

21   that the Federal Records Act provides a basis for spoliation

22   here.  And the answer is absolutely yes.  The statute is one

23   that has applicability government-wide.  It's not your average

24   statute in many respects.  And because of that, or consistent

25   with that, there are government-wide regulations implemented or
```

1    established.

2              THE COURT:  But you haven't referred me to a single

3    specific provision of the Federal Records Act or to a single

4    specific regulation.

5              MR. METCALFE:  Actually, I have, Your Honor.  It's

6    block quoted and quoted in the brief that we filed most recently

7    on the subject, and I'm holding excerpts in my hand.

8              THE COURT:  What page?

9              MR. METCALFE:  Well, this would be -- I'd have to go

10   back to the table --

11             THE COURT:  So you don't know what page the block

12   quote is, but go ahead.

13             MR. METCALFE:  It would be the spoliation brief,

14   September 6.

15             THE COURT:  September 6?  I thought your last brief

16   addressing spoliation was actually filed September 14.

17             MR. METCALFE:  Actually, what happened, that's

18   something -- we filed something that was not a conforming

19   length, so there was a delay on what was entered in the court

20   record.

21             THE COURT:  So this is the right brief?

22             MR. METCALFE:  Yes.  I believe it's the one that says

23   September 6 originally, and then, you're right, I think it was

24   even the 12th or the 14th thereafter.

25        What I'm holding in my hand is just an electronic excerpt

 1     from the brief itself, Your Honor.  And it says in part -- and

 2     these are the narrow government-wide regulations:  "To meet

 3     their obligation for adequate and proper documentation, agencies

 4     must... document the formulation and execution of basic policies

 5     and decisions and the taking of necessary actions, including all

 6     substantive decisions."

 7          That is Section 1222.22(b) of 36 CFR.  That same set of

 8     regulations, again that have government-wide applicability,

 9     provide in Section 1222.12 -- so that would be 12 and not 22 at

10     the very end -- speaks of records that contain unique

11     information such as substantive annotations or comments.

12          Now, under these regulations --

13               THE COURT:  Which part of 1222.12 talks about

14     annotations or comments?

15               MR. METCALFE:  Yes.  Let me be even more specific.

16               THE COURT:  That's (c)(2)?

17               MR. METCALFE:  Yes.  (A), (b) -- (c)(2) exactly says

18     the point about substantive annotations or comments.  And again,

19     what I'm holding in my hand is directly from the government's

20     brief.  Now, we have a statute, we have government-wide

21     implementing regulations that are crystal clear that these

22     records, that were called scraps of paper and a lot of other

23     things at various stages in this case, were required to be

24     maintained.

25          The Federal Records Act basically says if an agency makes a

1    decision such as a personnel decision, it has an obligation to

2    maintain those records as federal records are regularly

3    maintained, and then to dispose of them only in the fullness of

4    time.

5         THE COURT:  What do you think the requirements of the

6    Federal Records Act, and implementing -- and either the NARA

7    regulations or implementing regulations of the Department of

8    Justice, what do you think they require with respect to the

9    records at issue here, which I will describe as the application

10   materials printed out by members of a screening committee

11   involved in the application -- in the decision-making process

12   with respect to those applicants?  What do you think the

13   regulations and statute require in terms of record retention?

14        MR. METCALFE:  The direct answer to your question,

15   Your Honor, is that they require them to be maintained until

16   they were disposed of in the fullness of time, just as all

17   federal records are disposed of according to records disposition

18   processes.

19        THE COURT:  So is the answer -- and I'm not sure that

20   the filings before me are specific enough on this, but is the

21   answer the following:  That when you have an application

22   process, there may be duplicate copies printed out of

23   applications -- in other words, they may start as an electronic

24   version and then there may be printouts of them, for different

25   people to use during the course of that process.  The

1   regulations and FRA, to the extent it's applicable, don't

2   require that all of those be retained, but what they do

3   require -- is this correct? -- is that anything that contains

4   unique annotations or a unique document that isn't elsewhere in

5   the materials relevant to that application does have to be

6   maintained?

7        MR. METCALFE:  Yes, that's correct.  As a matter of

8   fact, what Your Honor just said goes to how I wanted to clarify,

9   if I could, the way you formulated it right at the very

10  beginning.  It's not just the printouts that were made for the

11  screening committee.  Those were just pieces of paper that were

12  counterparts to what existed electronically in the formal

13  system.  But then those pieces of paper became the means by

14  which the screening committee operated.  And in that process,

15  it's undisputed, as you've already discussed with Mr. Rosenberg

16  this morning, that Esther McDonald did two distinct things.

17  One, she printed some things out off the Internet, slapped them

18  together to the application.  Two, she sometimes, looking on the

19  screen, not printing something out, but gleaned information that

20  then became the basis of an annotation.

21       She was engaged in a deselection process.  That was the

22  whole nature of the beast right there.  And when she did either

23  of those two things -- could be one, could be the other, could

24  be both -- that made that record a new record.  Certainly if

25  it's an annotation it's a new record, and if it's something

printed out it's brand-new, so to speak.  And the Federal

Records Act requires agencies -- all agencies, when they engage

in that sort of process -- to maintain those records and dispose

of them only in the fullness of time.

          THE COURT:  Because they're part of a determination

being made?

          MR. METCALFE:  Yes.

          THE COURT:  Because it isn't true, is it, that when

you were an attorney at the Department of Justice, if you just

happened to print out a law review article to read relevant to

your duties, but not relevant to any particular determination,

or you printed out someone's resume, but it was not relevant to

any kind of determination, you just wanted to see what this

individual had that you were coming into contact with, those

didn't have to be maintained, did they?

          MR. METCALFE:  As a matter of fact, that goes to the

third excerpt that I hold in my hand, Your Honor.  Because we

cited additionally 36 CFR Section 1222.14(b).  And that makes

clear what are called nonfederal materials -- pardon me --

nonrecord materials.  You can think of them as nonfederal

records.  And what that says is if the sole reason such copies

are preserved is for convenience of reference, then that's not

necessarily a federal record.

     This whole idea, this parade of horribles that the

defendant, the Department of Justice is parading before the

```
1    Court, that this would be an expansion of the Federal Records

2    Act, or a breathtaking expansion of the spoliation doctrine,

3    it's just not so.  The Federal Records Act simply requires

4    agencies to maintain records properly when they reflect agency

5    decision-making, as is the case here.  I don't see how the

6    Department of Justice could argue otherwise.  And that's what

7    provides the basis --

8         THE COURT:  How long under those regulatory

9    requirements would these materials that you're saying were

10   improperly destroyed, how long do they have to be retained?

11        MR. METCALFE:  The answer is one that Your Honor might

12   not like because you heard it several times this morning.  It

13   depends.  Some such materials I think would be --

14        THE COURT:  These materials that we're talking about

15   with respect to these three plaintiffs that you think existed.

16        MR. METCALFE:  Yes.  I don't know how long the

17   Department of Justice's regulations particularly, or records

18   systems, required them to be maintained.

19        THE COURT:  What if they only required them to be

20   maintained one year?  That wouldn't have been any use to you.

21        MR. METCALFE:  If they were required to be maintained

22   only one year?

23        THE COURT:  They still would have been destroyed

24   before you wanted to see them.

25        MR. METCALFE:  Well, they certainly would have been --
```

 1              THE COURT:  They would have been destroyed before the

 2     IG report came out.

 3              MR. METCALFE:  Yes.  And they would have been

 4     destroyed improperly, in violation of the Federal Records Act.

 5              THE COURT:  You just said you didn't know how long

 6     they had to be destroyed, and I said, what if it was only for a

 7     year.

 8              MR. METCALFE:  Yes.  That would have been longer than

 9     they were maintained.

10              THE COURT:  So what?  You wouldn't have suffered any

11     harm from it, so you wouldn't have any spoliation claim.

12              MR. METCALFE:  I take your point.  I'm quite

13     confident, and I can certainly provide a supplemental filing to

14     the Court -- because remember the Federal Records Act came up

15     only very late in the game, given how the plaintiffs made this

16     argument late in the game, and they hedged early on about --

17              THE COURT:  The plaintiffs or the defendant?

18              MR. METCALFE:  Pardon me.  My mistake.  You referenced

19     my days working at the Department of Justice.  I still have the

20     problem that I think of the other side as the plaintiffs, not

21     the defendant.  I do that all the time.

22          What they did is they hedged as to whether they would even

23     make this threshold argument.  They specifically did that.  So

24     it didn't come up until late in the briefing process.

25          And I apologize that I'm standing here and I'm not able to

give you an answer that it's three years versus four years or

five years.  I know from experience that this type of thing, it

is a matter of years, many years, not months.  For example,

Freedom of Information Act materials, I know there's a

requirement they be maintained for seven years.  And I'll be

glad to file a supplemental on that point to pin that down as to

the number of years.  But I don't think there's any reasonable

doubt that when they were destroyed by Mr. Elston, or under his

authority, that they were destroyed improperly.

THE COURT:  This isn't an independent claim under the

Privacy Act, is it?  This is only a spoliation argument that

gives rise to what kind of relief for you?

MR. METCALFE:  Let me try to characterize it in the

way plaintiff has.  And tell me if you disagree or if I don't do

it to your satisfaction.

We have a situation in which it's undisputed that Esther

McDonald did what she did, that she printed things out, that she

made annotations.

THE COURT:  But it is in dispute as to whether she did

it for these three plaintiffs.

MR. METCALFE:  Well, it's not known whether she did it

for any plaintiff in particular.  That's the basic situation.

They destroyed --

THE COURT:  Do you agree, by the way, with

Mr. Rosenberg that Internet searches were only done for two of

1    your three clients?

2           MR. METCALFE:  I don't know what the truth is there.

3    I don't know that Mr. Rosenberg knows what the truth is there.

4           THE COURT:  Do you have any evidence that an Internet

5    search was done with respect to Mr. Saul?

6           MR. METCALFE:  There's no evidence to my knowledge of

7    Internet searches being done for any deselectee in particular.

8           THE COURT:  What I heard is that the information that

9    the IG report relies on, that is accessible, at least to the

10   attorneys for the Department of Justice here today, indicates

11   that Internet searches were done for the other two plaintiffs

12   but not for Mr. Saul.

13          MR. METCALFE:  I heard what he said, Your Honor, but I

14   can tell you that's not from the IG report.

15          THE COURT:  No, I don't think he said it was in the

16   report itself; I think it's in the materials underlying the

17   report.  Because the report, quite clearly, on page 77, says,

18   "Our search of McDonald's Internet activities on her department

19   computer" -- in other words, they searched the computer and the

20   Internet activities during October and November of 2006,

21   "confirmed that she conducted searches on many of the

22   candidates' names."  Therefore, the IG knows which names

23   searches were conducted on.  Apparently, Mr. Rosenberg knows

24   that as well.

25          MR. METCALFE:  I don't know that's so at all.

1          THE COURT:  Let's assume that the facts are as he

2    expresses, and that an Internet search was done with respect to

3    two of your clients but not with respect to Mr. Saul.  That ends

4    Mr. Saul's claims under the Privacy Act, does it not?

5          MR. METCALFE:  I think that if it could be shown

6    factually, conclusively, that a search was not done on any

7    particular deselectee, of course that would be so.

8          THE COURT:  But the way you're articulating it, you're

9    putting the burden on the defendant to show that, as opposed to

10   your burden to show that a search was done with respect to a

11   plaintiff.

12         MR. METCALFE:  Let me try it this way, then.  You

13   asked me what if it were so.  I'm saying that I don't know that

14   it's so unless it is established to be so.

15         THE COURT:  But you didn't even look at that evidence.

16   You didn't even explore that evidence.  You didn't even follow

17   up to get ahold of the information with respect to this question

18   of who Internet searches were done with respect to, although in

19   the IG report it indicates quite clearly that that information

20   is available.

21      Now, whether it's available to you is a different question.

22   I don't know that you could have gotten it through discovery,

23   but I'm assuming that you could have.

24         MR. METCALFE:  The best I can say to that, and I

25   understand the logic of the question, Your Honor, is that I

1    don't think there's any firm basis, evidentiary basis, for

2    establishing that it was done for one and not the other.

3              THE COURT:  How can you say that when the IG report

4    relies on that?  You think they relied on infirm information?

5              MR. METCALFE:  I think the Inspector General and OPR

6    investigators looked at what they could find.  They could not

7    see the best evidence of what had been done person by person by

8    person, candidate by candidate by candidate --

9              THE COURT:  Quite to the contrary.  Quite to the

10   contrary.

11             MR. METCALFE:  Okay.

12             THE COURT:  The best evidence you're talking about is

13   the best evidence of whether annotations were made or documents

14   were printed out from an Internet search.  But the best evidence

15   as to whether an Internet search was conducted may well be a

16   search of her computer, which is what they did.

17             MR. METCALFE:  Well, again, I don't think it can be

18   taken that whatever they were able to look at established with

19   certainty whether a search was in fact conducted.  There's

20   nothing to indicate conclusively that they found everything that

21   was there to be found or could have been found that would

22   reflect that.

23        And just because an investigator looked and found some

24   evidence for some deselectees, that's not the same thing as

25   saying they determined conclusively --

```
1              THE COURT:  But your problem is, if I accept that as

2    being evidence -- and nobody has put it before me in this

3    summary judgment proceeding -- I stress that, no one has put it

4    before me, until orally here today.  But if I accept that as

5    being accurate, in other words, that a search of McDonald's

6    computer revealed that an Internet search was conducted with

7    respect to two plaintiffs but not with respect to the third

8    plaintiff, Mr. Saul, if I accept that as being a fact --

9              MR. METCALFE:  You cannot.

10             THE COURT:  Just a minute.  If I accept that as being

11   one fact before me, what evidence is there to contradict that?

12             MR. METCALFE:  Okay.  It goes to the fact that if they

13   found it for one and a second one, and didn't find it for a

14   third, that doesn't conclusively establish that it didn't exist

15   for the third.  You have no evidence before you that

16   indicates --

17             THE COURT:  That's like saying if I had a traffic

18   accident and there were six people who observed the traffic

19   light and they all testified that it was red, that still is not

20   conclusive that it's red.  You're right in an abstract sense,

21   but you're not right in an evidentiary sense in litigation.  If

22   the only evidence that I have is that the computer search

23   revealed that Internet searches were done for two but not for

24   the third, then I don't see how you can argue to me that it was

25   done for the third unless you have some expert testimony that's
```

1    going to tell me that that Internet -- that review of her

2    computer didn't reveal accurate information.

3            MR. METCALFE:  I apologize for not making this clearer

4    sooner.  It has to do with the last clause of what you said.

5    You said if the evidence shows that searches were done for one

6    and two but not three.  It's that last clause, but not three.

7    How is there evidence that shows that it wasn't done for No. 3?

8    They found it was done for 1 and for 2.  But how is it

9    conclusive that it wasn't done for 3?  That's the problem with

10   it.

11           THE COURT:  I'm assuming that with respect to that

12   computer, an expert could testify that this search was done --

13   and when I say search, I mean a search of her computer -- this

14   search was done and it revealed that she conducted during the

15   October-November 2006 time period an Internet search with

16   respect to plaintiff A and with respect to plaintiff B, but she

17   did not conduct an Internet search with respect to plaintiff C.

18           MR. METCALFE:  The way you just phrased it, I

19   understand.  That is accurate.  If there were proof that it was

20   not done on C, then what you say makes perfect sense.  Of course

21   it does.  But that's not what we have here.  We have some

22   indirect indication that something was done on 1 and No. 2, and

23   it's not at all conclusive --

24           THE COURT:  You don't even know what we have, because

25   you didn't look at it.

1        MR. METCALFE:  I certainly looked at what we're

2   talking about, Your Honor.

3        THE COURT:  You didn't look at the underlying

4   information that the IG report is based on with respect to the

5   Internet searches, that they gleaned from a review of her

6   computer.

7        MR. METCALFE:  Let me put it this way.  I asked in

8   discovery for any information that the government has on any of

9   the three plaintiffs in particular, as well as others.  If

10  plaintiff is saying that somewhere in a box of discovery --

11       THE COURT:  Now this is a new issue.  Are you saying

12  that you posed a discovery request that would have required the

13  government to produce any information it had with respect to

14  whether Internet searches were conducted on these three

15  plaintiffs?

16       MR. METCALFE:  As well as others, yes.

17       THE COURT:  As well as others.  But you're saying you

18  posed a discovery request --

19       MR. METCALFE:  But those others aside --

20       THE COURT:  And this is a written interrogatory?

21       MR. METCALFE:  Yes.  Actually, a request for document

22  production, and there was an enormous document production.

23       THE COURT:  And did you get the information with

24  respect -- any information with respect to what I'm referring

25  to, which is the IG's search of McDonald's Internet activities

on her department computer during October and November of 2006?

        MR. METCALFE:  Not to the best of my knowledge and recollection, and certainly did not get anything that indicated as Your Honor posed it in that final clause --

        THE COURT:  But you think a discovery request that you made would have required that to be produced to you?

        MR. METCALFE:  Yes, I do.

        THE COURT:  All right.  We'll see about that in a minute.

        MR. METCALFE:  You may.

        THE COURT:  Go ahead.

        MR. METCALFE:  Okay.  Second thing, a primary point, and that has to do with the argument of plaintiff losing an opportunity or not taking an opportunity.  I heard a lot of what Mr. Rosenberg said, but what he didn't --

        THE COURT:  You mean this relates to damages and to the question of an interview versus selection?

        MR. METCALFE:  No.  Actually it relates to the earlier part of the exchange with Your Honor when he talked about causation, and saying plaintiffs did not seek proof on that.

        THE COURT:  All right.  Go ahead.

        MR. METCALFE:  What Mr. Rosenberg did not tell you is that prior to Ms. McDonald's deposition, her attorney on her behalf said the following:  "As I have represented to you and Ms. McDonald is willing to attest under oath, she has absolutely

no recollection of the remaining plaintiffs.  She similarly has
no recollection of whether she reviewed their resumes at all, as
to whether she performed any Internet searches as to any aspect
of their resumes, or whether she made any written comments on
their resumes on any basis."

THE COURT:  But she invited you at the deposition to
follow up with her by trying to refresh her recollection with
respect to specific individuals, didn't she?

MR. METCALFE:  What she did is generally tried to fend
off questions by saying, well, there's nothing I can tell you.
If you show me a particular application, then I'll respond to
that.  But she already stated unequivocally prior to that she
had no recollection whatsoever.  And defendant makes much of
this.

THE COURT:  Right.  They do.  There's no question that
they do in claiming that you don't have specific proof.

Assume for a second that she would have said, even if
pressed during her deposition, that she didn't recall anything
with respect to these three particular plaintiffs, she didn't
recall whether she did an Internet search and she didn't recall
whether she printed anything out, even when shown their resumes
and other application materials.

MR. METCALFE:  I have no reason to think it would have
been anything other than that, Your Honor, yes.

THE COURT:  So you think that you can recover for

     1     these three plaintiffs even though you can't show that they were

     2     the subject of Internet searches -- maybe you can show that with

     3     respect to two of them.  I think you actually can, but not with

     4     respect to a third.

     5          MR. METCALFE:  I would caution Your Honor not to draw

     6     a conclusion too quickly from that, please.

     7          THE COURT:  But your view is that because of the

     8     spoliation argument and because of the requirement that existed

     9     with respect to the department, their destruction of records

    10     should be held against them and therefore what?  You should get

    11     a presumption that the records contain information that is a

    12     violation of (e)(7) and information that, because it was then

    13     destroyed, is a violation of (e)(5)?

    14          MR. METCALFE:  Your Honor, let me say two things in

    15     response to that.  One is a small point of clarification, and

    16     the other is larger.  The small point of clarification is that I

    17     do recall in your exchange with Mr. Rosenberg, you spoke of the

    18     word "maintain" in (e)(5).  And I know we're talking about

    19     maintaining records in a broader sense.  With respect to the

    20     Federal Records Act, the duty to maintain and the spoliation

    21     mechanism, the maintain is not the same.

    22          The word "maintain" in (e)(5), I suggest to you, doesn't

    23     have to do with maintain versus destroy.  It says maintain with

    24     sufficient accuracy, timeliness, relevance, and completeness.

    25     It's maintain with relevancy for purposes of the decision.  The

maintain had to do with what occurred in October of 2006, just as (e)(7) had to do with what occurred in October of 2006.

Here we have all of these paper copies, and we know that in some instances, in many instances I would suggest -- and there's evidence as to how Mr. Elston wanted to institutionalize this process after he saw how favorable it was -- in many instances you have new records that are covered by the Privacy Act that fall within the prohibition of both (e)(7) and (e)(5).

THE COURT:  We don't know that there are many.  We've heard the word "some" used, but I'm not sure we've heard the word "many" used.  But go ahead.

MR. METCALFE:  I will stress to you on that point that we have testimony from Ms. McDonald that after she was part way through -- and the word "continue" was used -- he spoke with her, and we don't know whether it was at a water cooler or at a meeting, whether he put his arm around her in the hallway, but he said to her, in effect, you're doing what I want you to do. Working on the Internet is good.  Please continue to do that. Based upon what he had already seen.  So he had already seen part way through enough to make him want to institutionalize the process.  I think that's pretty heavy evidence right there.

THE COURT:  Back to your point.

MR. METCALFE:  Maintain has to do with what occurred in October.  It has to do with maintaining it under (e)(5) and (e)(7).

1          THE COURT:  Forget about (e)(7) for a second and talk

2     about (e)(5).  What is it that you think is the violation of

3     (e)(5) here?

4          MR. METCALFE:  The primary violation of (e)(5) is that

5     after records were created -- and I'll just use that phrase to

6     mean either printed out or freshly annotated from Internet

7     information -- they were then used in the decision-making

8     process as part of what the screening committee did, and what

9     then was there to be used was something that was not maintained

10    with sufficient relevancy.  As Your Honor said in your earlier

11    decision in September of '09, what (e)(5) has to do with is

12    maintaining something with relevancy, and this was not relevant

13    information.

14       So it was wrongfully maintained for purposes of the

15    decision.

16          THE COURT:  Even though it was pretty promptly

17    destroyed.

18          MR. METCALFE:  Absolutely, because it doesn't

19    matter -- the destruction later on doesn't matter at all.

20          THE COURT:  For your (e)(5) claim, except for

21    spoliation.

22          MR. METCALFE:  It's clear that it's maintained for

23    purposes of decision-making right up front.  That's the primary

24    (e)(5) violation.  Whether there's a subsequent (e)(5) violation

25    further down the road, that's another matter.  But when

```
 1    Your Honor was speaking of maintain earlier, maintain has to do
 2    with maintain for purposes of the decision that the screening
 3    committee made right there at that point.
 4              THE COURT:  So the violation of (e)(5) in your view is
 5    that at the time the decision was made by the screening
 6    committee there was a document, you believe, with respect to
 7    your clients --
 8              MR. METCALFE:  And we know for a fact in many
 9    instances, or in some number of instances, in fact that is so.
10    Not a matter of belief.
11              THE COURT:  Well, it's a matter of belief with respect
12    to your clients.
13              MR. METCALFE:  Or anyone in particular.  Makes no
14    difference.
15              THE COURT:  You believe that there's a record that
16    existed that reflected some information that was part of the
17    determination.
18              MR. METCALFE:  Yes.
19              THE COURT:  And having that record at the time of the
20    determination is a violation of (e)(5) because?
21              MR. METCALFE:  Because what was there maintained for
22    the purpose of that decision was not relevant under (e)(5).
23              THE COURT:  What does relevant mean?
24              MR. METCALFE:  Relevant means that if the document
25    showed that Daniel J. Herber, one of the plaintiffs, won
```

```
1   election as a Green Party member to the La Crosse city council,
2   such as the piece of paper I'm holding in my hand, which flows
3   from one of the links we know existed back then, that that's not
4   relevant, that's not proper.  And it's not just me, Your Honor,
5   giving you --
6           THE COURT:  Let's not say not proper.  Let's use the
7   words of the statute, relevance.
8           MR. METCALFE:  I'm going to go a little bit further.
9   Not that it matters legally, but my point is that the Inspector
10  General found that.  It's the Department of Justice --
11          THE COURT:  They didn't make any finding under the
12  Privacy Act.
13          MR. METCALFE:  No, but it found that that sort of
14  information was not properly taken into consideration.
15          THE COURT:  Should not have been taken into
16  consideration.
17          MR. METCALFE:  And therefore was not relevant.  You
18  have an official finding of the Inspector General of the
19  Department of Justice.  It's a Department of Justice policy --
20          THE COURT:  Even though it may have been determinative
21  with respect to the decision --
22          MR. METCALFE:  Oh, all the more so.
23          THE COURT:  -- it was not relevant in that it
24  shouldn't have been.
25          MR. METCALFE:  And I would say it was not properly
```

1    determinative because it was not relevant.  And it's the

2    Department of Justice's official policy that that type of

3    information was not relevant, was not appropriate.  I'll use

4    that word.  That's official Justice Department policy on that.

5    We have that for Mr. Herber, the Green Party, we have that for

6    Mr. Saul, that he advocated the removal of recruitment from

7    campus.  In other words, he advocated against allowing military

8    recruitment on campus.

9              THE COURT:  Stop.

10             MR. METCALFE:  It wasn't on his application.

11             THE COURT:  Stop.  And that's the key.  If it was on

12   his application --

13             MR. METCALFE:  Different.  We use the word --

14             THE COURT:  -- then it's not a Privacy Act violation.

15             MR. METCALFE:  How could it be a Privacy Act violation

16   if he himself submitted it?

17             THE COURT:  Exactly.

18             MR. METCALFE:  Absolutely right.  The whole point is

19   that there was information available about each of these three,

20   Mr. Herber with respect to the Green Party election at age 21;

21   Mr. Faiella with respect to his advocacy of basically DOD off

22   campus at Cornell University; and Mr. Saul with respect to the

23   strong personal opinions that he expressed in writing and

24   available on the Internet about strategy against EPA with

25   respect to certain environmental matters having to do with the

1   broader issue of global warming.

2       Each of these three plaintiffs, there was information

3   there.  The problem is, we don't know for any one of these 170

4   exactly what happened.

5           THE COURT:  Unless you can get a spoliation inference

6   that effectively switches the burden of proof, if you will, but

7   certainly gives you an inference that as to these three

8   individuals there was such a record, you can't win, can you?

9           MR. METCALFE:  Well, I think that answer has two

10  parts.  In general, because the best evidence has been

11  destroyed, I think the answer to that has to be yes in general.

12  But with respect to what Mr. Rosenberg said today about two of

13  the three, the answer might well not be yes.  I think it's

14  appropriate for the Court to not reward the government for its

15  record destruction and find --

16          THE COURT:  If that record destruction is inconsistent

17  with some obligation.

18          MR. METCALFE:  Well, there's no question that that

19  would have to be the case.  Of course.  I wouldn't come to the

20  Court, Your Honor, and ask you to issue a spoliation sanction if

21  it was not something that involved a duty to maintain that was

22  breached.  A duty, by the way, that has nothing to do with

23  whether litigation was pending then or upcoming, but a basic

24  duty that would be breached, a duty that all agencies have to

25  maintain records under the Federal Records Act.

1          THE COURT:  Their view is that the D.C. Circuit has

2     said that a Federal Records Act requirement cannot give rise to

3     a spoliation claim.

4          MR. METCALFE:  Well, I heard words pretty much to that

5     effect, as did Your Honor.  I also heard the word "holding" used

6     with respect to what the Court of Appeals decided in the case

7     with which I know Your Honor is familiar.  All the D.C. Circuit

8     did, I suggest to you, is say that in that particular case there

9     were regulations, agency-specific regulations, and that the

10    practice of the record destroyer was not an exception to those

11    regulations.

12         That does not mean that if you have a duty with respect to

13    a process under the Federal Records Act regulations, that that

14    has no applicability.  In other words, different agencies could

15    have different individual regulations, but the government-wide

16    obligation is on all agencies as administered by NARA.

17         THE COURT:  But to succeed on a spoliation argument,

18    you have to show something more than the obligation to preserve

19    the evidence.  Let's assume for a moment that the Federal

20    Records Act, NARA regulations, and DOJ regulations combined

21    placed an obligation on the Department of Justice not to

22    destroy, when they did, the records that Ms. McDonald created as

23    part of her review through Internet searches in the screening

24    committee activities.  Let's assume that there was an obligation

25    not to destroy those at the time that they were destroyed.

1        MR. METCALFE:  If I could just drop a footnote from

2   that assumption and say it doesn't matter what Justice might

3   have said or not at its own agency level.  What matters is what

4   the government -- the federal statute and the government-wide

5   regulations.

6        THE COURT:  I said through the composite of all of

7   those, let's assume there's an obligation.  That's not enough

8   for spoliation, though.  You've got to show some bad faith or

9   culpability or something negative or adverse with respect to

10  their state of mind, in other words, with respect to why the

11  records were destroyed.  That's part of the spoliation

12  assessment, isn't it?

13       MR. METCALFE:  With respect, Your Honor, I don't

14  believe that to be so.

15       THE COURT:  You think all that is necessary is for you

16  to show that the records shouldn't have been destroyed and then

17  you get the benefit of a spoliation presumption, inference, or

18  whatever the relief is?

19       MR. METCALFE:  Let me say two things about that, but

20  first as a preface, this is not plaintiff looking for a benefit.

21  This is plaintiff looking to level the playing field because of

22  an act of the defendant.

23       THE COURT:  That's fine.

24       MR. METCALFE:  Okay.  Two things.  One, I understood

25  the colloquy that you had with Mr. Rosenberg to mean that he was

1    no longer relying on the position that bad faith was required,

2    that intent was required.

3            THE COURT:  No.  He said negligence would be enough.

4            MR. METCALFE:  Okay.  So you said state of mind and

5    negligence.  The second thing is, the Talavera case --

6            THE COURT:  Doesn't it have to be something more than

7    simply the fact that the records were destroyed and that there

8    was an obligation not to destroy them?  If that's all that's

9    required, then there is no state-of-mind requirement.  So there

10   has to be something, doesn't it?

11           MR. METCALFE:  I don't know that there is a state of

12   mind requirement that has to be shown.  I think all the agency

13   has to -- all the plaintiff has to show is that there was a duty

14   and the duty was breached.  That's what was --

15           THE COURT:  What case do you rely on -- what

16   spoliation case do you rely on for that proposition?

17           MR. METCALFE:  Talavera itself.  There was a duty to

18   maintain the records, and that duty was breached.

19           THE COURT:  The duty arose from?

20           MR. METCALFE:  Well, in that particular case, the

21   Court of Appeals cited agency-specific regulations.  I suggest

22   that that's not essential, that's not a necessary element there;

23   it could be the Federal Records Act regulations that are

24   applicable equally to the agency at the grass-root level where

25   people make decisions.  In that case, or in Talavera, he just

1    destroyed the records, nothing more than that.

2          THE COURT:  And that's enough to get the adverse

3    inference?

4          MR. METCALFE:  I think that's what happened in

5    Talavera.  Now, I realize that case was just the tail wagging

6    the dog, and maybe the dog was quite a big dog of a case, quite

7    frankly.  I know Judge Silverman suggested as much at the

8    appellate level to be sure.  But fundamentally you had a duty to

9    preserve under records maintenance requirements applicable to

10   that individual.  He breached that duty, and the court used the

11   word spoliation, and that was that.

12      I know of nothing -- now, I don't want to suggest that even

13   if there were such a requirement, that we couldn't reach that

14   and meet that, certainly with respect to what Mr. Elston said.

15      Ms. McDonald, after being asked the seventh time, said,

16   well, he said well, at least I did one thing right.

17         THE COURT:  But that doesn't necessarily show that he

18   did it intentionally or for the reason of interfering with this

19   litigation.  I mean, the litigation didn't even exist at the

20   time the records were destroyed, and the evidence is, from his

21   staff assistant is that she did it without even consulting with

22   him.  And he doesn't refute that.  He says he doesn't remember.

23         MR. METCALFE:  He says maybe she consulted me, maybe

24   she didn't.

25         THE COURT:  All he did was make a casual comment to

1    Ms. McDonald along the lines of, well, at least I did something

2    right, which is a comment that someone could make even if at the

3    time they hadn't done it intentionally or hadn't even been

4    involved in it.

5           MR. METCALFE:  With respect, Your Honor, I disagree.

6    I think that comment speaks volumes about his state of mind and

7    his attitude.  That was made at the time at which he advised her

8    that he had just retained private counsel, that she should do

9    the same, and it was in the face of a congressional inquiry.

10   And the context of it meant that he was recognizing that because

11   the destruction took place, Congress would never be able to see

12   those pieces of paper.

13          THE COURT:  Fine.  Fine.  But that doesn't mean that's

14   why he destroyed them.  It doesn't even mean that he destroyed

15   them.  Indeed, the evidence is that he didn't destroy them.

16          MR. METCALFE:  Doesn't matter whether he destroyed

17   them or not.  The department institutionally destroyed them.

18   They were destroyed under his supervision.

19          THE COURT:  But not with any bad motivation.

20          MR. METCALFE:  I disagree, Your Honor.  I think it was

21   with the motivation of violating the Federal Records Act, or the

22   overall institutional state of mind of not giving a darn about

23   the dos and don'ts of federal statutes, in the deputy's office,

24   in the Attorney General's office, with respect to the Federal

25   Records Act, with respect to --

1          THE COURT:  You're just making that up.  You don't

2     have any evidence of that.

3          MR. METCALFE:  I do.

4          THE COURT:  What?

5          MR. METCALFE:  What I put in our opening brief.

6          THE COURT:  What?

7          MR. METCALFE:  The evidence from the Gonzales

8     transcript, from the Goodling transcript about how they

9     understood the Federal Records Act to work, at the tippy top of

10    the agency, the evidence from the depositions as to what they

11    did and didn't do in the deputy Attorney General's office, when

12    Mr. Elston said, I didn't discuss my records disposition

13    practice with anybody; why would I?  It's a total cavalier

14    disregard of the dos and don'ts of federal statutes, the Privacy

15    Act and the Federal Records Act both.

16         So I think if Your Honor were to find, not that it's

17    present in the Talavera case, if Your Honor were to find that

18    there had to be some mental state, I'll use that phrase, element

19    there, I think there is more than ample evidence on the record

20    to find that that is so.  They just didn't care about following

21    the law.  Simple as that.  They didn't care about following the

22    Federal Records Act or the Privacy Act.  And there's ample

23    evidence in the record of that.

24         THE COURT:  There's nothing that would indicate that

25    with respect to the actors involved here that there was any

consideration given to the Federal Records Act or the Privacy

Act with respect to -- for the Federal Records Act with respect

to the destruction of the records, for the Privacy Act with

respect to the requirements of (e)(5) and (e)(7) on maintenance

of records.

MR. METCALFE:  That is correct.  I'd like to point out

that Mr. Elston was not just a run-of-the-mill employee in that

component of the department.  He was the chief of staff.  He was

the guy that bore the administrative responsibility for making

sure that everyone else did the dos and don'ts, let alone him.

THE COURT:  But with respect to the destruction of

records, there's no evidence that anyone involved undertook to

destroy these records in order to frustrate the ability of

anyone to look into the determinations made.  I mean, there's no

evidence of that.  The only evidence that exists is that the

staff assistant routinely destroyed the records.

Now, maybe you can make an argument, whether it be on the

spoliation prong of this or on the willfulness prong of this,

that there was some flagrant disregard for the obligations

created by the law --

MR. METCALFE:  We already have argued that,

Your Honor, yes, with respect to both the Federal Records Act

and the Privacy Act.  I think the detailed briefing and the

evidence in the record very much supports that.

I would say, just to cap this off, if I may, even if

1    Your Honor were to find that if some state of mind element was

2    part of spoliation as a formal doctrine, that is amply supported

3    in this case.  And moreover, if Your Honor were to feel that the

4    formal doctrine of spoliation were so limited or contoured --

5    that's probably a better word for me to use -- then there's also

6    the fact -- and this is just a fallback, obviously -- that we've

7    argued that the broader equitable inference doctrine applies as

8    well.

9        Spoliation is something that's sort of a distinct concept.

10   I think it's certainly robust enough to include these facts.

11   But if Your Honor were to regard spoliation as technically

12   requiring something that you didn't see here, there's also that

13   broader principle of leveling the playing field, of not

14   rewarding the department for its destruction.

15       It's not that the plaintiffs are trying to get a benefit

16   here.  The department went ahead --

17            THE COURT:  But unless that destruction were somehow

18   inappropriate, you can't get anything from it at all, benefit or

19   otherwise.  It really turns on there being some impropriety to

20   it, under the Federal Records Act or implementing regulations or

21   otherwise.

22            MR. METCALFE:  I couldn't agree more, Your Honor.

23   It's a duty, and it's the breach of that duty.  And it's the

24   duty to maintain that all federal employees have for records

25   that are of the character that I read when I read those

1   implementing regulations.

2          THE COURT:  So your argument in response to

3   Mr. Rosenberg is basically there wasn't much more to do in terms

4   of developing the evidence on these three plaintiffs, whether

5   specifically they were subject to Internet searches and then

6   some record was created.

7          MR. METCALFE:  I can respond to that if you like.

8          THE COURT:  Let me finish it out.  And that -- and

9   part of that is because of the letter you got from

10  Ms. McDonald's counsel saying that she had no specific

11  recollection.

12         MR. METCALFE:  Yes.  That was very clear.

13         THE COURT:  And then with respect to spoliation, you

14  believe you should get the benefit of an adverse inference

15  because these records were destroyed notwithstanding

16  requirements under the Federal Records Act and implementing

17  regulations, whether they be NARA or DOJ.

18         MR. METCALFE:  They were destroyed despite those

19  regulations.

20         THE COURT:  Notwithstanding means the same as despite.

21         MR. METCALFE:  All right.

22         THE COURT:  And they were destroyed notwithstanding

23  those requirements, and therefore you should get the benefit of

24  an adverse inference in a spoliation-type assessment.

25         MR. METCALFE:  Yes.  Except of course I react to the

1    word "benefit."  It's not as if we're asking something special.

2    What we're doing --

3            THE COURT:  You're playing semantics.  Don't worry

4    about the semantics, okay?

5            MR. METCALFE:  Fine.  But it is key to remember that

6    this is just a matter of setting the record or the playing field

7    level given their act of destruction.  That's what spoliation

8    and the broader adverse inference doctrine is all about.  It's

9    not so much a benefit; it's compensation for the evidence that

10   is the best evidence, the only conclusive evidence in any

11   particular case having been destroyed by the other side.

12           THE COURT:  And your position is that notwithstanding

13   that the only specific evidence with respect to whether an

14   Internet search was done in regard to Mr. Saul is that there was

15   no Internet search, you think he nonetheless should be able to

16   continue with his Privacy Act claim?

17           MR. METCALFE:  Yes.  I disagree with the idea that the

18   only evidence of that is significant evidence.  It's not

19   conclusive on the question.  The question is did Esther McDonald

20   do that in his case or not?  The only thing that shows that is

21   the record that was destroyed.  Anything secondary to that --

22           THE COURT:  That's wrong.  That's absolutely wrong.

23   There's no reason to believe that whatever the search of her

24   computer was, however it was done, there's no reason to believe

25   that that isn't relevant evidence on the question of whether an

1   Internet search was done by Ms. McDonald with respect to

2   Mr. Saul.  It's evidence.

3           MR. METCALFE:  If Your Honor had said relevant

4   evidence, that would be one thing.  I'm saying it's not

5   conclusive.

6           THE COURT:  Well, you say it's not conclusive, but

7   it's the only evidence that I have, isn't it?

8           MR. METCALFE:  Well, part of the answer has to be that

9   the best evidence is what was destroyed by the plaintiff.  And

10  the reason that you're sitting there saying the only evidence

11  you have is because --

12          THE COURT:  I don't think that's right at all.  The

13  evidence that was destroyed would not necessarily tell me

14  whether an Internet search was made as to Mr. Saul.

15          MR. METCALFE:  Oh, I absolutely disagree, Your Honor.

16          THE COURT:  That's because you firmly believe that an

17  Internet search was made.

18          MR. METCALFE:  No.  You used the word "whether."  It

19  would tell you whether, because it would have his application,

20  and either it would have something as a printout attached to it,

21  it would have annotations --

22          THE COURT:  There's no reason to believe that she

23  printed out and made an annotation with respect to everyone she

24  did an Internet --

25          MR. METCALFE:  I agree.

1          THE COURT:  -- search on -- stop interrupting me.

2          MR. METCALFE:  Agreed.

3          THE COURT:  Indeed, the evidence is just to the

4    contrary.  The evidence is that she did more Internet searches

5    than she created records.

6          MR. METCALFE:  Your Honor, with respect, I was

7    reacting to the word "whether."  You said it would not say

8    whether she did it.

9          THE COURT:  It wouldn't.  Because, if those records

10   still existed and there was no printout or annotation with

11   respect to Mr. Saul, you still would not know whether an

12   Internet search was done with respect to Mr. Saul.

13         MR. METCALFE:  I would know that there's no Privacy

14   Act violation.

15         THE COURT:  That's a different question.  I'm saying

16   the best evidence on whether an Internet search was done with

17   respect to Mr. Saul is the evidence that the IG had.

18         MR. METCALFE:  The best evidence that existed at one

19   time was his application.

20         THE COURT:  Wrong.  It wouldn't have shown that.  It

21   might have, it might not have.

22         MR. METCALFE:  With respect, Your Honor, it would have

23   shown whether she did it.

24         THE COURT:  No, it wouldn't have.

25         MR. METCALFE:  Because had she done it, had she done a

search -- and by the way, doing a search is not what matters.

THE COURT:  I understand that, but go ahead with the point you're trying to make.

MR. METCALFE:  The point is that what matters here -- and perhaps I collapsed two things earlier, for which I apologize if I did so.  What matters is whether she did a search and then, having done a search, printed something out or annotated the paper.  The paper would show that.  The application would show whether she did that --

THE COURT:  And that's not the question we're talking about.  We're spinning around here because you're being so unwilling to concede anything.  The best evidence is -- the only point I'm making, Mr. Metcalfe, is that the best evidence of whether an Internet search was made with respect to Mr. Saul was the review of her computer to reveal whether an Internet search was made with respect to Mr. Saul.  Because the evidence that was destroyed, that you say was destroyed, might or might not have shown that.

MR. METCALFE:  Okay.

THE COURT:  Because even if there were no printouts or annotations with respect to Mr. Saul, it might still be the fact that an Internet search was conducted.  I'm not talking about the best evidence of a Privacy Act violation; I'm talking about the best evidence of whether an Internet search was conducted.

MR. METCALFE:  I have to agree, Your Honor.

1          THE COURT:  Move on to the next point.

2          MR. METCALFE:  What matters for purposes of

3    spoliation, I suggest, is whether they had the duty and whether

4    they breached the duty.  That's the simple fact of the matter.

5          Let me just say something, if I may, about the standard of

6    intentional, willful.

7          THE COURT:  And by the way, with respect to Mr. Saul,

8    how can I give you an adverse inference -- in other words, that

9    the records that were destroyed would have included records

10   generated from the Internet search, when the evidence that I do

11   have is that there was no Internet search?

12         MR. METCALFE:  I think the best answer is that you

13   don't have evidence that there was no Internet search.  And I

14   know I keep saying that --

15         THE COURT:  You're only saying you think it's not

16   conclusive evidence, but it is evidence.

17         MR. METCALFE:  Well, the way you're saying it,

18   Your Honor, is that it's as if it is conclusive.  The fact that

19   the IG didn't learn something about a particular person doesn't

20   mean that she didn't do the search.  It doesn't mean -- it only

21   means that they were able to find what they could find.  That's

22   all Your Honor has before him right now.

23         THE COURT:  We'll see.  The problem for both sides is

24   that nobody presented that evidence to me in the summary

25   judgment proceedings in the first instance.  Neither you, nor

1    they.

2            MR. METCALFE:  I'll be glad to supplement the record

3    with respect to that, Your Honor.

4            THE COURT:  You don't even have the evidence.

5            MR. METCALFE:  Pardon me?

6            THE COURT:  You don't even have the evidence.

7            MR. METCALFE:  I don't know exactly what we're

8    speaking of, that's correct.  We have only what Mr. Rosenberg

9    says today, because there's nothing indicated there.

10        With respect to the intentional, willful standard, they're

11    still playing games, I would suspect, with the difference

12    between whether something is a flagrant action or the intent of

13   a particular individual.  Mr. Rosenberg keeps saying, well, if

14   the individual didn't feel or didn't think she was violating the

15   act, I think Your Honor correctly understood it and

16   characterized it as talking about whether the agency

17   institutionally flagrantly disregarded.

18           THE COURT:  And what do you think is the evidence that

19   the agency flagrantly disregarded the Privacy Act?

20           MR. METCALFE:  I think it's everything we cited first

21   and foremost in our opening brief, where we talked about that

22   standard, and the deposition testimony --

23           THE COURT:  Humor me and tell me what the actual

24   evidence is rather than just saying it's everything you've

25   cited.

```
 1              MR. METCALFE:  Okay.  It is evidence, as Your Honor

 2    indicated earlier, that they did not do any training with

 3    respect to the Privacy Act, that no one in the Attorney

 4    General's office, the deputy Attorney General's office, the

 5    associate Attorney General's office, bothered thinking about the

 6    Privacy Act at all.  I even made a FOIA request that I referred

 7    to in one of the briefs where I asked the department to indicate

 8    any evidence of training in the associate's office and the

 9    deputy's office, and there was nothing there that supports their

10    position.

11              THE COURT:  So you think a failure to sufficiently

12    train generally with respect to the Privacy Act amounts to

13    flagrant disregard for purposes of the willfulness assessment

14    under the Privacy Act?

15              MR. METCALFE:  I think failure to train --

16              THE COURT:  Are you aware of any case that has

17    concluded that a generalized failure to train amounts to willful

18    conduct for purposes of a Privacy Act violation?

19              MR. METCALFE:  Not as such, Your Honor, no.  But

20    that's only part of the picture.  It was a flagrant disregard of

21    the Privacy Act in general.

22              THE COURT:  What does that mean?

23              MR. METCALFE:  Well, it means that --

24              THE COURT:  They did what they did?

25              MR. METCALFE:  I'll go even further.  They're still
```

1  violating the Privacy Act today.  They're still today, as near

2  as I can tell, doing Internet searches.  They're still going

3  ahead and doing the same thing they did back then as if it's not

4  violative of the act, and you've had that indicated to you in

5  multiple different ways.

6  THE COURT:  Well, the hiring policy, which is what I

7  assume you're talking about, is that components should, as a

8  matter of practice, "check a candidate's references and review

9  any information about the candidate that is easily accessible to

10  the general public.  When considering Web-posted information,

11  components should exercise due caution to ensure correct

12  identification and attribution."

13  Does that policy in and of itself violate the Privacy Act?

14  MR. METCALFE:  That policy in and of itself bespeaks

15  conduct that violates the Privacy Act, yes.

16  THE COURT:  How so?

17  MR. METCALFE:  Because the policy says to

18  interviewers, go out on the Web, look for information that is

19  readily accessible, and make use of it.  And when make use

20  involves maintaining that information, either as a printout or

21  as an annotation on an existing piece of paper --

22  THE COURT:  But there are lots of things that fit

23  within this policy that the Department of Justice should do

24  that, number one, they should do, and number two, wouldn't

25  violate the Privacy Act.  Checking someone's references, do you

1    think that violates the Privacy Act?

2              MR. METCALFE:  If you're talking about a telephone

3    call, no.  But if you go online and print something out --

4              THE COURT:  How about printing out the resume of a

5    reference so that you'll have a better understanding of who it

6    is that's making the recommendation on behalf of the applicant?

7    That violates the Privacy Act?

8              MR. METCALFE:  No.  I would say that pertains to the

9    person making the recommendation.  It's not about the individual

10   applicant to be sure.

11             THE COURT:  So what is it that you think violates the

12   Privacy Act with respect to checking a candidate's references?

13             MR. METCALFE:  If checking a reference means just

14   talking to someone on the phone or doing what you just said, no,

15   that doesn't violate the Privacy Act.

16             THE COURT:  What do you think would?

17             MR. METCALFE:  Well, first of all, what they did here,

18   in this case --

19             THE COURT:  That doesn't have anything to do with

20   checking a candidate's references.

21             MR. METCALFE:  Oh, I thought you were asking me what

22   would violate the Privacy Act beyond checking the reference.

23             THE COURT:  What aspect of this policy, as you fear

24   it's implemented, would violate the Privacy Act, checking a

25   candidate's references?

1          MR. METCALFE:  Not in and of itself, no.

2          THE COURT:  Reviewing information about the candidate

3     that is easily accessible to the general public?

4          MR. METCALFE:  Yes.

5          THE COURT:  Maybe, maybe not.

6          MR. METCALFE:  Yes.

7          THE COURT:  Reviewing it doesn't violate the Privacy

8     Act, it's only if you create a record.

9          MR. METCALFE:  Exactly right.

10         THE COURT:  And it depends what the record is.

11    Because if you create a record that is not First Amendment

12    activity, then it doesn't have anything to do with (e)(7)?

13         MR. METCALFE:  Of course.  But when you create a

14    record as was done here, found by the IG as official Department

15    of Justice policy, that violates (e)(7), if you make a decision

16    on the basis of pieces of paper that include that.  That's what

17    they did --

18         THE COURT:  But this policy doesn't say to do that.

19    And why is it wrong for the department to have a policy that

20    includes checking easily accessible information?  Why is that

21    wrong?

22         MR. METCALFE:  Because that can include, as was the

23    case here, information reflective of the applicant's First

24    Amendment rights that is not relevant to the decision to be

25    made.

1        THE COURT:  But that wouldn't make this policy a

2    violation of the Privacy Act or any other provision.  What would

3    make it a violation of the Privacy Act might be in a specific

4    instance if something was done under this policy that then

5    violated the Privacy Act.  But if the people at the Department

6    of Justice kept in mind both this policy and the requirements of

7    the Privacy Act, then there wouldn't be any problem, would

8    there?

9        MR. METCALFE:  Well, certainly if they kept the

10   requirements of the Privacy Act in mind, then there would be no

11   Privacy Act violation, of course.  I would say this policy is a

12   clear enabler to the type of violation we have here.

13       THE COURT:  But in and of itself it's not violative of

14   the Privacy Act.  All it is is perhaps it's not specifically

15   enough constrained, as you would like to see it, or perhaps as

16   objectively one would like to see it.  Perhaps a better policy

17   would also include a reference to taking care not to violate the

18   Privacy Act or other provisions.

19       MR. METCALFE:  Yes.  And the fact that this was issued

20   in the wake of the IG report.

21       THE COURT:  But you don't know that the Department of

22   Justice is violating the Privacy Act under its current policy,

23   which is what you said a moment ago, that they continue to

24   violate the Privacy Act.  Do you?

25       MR. METCALFE:  Yes.

1          THE COURT:  How do you know that?

2          MR. METCALFE:  Well, how about this?  You yourself

3     pointed to the fact that in the after-action activity that took

4     place in this particular matter, two other components went on

5     the Internet themselves, I think you said antitrust and another

6     one, and they started looking for information.  That violated

7     the Privacy Act right there.

8          THE COURT:  Depends.  It depends what they did.  We

9     don't know that they even created a record.  See, you're doing

10    what your whole case suffers from, and that is lumping together

11    the generalized wrong here and Privacy Act violations.  And they

12    may be two very different things.  It may be wrong in some sense

13    for tax and antitrust to have done what they did.  It may not

14    be.  But it's not necessarily a violation of the Privacy Act.

15         Just as with respect to your clients and the broader group

16    of applicants, it not only may be, but it probably is wrong what

17    the Department of Justice did.  It doesn't necessarily mean it's

18    a violation of the Privacy Act.

19         MR. METCALFE:  Maybe I should then clarify what's

20    animating my attitude or my approach to this.  The Justice

21    Department has said in no uncertain terms in litigation in this

22    case that it doesn't regard (e)(7) as constraining it as it does

23    a private employer.  It has in that very argument indicated, I

24    would say, very plainly that it's still doing that sort of

25    thing.

1          THE COURT:  I don't know that it's indicating that,

2     but as you no doubt could ascertain from my questions with

3     Mr. Rosenberg, I'm a little troubled by the breadth of the

4     Department of Justice's position.  And indeed in the

5     hypothetical I presented, it appeared that Mr. Rosenberg was

6     troubled a little bit as well.

7          MR. METCALFE:  Yes.  Their argument is almost that

8     it's too big to fail.  In other words, that they've been doing

9     this and they can't stop doing this.  And I have said, and they

10    try to twist this around, I have said, listen, I get it, in the

11    private sector this is done all the time.  I get the efficiency

12    of that.  It makes sense, to me, to everyone else.  But the

13    Privacy Act says what the Privacy Act says; it cannot be done --

14         THE COURT:  No, it doesn't say that.  If doesn't say

15    it can't be done.  It says you can't make a record of it.

16         MR. METCALFE:  Okay.  It cannot be done for purposes

17    of --

18         THE COURT:  You can do it, you can make your decisions

19    based on it, and that doesn't violate the Privacy Act.

20         MR. METCALFE:  But it would violate the Federal

21    Records Act.

22         THE COURT:  That may be --

23         MR. METCALFE:  If you don't memorialize your

24    decisions.

25         THE COURT:  That may be.  And it may violate the CSRA,

may violate other things, but it doesn't violate the Privacy

Act.

          MR. METCALFE:  When they memorialize the information,

when they do that, and I'm positing yes, that in some instances

at least, they do memorialize the information, for the same

reason that Esther McDonald did, that is what's contrary to

(e)(7).  Can it be done in the private sector?  Yes.  Can it be

done in the federal government sector?  No.  And the Department

of Justice just doesn't get that.  And that's part of the

pattern here of flagrant disregard.

     Frankly, it hasn't ceased.  It's just saying, you know,

it's too big to fail here.  We need to do this.  At the earlier

oral argument, the way it was characterized to Your Honor was

that it would be irresponsible for the department not to do it.

That's from the transcript in August 2009.

          THE COURT:  What is your evidence -- I know I'm

jumping around a little bit.  What is your evidence -- what if

any evidence do you have that the individuals who were involved

in these events knew or should have known that what they were

doing was unlawful?

          MR. METCALFE:  Okay.  If unlawful means contrary to

the Federal Records Act or the Privacy Act both, then all

federal employees are given instructions on the basic -- let me

back off.  In general, federal employees are given instructions

on the basic dos and don'ts of record-keeping for purposes of

1      the job.  They either knew -- and I don't think they did --

2              THE COURT:  What's the unlawfulness?  The unlawfulness

3      there is creating and keeping a record that violates (e)(7)?

4              MR. METCALFE:  That is used in a decision, and

5      therefore that's what implicates (e)(7).  That's correct.  And

6      with respect to the Federal Records Act, it's the proper

7      maintenance and disposition of federal records.  The record is

8      quite clear in this case, Your Honor, that for the top

9      leadership offices during the tenure of --

10             THE COURT:  It's not the Internet searching that's the

11     relevant consideration for willfulness under the Privacy Act and

12     flagrant disregard.

13             MR. METCALFE:  Well, of course.  Of course it's not.

14             THE COURT:  It's not.

15             MR. METCALFE:  Because that's not violative.

16             THE COURT:  Right.  Instead, what it is is the --

17     whether it happened with these specific individuals or not is a

18     different question, but it's the creation and maintenance of a

19     record for purposes of either (e)(7) or (e)(5).

20             MR. METCALFE:  For purposes of decision-making, yes.

21     That's correct.  And Mr. Elston --

22             THE COURT:  And they should have known that was wrong

23     because they should have been better informed as to the Privacy

24     Act.

25             MR. METCALFE:  That's correct.  At least Mr. Elston

1      should have --

2              THE COURT:  It doesn't have anything to do with the

3      fact that, oh, they knew this was being done in the private

4      sector, they knew that Internet searches could produce some

5      useful information in assessing candidates.  Instead, what it

6      had to do with is whether when they created -- when Ms. McDonald

7      created a document either by printing something out off the

8      Internet or by making an annotation, she should have known that

9      that was violative of the Privacy Act, either under (e)(5) or

10     (e)(7), and she acted in flagrant disregard of those

11     requirements.

12             MR. METCALFE:  Yes as to her, yes also as to

13     Mr. Elston, who should have known, because he saw what she was

14     doing and wanted to institutionalize it, and yes, the

15     institution through them acted in flagrant disregard.  The sum

16     and substance of the course of conduct was flagrant disregard of

17     their Privacy Act rights, through those employee actors, and

18     especially given Mr. Elston's role, not only as chairman of the

19     screening committee but as chief of staff to the deputy Attorney

20     General of the United States.

21             THE COURT:  And you've already indicated to me that

22     you don't have any authority for the proposition that an agency

23     has willfully violated the Privacy Act by failing to inform

24     employees of their obligations under the Privacy Act.

25             MR. METCALFE:  I would like not to go that far,

```
1    because Your Honor used the word "training" earlier, and

2    training can be something more formal.  I believe there might be

3    authority to that effect --

4             THE COURT:  Believing that there might be is not all

5    that helpful to me.

6             MR. METCALFE:  Like saying it depends, right?  I'm not

7    certain that there is not, and I would be glad to go back and

8    look at that as well, Your Honor.  I don't think that's

9    essential because I think it's clear it's flagrant disregard,

10   even apart from there being any such authority or not.  But if

11   it's something that is of concern to Your Honor, I would

12   certainly be glad to go back and focus on that in particular.

13            THE COURT:  All right.  Take a couple of minutes to

14   address anything further that you want to address before I give

15   each side a moment to say a last word.

16            MR. METCALFE:  Well, I'd be hoping to have more than a

17   moment when it comes to that, given what the balance of time has

18   been thus far.

19            THE COURT:  Well, it all depends how much time I give

20   them.  If I only give them a moment, it's not going to take you

21   more than a moment to respond to what they said.

22            MR. METCALFE:  But you already gave them a heck of a

23   lot of time --

24            THE COURT:  Go, go, go, go, go.

25            MR. METCALFE:  All right.  From the very beginning of
```

1   this case, they have acted as if what's involved is *de minimis*.

2   They call these papers just scraps of papers.  As a matter of

3   fact, at oral argument the first time around, it was indicated

4   that they were just innocuous.  Well, it's clear that they're

5   not.

6       This case has evolved through time, and it's evolved

7   through how the Department of Justice has slowly unpeeled the

8   onion as to how it's defending the case.  And that's why we're

9   only now at the point where we're focusing on spoliation.  They

10  didn't make this what I call extreme threshold argument right up

11  front.  They specifically hedged on that.  That's why now we're

12  at this stage.

13      I don't think spoliation, at least as a distinct doctrine,

14  requires a formal finding of state of mind.  But if it does, I

15  think that's more than satisfied here.  I think it's clear that

16  Your Honor has a very -- and I don't want to understate the case

17  here -- has an extraordinarily full grasp of the nature of the

18  case and the facts of the case.  So what I'd like to do is just

19  rely on that and answer any additional question that you might

20  have at this stage.

21          THE COURT:  Well, what do you want to tell me with

22  respect to the damages and mitigation argument?  You haven't

23  really had a chance to address that.  So if you want to address

24  that, go ahead.

25          MR. METCALFE:  Okay.  Well, the threshold argument

```
1   that they've made there basically is that an interview is not

2   the same as an offer.  I'll tell you quite candidly, I discussed

3   this, I have a half a dozen alumni of the Civil Rights Division

4   on the faculty with me at the Washington College of Law.

5               THE COURT:  This isn't going to take me any --

6               MR. METCALFE:  Okay.  But I ran this by them and they

7   said --

8               THE COURT:  Your discussions with former Civil Rights

9   Division employees aren't going to do anything for me.

10              MR. METCALFE:  What I'm telling you is that the notion

11  that an interview is not the same as an offer means that anyone

12  could discriminate, as Your Honor indicated in your own

13  hypothetical, effectively through the interview and never the

14  person gets an offer, and that would be that.

15              THE COURT:  I think I've already indicated that I'm

16  somewhat troubled by that position.  And I think I've already

17  indicated that it seems to me that assessing the probabilities

18  of whether someone would have been selected is something that

19  fact-finders do all the time in determining what damages should

20  be forthcoming in a discrimination setting, and there's no

21  reason they couldn't do it equally well in a Privacy Act

22  setting.

23              MR. METCALFE:  I agree with that.  So I'd like to

24  address any particular concern Your Honor might have.

25              THE COURT:  What about mitigation by virtue of the
```

1    2008 offer of an interview?

2            MR. METCALFE:  Okay.  The department has said most

3    recently and consistently that they were offered the exact same

4    position.  They were not.  They were offered a position two

5    years out or some number of years out beyond what they would

6    have had directly off of their clerkships or --

7            THE COURT:  But they were offering a position with the

8    grade increases they would have incurred in that period.

9            MR. METCALFE:  And the way Your Honor just spoke of

10   that, that acts as if salary is all that's involved.

11           THE COURT:  But, Mr. Metcalfe, I don't understand your

12   position on that.  What you're basically arguing is nothing can

13   ever be equivalent to what they didn't get.  There's no position

14   that could be equivalent, even though it's the exact same

15   position with the same responsibilities at the same grade two

16   years later that they would have had.  I don't understand that

17   position.

18           MR. METCALFE:  Let me try to do a better job, then,

19   Your Honor, of articulating that.  I'm comparing a situation in

20   which someone comes in -- let's forget a clerkship, for example,

21   and just say right out of law school.  That first year out of

22   law school is key.  It's a very important year.  The second year

23   is important as well.  It's a sliding scale as time goes by.

24       Having the benefit -- and I'll use the word "benefit"

25   here -- of being a Justice Department Honors Program attorney in

1    that first year is very significant.  It is different from the

2    benefit of being an Honors Program attorney two years out.

3            THE COURT:  But what the law does for someone who's

4    denied a position or denied a promotion, what the law does is,

5    at best for the person, is put them in that position at the same

6    grade that they would have achieved -- that's called making them

7    whole, and front pay -- and giving them back pay.

8            MR. METCALFE:  Yes.

9            THE COURT:  That's it.

10           MR. METCALFE:  Yes.  That's it --

11           THE COURT:  That's it.  The department isn't arguing

12   different here.  They're saying that the mitigation only runs

13   from the time that that offer was made -- the date on which the

14   offer had to be accepted for the interview, and it doesn't

15   preclude a recovery for lost salary before that.  It's the same

16   as the relief that one would get in any context.

17           MR. METCALFE:  It may be the same relief when you look

18   at only the salary, but it's not the same position that they

19   would have had to begin with.  It's not a suitable substitute

20   for what they had.

21           THE COURT:  Because you think there never can be a

22   suitable substitute.  If someone is denied a position, promotion

23   or an initial applicant in 2006, that achieving it later on is

24   never a suitable substitute.

25           MR. METCALFE:  The answer is yes to that with one key

1    element, Your Honor.  And that is when you're talking about the

2    Attorney General's Honors Program at the Department of Justice,

3    a very significant part of that is the developmental experience

4    you have in that first year of practicing law, and that's what's

5    different.  It's not exactly the same.  Can the salary be the

6    same?  Sure.  It's something special.

7            THE COURT:  But it's not compensable.  You can't get

8    any relief for that either.

9            MR. METCALFE:  But we're not asking for that.  They're

10   asking to have it regarded as suitable.

11           THE COURT:  But, Mr. Metcalfe, listen.  They're asking

12   to have it regarded as suitable only in mitigating the damages

13   award, and that is what it is.  It mitigates the damages award,

14   and only a part of the damages award.  The damages award they're

15   saying it mitigates is the salary award.  And that it does.

16   Yes, it's not the exact same position in terms of the

17   development, but that's not compensable in the damages you claim

18   either.

19           MR. METCALFE:  I think I understand exactly what

20   Your Honor is saying.  And let me try to approach it this way,

21   and I'm sorry I didn't do it more clearly the first time around.

22      The standard that applies is whether the plaintiff had an

23   obligation to accept that position, and it had to be a suitable

24   replacement for what would have been the case to begin with.  It

25   was not a suitable replacement --

1          THE COURT:  There never can be a suitable replacement

2    under your view, not only for the Honors Program in the

3    Department of Justice, but for any other position.  So there

4    never can be mitigation, because no position is exact, because

5    whatever entity you're working for you develop some experience

6    and benefits from being there during the period of time you're

7    not.  It's no different for the Honors Program.

8          MR. METCALFE:  I disagree, Your Honor.

9          THE COURT:  Fundamentally the same.

10         MR. METCALFE:  With respect, I'm saying --

11         THE COURT:  You're just saying there can't be

12   mitigation, period.

13         MR. METCALFE:  You can't go back home again.  You

14   can't repeat that first year.  You can't replicate --

15         THE COURT:  The law is to the contrary.  The law says

16   there can be mitigation.  And I see no reason to separate out

17   the Honors Program of the Department of Justice and conclude,

18   can't be mitigation there even though there can be in every

19   other employment setting.

20         MR. METCALFE:  I understand what you have said.

21         THE COURT:  What else?

22         MR. METCALFE:  What else concerns you with respect to

23   damages or any other aspect of the case?

24         THE COURT:  We can't do that, Mr. Metcalfe.  If your

25   answer is I have nothing further unless the Court has additional

1      questions, then so be it.

2              MR. METCALFE:  Fair enough.  I thought you might be

3      indicating that perhaps not.  I'll retire at this point and look

4      for a rebuttal to Mr. Rosenberg.

5              THE COURT:  All right.  Thank you.

6          So did they make a discovery request that would have

7      covered the information that the IG report relies on with

8      respect to whether there were Internet searches for these or

9      other candidates?

10             MR. ROSENBERG:  Yes, Your Honor.

11             THE COURT:  And did you provide the information?

12             MR. ROSENBERG:  Yes, we did.  In fact, I recall we

13     produced about a box and a half of documents.  The Internet

14     searches was a stack of papers.  We produced in hard copy, per

15     plaintiffs' request, between about an eighth and a quarter inch

16     thick, and I believe it was at the very front of the second box.

17             THE COURT:  So by looking at that it would have

18     indicated whether there was an Internet search with respect to

19     each of the plaintiffs?

20             MR. ROSENBERG:  It would have indicated there were

21     Internet searches for Faiella and Herber.  The first page of the

22     document -- basically it was a several hundred page long

23     document.  We redacted out those Internet searches that did not

24     relate to the three named plaintiffs.  So the first page of the

25     document said something like pages 1 to 230 have been redacted

1    in full, flip the page over, second page had some black-out

2    marks on it, then you'll see www.Google.com/Matthew+Faiella, and

3    then there's a whole string that goes over several pages.

4         There were some documents we withheld on various privilege

5    bases, but we did provide the raw Internet data that shows there

6    were Google searches for Faiella and Herber.

7         I want to address a couple of points, and I'll try to be

8    brief.  Mr. Metcalfe admitted during the questioning today that

9    plaintiffs have no way to prove up the elements of their Privacy

10   Act claim absent a spoliation inference.  They also have known

11   from the very beginning of this lawsuit that the hard copies of

12   these applications were destroyed.  And repeatedly throughout

13   this litigation they have attempted to shift the burden to the

14   government, saying things like, well, we didn't know that the

15   government would be making this type of threshold defense

16   regarding these Privacy Act claims, and that's why we hedged and

17   waited until now to raise a spoliation inference.

18        Let me be clear.  This is not a defense.  This is simply

19   alerting plaintiffs to what the elements of a Privacy Act claim

20   are.  Those elements are well settled and were set forth in your

21   brief regarding the motion to dismiss, that to prevail on a

22   Privacy Act claim you have to prove there's a record, you have

23   to prove causation, you have to prove willful and intentional

24   conduct, and you have to prove fact of damages.

25        Plaintiffs knew that, and they knew that going into

1    discovery.  They chose not to seek discovery on the issues of

2    causation, and instead to throw the dice on the spoliation

3    adverse inference.  It's simply not appropriate for them to rely

4    on that inference now, if it's not available, and to repeatedly

5    attempt to shift the burdens to the government.

6         Let me turn to the Federal Records Act for just a moment.

7              THE COURT:  Let's talk about whether the spoliation

8    inference is available.

9              MR. ROSENBERG:  Okay.  The answer, Your Honor, is no,

10   it is not, because plaintiffs still have not comes to terms with

11   Talavera.  I don't have the decision in front of me, but I

12   remember clearly --

13             THE COURT:  But you have it memorized.

14             MR. ROSENBERG:  Probably not as well as you do, Your

15   Honor --

16             THE COURT:  I doubt that.

17             MR. ROSENBERG:  But I remember the Circuit Court's

18   analysis was clear, that an essential element of Talavera's

19   spoliation claim was that he was a member of the class intended

20   to be protected by these regulations.  Plaintiffs, who

21   presumably knew that they've had to make this spoliation

22   argument now for years, haven't identified any such regulations.

23   And their view of the Federal Records Act is in contrast with

24   the D.C. Circuit's holding.

25             THE COURT:  Well, they point to the NARA regulations.

1        MR. ROSENBERG:  Plaintiffs aren't a member of the

2   class intended to be protected by those regulations.  And in

3   fact, if that's the case, then you can throw out any litigation

4   hold obligation for anticipation of litigation, at least as it

5   relates to the government.  If the FRA provides a spoliation

6   basis, then in every litigation matter in which there are

7   substantive documents in any way, shape, or form, they would

8   have to be preserved pursuant to the FRA and there would be no

9   need to put any litigation hold obligations in anticipation of

10  litigation because presumably everything would be kept pursuant

11  to the FRA.

12       THE COURT:  But in the first instance, according to

13  plaintiffs, I need to look at the Federal Records Act, the NARA

14  regulations, and perhaps any other regulations that the

15  Department of Justice has.  Without being too worried about the

16  parade of horribles that you mentioned, I have to look at what

17  those requirements are.

18       They say that under those provisions there is a requirement

19  to preserve the records at issue here -- in other words, any

20  records that reflected something unique in the context of the

21  determinations being made here.  In other words, a printout that

22  at least one of the members of the screening committee thought

23  was important for purposes of deciding whether to deselect

24  someone from an interview, or an annotation that at least one of

25  the members of the screening committee felt was important for

1    the purposes of deciding whether to deselect someone for an

2    interview.  The plaintiffs' position is that under the legal

3    requirements of the Federal Records Act, NARA regulations and

4    perhaps DOJ regulations, those materials have to be preserved.

5         Can you tell me they are wrong on that?

6         MR. ROSENBERG:  Yes, I can.

7         THE COURT:  And by looking specifically to which of

8    those legal provisions?

9         MR. ROSENBERG:  Well, I would look -- the legal

10   provisions are what they are.  The question is do the documents

11   or records, if we're going to call them records, fit within the

12   scope of those provisions.  They don't have any evidence

13   regarding their own clients that any records that fall within

14   the scope of those provisions were ever created.

15        THE COURT:  Forget that.  Forget that.  It seems to me

16   that it wouldn't be inappropriate for me -- I mean, you're

17   trying to get them coming and going, and they're trying to get

18   you coming and going.  But why is it inappropriate for a court

19   to say, okay, they can't -- I'll change it.  Why is it

20   appropriate for the Court to say on their spoliation claim,

21   well, they can't show that there was any record specific to them

22   and therefore they can't get the adverse inference?  That would

23   be nonsense.

24        MR. ROSENBERG:  It would reward a party for failing to

25   take steps to lay an adequate foundation --

1          THE COURT:  As opposed to rewarding a party for

2    destroying the records.  This is a finger-pointing exercise that

3    doesn't get me very far.

4          MR. ROSENBERG:  But that I think is the paradigm

5    problem, Your Honor.  Because we're not asking to be rewarded

6    for the destruction of the records.  We're simply asking for

7    purposes of summary judgment that they be held to their burden

8    of proof.  Or, if they have a spoliation claim, they could have

9    asked Esther McDonald, based on the Internet searches, based on

10   the applications, whether she recalled making any scribbles or

11   maybe it was just a check mark, which wouldn't be required --

12         THE COURT:  The IG report indicates that there were

13   annotations made.

14         MR. ROSENBERG:  Yeah.  They varied, depending on the

15   applicant.  Sometimes there were none.  Sometimes it might be

16   just a yes or a no.  Sometimes -- who knows?

17         THE COURT:  They could have asked Esther McDonald, is

18   your view, and therefore they lose, although Mr. Metcalfe has a

19   letter from Esther McDonald's counsel saying, he says quite

20   clearly that she has no recollection with respect to them

21   specifically.

22         MR. ROSENBERG:  That was actually the next point I

23   wanted to address, was that letter from her counsel.  It's true

24   that her counsel wrote a letter that said that Ms. McDonald

25   doesn't remember any particular applicants.  Number one, just

1    because a potential deponent's counsel says their deponent may

2    not remember something, doesn't mean you don't ask the

3    questions.

4              THE COURT:  It may or may not mean that.

5              MR. ROSENBERG:  Number two, Ms. McDonald repeatedly

6    said throughout the deposition, I might remember something if

7    you show me an application.  And Mr. Metcalfe was very

8    persistent in the depositions when somebody said they couldn't

9    remember something on the fourth or fifth question, they might

10   remember it.

11             THE COURT:  Assume for a moment, just to humor me,

12   that he had asked her that and she still hadn't remembered.  Do

13   they get the spoliation inference?

14             MR. ROSENBERG:  She doesn't remember anything at all

15   regarding the applicant?

16             THE COURT:  Yep.

17             MR. ROSENBERG:  I think that they get past the element

18   of whether or not there may be a spoliation inference as to that

19   particular applicant.  They would still need to prove the other

20   elements of spoliation.  Were the documents destroyed under the

21   appropriate standard.  And that was actually the very next thing

22   I wanted to discuss.  We talked about negligence.  Plaintiffs'

23   counsel seems to think there's no *mens rea* requirement.

24        I did want to circle back to negligence, though, because we

25   did brief it actually in our reply brief on page 19 at note 15.

We noted that there were some negligence cases that plaintiffs

cited.  I think they're all inapposite, because I think they all

involve a situation where you already have a clear litigation

hold or you already have documents that are being produced, and

somebody deletes the hard drive in light of the litigation, or

something else along those lines.  I'm not aware of a negligent

violation of a statute or regulation that can automatically lead

to a spoliation claim.

THE COURT:  Even in the cases that I've decided where

I have observed that the adverse inference doctrine, if you

will, within the spoliation examination does include negligent

destruction of evidence, you think that's in a different

category of cases.

MR. ROSENBERG:  I think this is a unique category

because plaintiffs are relying upon this violation of the FRA,

and that -- they talk a lot about the issue of training, that

the individuals here were not appropriately trained in the

requirements of the FRA or the Privacy Act.

First, as with all their other contentions, they haven't

offered anything in the statement of facts to that effect that's

usable by the Court or the parties.  But more to the point, that

sounds an awful lot like a negligence standard, when you say the

department failed to train or basically it slipped through the

cracks; it didn't occur to people that Esther McDonald needed to

be trained within the first month of her employment on the

```
 1    requirements of the Privacy Act or the FRA.  But the Privacy Act

 2    is not a negligence standard.  It's much, much higher.

 3              THE COURT:  The spoliation examination is not a

 4    Privacy Act standard.

 5              MR. ROSENBERG:  But plaintiffs I think blur those

 6    two --

 7              THE COURT:  Well, they do.  I certainly concede

 8    there's some blurring going on.  But the actual spoliation

 9    standard doesn't really depend on any Privacy Act standard.

10              MR. ROSENBERG:  Well, they are separate, so maybe we

11    can break it down and say for purposes of the willful or

12    intentional conduct --

13              THE COURT:  That's a Privacy Act.

14              MR. ROSENBERG:  Has to be more than negligence.  And

15    when they say failure to train, that sounds an awful lot like

16    negligence.

17              THE COURT:  In that context I understand your

18    argument.  But I don't think that the same argument exists in

19    spoliation.  I mean, maybe you believe it does.

20              MR. ROSENBERG:  I'm not aware one way or the other.

21    All I recall from the cases is that the negligence cases tend to

22    hold after there's a clear litigation hold obligation.  Here

23    it's not so clear.  As we said before, the FRA simply can't give

24    rise to a spoliation claim because plaintiffs are not members of

25    the class intended to be protected.
```

1      It's also different because the FRA is ambiguous.  I mean,

2   plaintiffs cite 36 CFR 1222, that regulation that's the

3   regulation that we discussed at some length.  It is what it is.

4   But it's a bit different than when you have a litigation hold

5   memo.  When you have a litigation hold memo, it says preserve

6   all documents relating to X, Y and Z.

7      Here, someone has to make a substantive determination.

8   Does this Internet printout reflect the thought process that's

9   being used to deselect somebody for a Department of Justice

10  position?  It's a judgment call.  If it does, then I need to

11  preserve it.  If it doesn't, then I don't.  So I think the

12  Federal Records Act that plaintiffs rely on doesn't lend itself

13  to some sort of clear-cut negligence standard because you have

14  to fit the two pieces together.

15           THE COURT:  I think actually it's three pieces.  Not

16  only the obligation and the state of mind, but also the

17  relevance.  All three of those things are part of looking at

18  spoliation.  And they do overlap somewhat and merge and

19  influence one another.

20           MR. ROSENBERG:  I think that's right, Your Honor.

21      Unless the Court has any other particular questions, in

22  short we think that this case involves plaintiffs' burden.  They

23  haven't met that burden.  They've known for a long time what

24  they have to prove up to survive summary judgment, and whether

25  plaintiffs are happy with that outcome, the requirements of the

1    Privacy Act in summary judgment are clear.  Thank you.

2              THE COURT:  Thank you.

3         Mr. Metcalfe.

4              MR. METCALFE:  Your Honor, first I want to disagree

5    with what Mr. Rosenberg said about protected class.  As the

6    Court of Appeals in Talavera spoke, there is an element of

7    spoliation having to do with a regulation requirement and

8    protecting people.  I think it's very clear that the Federal

9    Records Act, in requiring that an agency document the

10   formulation and execution of basic policies and decisions, and

11   the taking of necessary actions, that there's a requirement that

12   they create those records.  And that's for purposes of the

13   people about whom those decisions are made.

14        That's why the federal government requires agencies to

15   maintain records, because they properly document agency activity

16   that can indeed affect the interests of individuals who are the

17   subject of agency decision-making.  The whole idea that there's

18   some distance between the Federal Records Act and the interests

19   of the people whose information would be documented here is just

20   out of whole cloth.

21        In the Talavera case, the Court also --

22              THE COURT:  You don't refer to anything more than they

23   refer to.  They say well, the class that's protected by the

24   Federal Records Act is archivists and the like, historians, et

25   cetera.  And you say, oh, no, it must be more.  What do you rely

1    on, and what do they rely on?

2         MR. METCALFE:  First thing is when they say it's only

3    archivists, that's nonsense.

4         THE COURT:  That isn't any more convincing.  Refer me

5    to something.

6         MR. METCALFE:  I would ask Your Honor to again look at

7    the excerpts, the portions of the government-wide regulations

8    that speak about maintaining unique information such as

9    substantive annotations or comments.

10        THE COURT:  But who's that for the benefit of?  Is

11   that for the benefit of those employed in the federal government

12   or wish to be employed in the federal government, or is it for

13   the benefit of historians, archivists, et cetera?

14        MR. METCALFE:  With respect to hiring matters,

15   personnel matters, if that's the agency activity that's going on

16   and a decision is being made about an individual who's either

17   being hired or not, or being promoted or not, the documentation

18   requirement is for the benefit of the individual.  Otherwise,

19   agencies could just run rampant, not keep records --

20        THE COURT:  No, they couldn't, because the Federal

21   Records Act says they can't.  But the reason the Federal Records

22   Act says they can't is for a different set of beneficiaries.

23        MR. METCALFE:  The reason is to have records there in

24   case there's a question later on.  If someone you knew were to

25   apply for a federal job, and the hiring official were to create

1  some records, and then later on there would be some question

2  about that person's entitlement to the job, that person would be

3  interested in having those records maintained.

4  THE COURT:  That's probably right, but whether the

5  Federal Records Act was Congress's articulation of that interest

6  remains an open question in my mind.  I know you're saying

7  logically it must be so, but you're not referring me to anything

8  to establish that.

9  MR. METCALFE:  Okay.  Well, given that the Federal

10  Records Act again came up only late in the briefing, I would be

11  glad to do that, Your Honor, and to make that very clear.

12  Another aspect of Talavera is that the Court of Appeals

13  said that the notes in question represented the plaintiff's best

14  chance to present direct evidence of what he was trying to

15  prove, or what he needed to prove as part of his burden of

16  proof.

17  That's exactly what we have here.  The best chance to

18  present direct evidence, really the evidence that embodied the

19  wrongdoing, that was foreclosed by the destruction.

20  No matter what else might exist and what it might suggest,

21  whether it's conclusive or not -- and it's hard to say that any

22  one thing is conclusive, especially when it's a thing in the

23  negative -- the best direct evidence that embodied what the

24  agency did in some number of instances was destroyed.  And

25  that's what prevents the plaintiff or any other plaintiff from

1    being able to do what the department knew all along could not be

2    done because it knew all along it had destroyed those records.

3    There's no magic about that.  It's something that was very clear

4    right from the outset in the case.

5         So, that's I think the key point about Talavera.  It does

6    not go so far as to have a holding that constrains this.  I

7    think if the Court looks at it carefully again, the Court will

8    agree with that.

9         And again, I'll be glad to brief with respect to the

10   Federal Records Act to respond to the particular question that

11   you raised.

12            THE COURT:  I'll let the parties know if I want any

13   further briefing.

14            MR. METCALFE:  One other thing I should mention is

15   with respect to the links that we provided for information about

16   the plaintiffs, I think there's some updating with respect to

17   changes.  I was working with one of the plaintiffs until after

18   midnight last night --

19            THE COURT:  I don't think that affects the decisions

20   that I'm asked to make on the pending motions.

21            MR. METCALFE:  Okay.  Fine.  But I just felt obligated

22   for the record to mention that there might be some broken links

23   there involved.

24       Is there anything else that I can speak to?  I realize

25   we've been here for a long time this morning.

1          THE COURT:  I won't say I've heard it all, but I think

2     you've addressed the issues, and I appreciate that.

3          MR. METCALFE:  Thank you.  Appreciate it as well.

4          THE COURT:  Mr. Rosenberg, let me see if I can ask you

5     one further question on willfulness.

6        Now, we reach willfulness if I've already concluded that

7     there's a violation, if you will, and then we're talking about

8     causation and damages in that context.  The willfulness here,

9     the flagrant disregard, would not be, would it, focused on

10    conducting an Internet search, but rather it would be focused on

11    the Privacy Act.  Is that correct?

12         MR. ROSENBERG:  I suppose that would be right,

13    Your Honor.

14         THE COURT:  And so, focusing it that way, the

15    willfulness question does seem to get more into what the

16    individuals, and through them the agency, really knew or was

17    doing with respect to Privacy Act requirements.  And if I had

18    already concluded, in order to reach willfulness, that there

19    was, in the abstract at least, a Privacy Act violation, wouldn't

20    it necessarily turn to some extent on what people knew, and

21    therefore perhaps on what they had been trained with respect to

22    the Privacy Act and avoiding Privacy Act violations?

23         MR. ROSENBERG:  I don't think I would dispute that.

24         THE COURT:  And the record here shows zero training,

25    right?  Now, it might not definitively show that there wasn't

 1    any, but there is no evidence of any training.

 2            MR. ROSENBERG:  Let me be clear.  I'm not aware of any

 3    training.  Esther McDonald was a new employee.  I don't think

 4    that there was evidence -- and Mr. Metcalfe can correct me if

 5    I'm wrong -- that Mr. Elston had specific training, at least as

 6    to the issues at issue here.

 7            THE COURT:  And certainly no Privacy Act training or

 8    awareness or reminders with respect to their responsibilities on

 9    the screening committee.

10            MR. ROSENBERG:  You know what, I have to take this

11    back a little bit, Your Honor.  Because I recall during Esther

12    McDonald's deposition, there was a discussion of formal versus

13    informal training, and she did say that she had some, what she

14    would characterize as I think informal training through

15    conversations, ironically enough with Mr. Metcalfe, because at

16    the time he was at the Justice Department.  And there was some

17    dispute over what was said.

18        I don't know the scope of that training.  It's somewhere in

19    the deposition transcript, although I don't know if that

20    particular portion is in front of the Court.

21            THE COURT:  Where I'm going is it seems to me that as

22    so framed, and I think that is the proper framing of the

23    willfulness issue, I might not be able to decide summary

24    judgment in favor of either side on that based on the current

25    record.

1          MR. ROSENBERG:  You raise an interesting question,

2   though, which is if we assume that searching the Internet by

3   itself is okay, the question then becomes when you print out

4   that information or make a substantive notation based on that

5   information, that's the process that creates the record, at

6   least for Privacy Act purposes, what is the state of mind

7   involved in creating that record?  Is it that the creation of

8   this record may violate the Privacy Act or somebody's rights, or

9   is it part of what plaintiffs have tried to frame as a broader

10  scheme to try to deselect candidates based on political

11  affiliations, which is more of a CSRA claim than a Privacy Act

12  claim.  The records then not causing the deselection; it's just

13  perhaps a vehicle depending on what happened.  And plaintiffs

14  never inquired about that.

15      But, going back to the threshold point, there's no evidence

16  that the failure to train, assuming that there is a failure to

17  train, rises to anything above negligence.  The Deters case was

18  very clear that a violation must be so patently egregious and

19  unlawful that anyone undertaking the conduct should have known

20  it unlawful.  And the deposition testimony does show that Esther

21  McDonald believed that she was doing everything right, whatever

22  that everything was.

23          THE COURT:  But that belief was really focused more on

24  the Internet search than it was on record creation.

25          MR. ROSENBERG:  Let's go back and take a look at the

1    transcripts on that, Your Honor.  I know that that portion of

2    the transcript is part of the record before the Court for

3    summary judgment.  I'm not sure -- I mean, I'm just not sure

4    exactly, depending on what the specific question --

5                THE COURT:  Believe me, I'm not saying ultimately that

6    either the defendant or any particular plaintiff should win or

7    lose on the willfulness question.  All I'm really saying is I'm

8    not sure that I have the record before me to decide on summary

9    judgment in favor of either side on that.

10               MR. ROSENBERG:  The last thing I would say on that is

11   you don't need to get to the willfulness prong --

12               THE COURT:  I understand.

13               MR. ROSENBERG:  -- if you decide for us on any of the

14   other prongs.

15               THE COURT:  Okay.  Thank you.

16               MR. METCALFE:  Your Honor, may I be heard on just that

17   last point?

18               THE COURT:  Very briefly.

19               MR. METCALFE:  Because you said you're not certain

20   that you have a sufficient record with respect to the

21   intentional willful element.  With respect, Your Honor, I think

22   you do.  And part of the reason is that Mr. Rosenberg just gave

23   you an incomplete articulation of the standard when he read what

24   he read from Deters.  What he read did not include that the

25   correct standard is flagrant disregard.  And that has nothing to

do with training per se.  It's the entire pattern of how those

upper leadership offices of the department treated Privacy Act

responsibilities.

I think there's more than ample evidence in the record to

show that that was more than flagrant in this case.  Again, with

that being the standard, flagrant disregard, as the institution,

the agency's flagrant disregard.

THE COURT:  I'll have to look at the record.  Maybe,

maybe not.  But let me ask you this question, Mr. Metcalfe.

You've made a jury demand in your complaint.  And the department

has -- I wouldn't say with 100 percent certainty, has indicated

to me that they believe that a Privacy Act case, I take it in

general, is not a case triable to a jury.

Is that the department's position?

MR. ROSENBERG:  Mr. Tyler and I have consulted on

that, and that is our understanding.

THE COURT:  And before I explore it further with

Mr. Metcalfe, does that understanding arise from the statute

specific language, or does it arise from controlling Supreme

Court or D.C. Circuit law?

MR. TYLER:  Sovereign immunity principles, Your Honor.

THE COURT:  Just the general principle that the courts

haven't articulated yet?

MR. TYLER:  No.  The courts have addressed this issue.

My office addressed this issue in a case.  It was arising out of

1   Georgia, and we cited to that court circuit law on that

2   decision.  I don't know whether the D.C. Circuit has ruled on

3   this.  But the position or the principle that applies is

4   sovereign immunity.  Just as Title VII plaintiffs were not

5   entitled to a jury trial until Congress said they were, those

6   same principles apply to the Privacy Act.  Congress has not

7   provided for a jury trial in the Privacy Act.  And we

8   consistently take the position that therefore there is no jury

9   trial available under any statute, as such, unless Congress

10  specifically provides.

11          THE COURT:  In your experience, and I'll ask

12  Mr. Metcalfe this as well, are you aware of any Privacy Act case

13  that has gone to a jury trial?

14          MR. TYLER:  I am not aware of any such case.  I am

15  aware of the fact that we consistently inform all courts of the

16  government's position that there is no jury trial available and

17  there is precedent on this.  I cannot speak to the D.C. Circuit.

18          THE COURT:  Okay.  Thank you.  Mr. Metcalfe, your

19  turn.  Are you seeking a jury trial with respect to the Privacy

20  Act claim?

21          MR. METCALFE:  I concur with what he just said.  There

22  has never been a jury case.  From what I understand, the law is

23  not entirely clear, it's not entirely free of doubt.  And we put

24  that in the complaint so as to preserve --

25          THE COURT:  You had other claims in the complaint too.

1      You weren't limited to Privacy Act.  So your jury demand really

2      went beyond Privacy Act.

3              MR. METCALFE:  But the question is does it apply to

4      the claims as they exist today.  I understand that's the Court's

5      question.  And I can tell you that's in the complaint because I

6      don't believe the issue is free of doubt.

7              THE COURT:  Are you seeking a jury trial on your

8      Privacy Act claims?

9              MR. METCALFE:  We are seeking summary judgment,

10     Your Honor --

11             THE COURT:  No, no, no, no.  That's not what I'm

12     asking you.  If you don't get summary judgment, are you seeking

13     a jury trial?  If I denied summary judgment to everyone, is it

14     your view that I would then have a bench trial, or is it your

15     view that we would have a jury trial?

16             MR. METCALFE:  It's my view that the greatest

17     likelihood is that we would have a bench trial, and I'm cabining

18     that only because I'm not 100 percent certain that the law is

19     100 percent clear with respect to jury trials for Privacy Act

20     cases.

21             THE COURT:  But the first determinant of that is what

22     you are seeking.  Because they're not seeking a jury trial, and

23     if you're not seeking a jury trial on the Privacy Act claims,

24     then it doesn't matter if you're entitled to one, there wouldn't

25     be a jury trial.  So in the first instance it's up to you if

1   that's consistent with the law.

2       So if a jury trial is available under the law, is that what

3   you're seeking?

4       MR. METCALFE:  And if we go to trial, no, Your Honor,

5   I think I'm quite confident with a bench trial in this case.

6   And you're absolutely correct, the jury trial demand was there

7   when we had broader <u>Bivens</u> claims.

8       THE COURT:  Okay.  With that, I will retire and chew

9   on this.  And I'll also give thought immediately to whether I

10  need any further briefing.  But you'll hear from me if I think I

11  need further briefing.  Please don't start filing briefs.  Wait

12  and file them only if I request them.

13      MR. METCALFE:  I think that's perfectly fine with both

14  sides, Your Honor.  There's been a lot of briefing thus far.

15      THE COURT:  There has been.  Perfectly fine with your

16  side as well, Mr. Rosenberg?

17      MR. ROSENBERG:  We agree on that, Your Honor.

18      THE COURT:  All right.  Good.  Thank you all very

19  much.  I appreciate your patience here today and both the

20  arguments and the written submissions.  And I will do my best

21  with them to make sense out of the issues and to get something

22  out in the relatively near future, but it's not going to be

23  tomorrow.  Thank you.

24      (Proceedings adjourned at 12:53 p.m.)

25

```
*   *   *   *   *   *
```

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE